**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES M. FOSTER and | : | |
| MIKE J. SHARP, on Behalf of | : | |
| Themselves and All Others | : | Civil Action No.: |
| Similarly Situated, | : | |
| | : | CLASS ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | JURY TRIAL REQUESTED |
| | : | |
| THE CITY OF PITTSBURGH, | : | |
| BUREAU OF POLICE, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT - CLASS ACTION

Plaintiffs James M. Foster ("Foster") and Mike J. Sharp ("Sharp") (jointly "Plaintiffs"), on behalf of themselves and on behalf of all others similarly situated, by and through their undersigned counsel, hereby submit this Complaint against Defendant, the City of Pittsburgh, including its Bureau of Police ("Defendant" or "City" or "BOP").

## INTRODUCTION

1. According to information received from the City of Pittsburgh under the Right To Know Act, the Bureau of Police has hired 368 police officers since 2001. Only 14 of those police officers – 3.8% of total hires – are African-American. And between 2007 and 2011, the Bureau of Police has hired 188 police officers, only 5 of whom – 2.7% – are African-American. In the most recent class, which the City announced with much fanfare this week, only 2 out of 41 recruits are African-American, or less than 5%.

2.      In its 2010 Equal Employment Opportunity Program Short Form submitted to the United States Department of Justice for the time period January 1, 2009, through June 1, 2010, the City observed that "African American Males [and Females] are significantly under-represented in the job categor[y] of … Sworn Protective Services," which includes police officers.  The City's DOJ filing also acknowledges that 22% of African-American males and 10% of African-American females in Pittsburgh are qualified to serve as police officers. According to the 2010 census, African Americans comprise about 26% of the City's population.

3.      This class action suit challenges the longstanding pattern and practice of racial discrimination by the BOP against African-Americans in the screening and hiring of applicants for entry-level police officer positions ("hiring process").  As more fully set forth below, Defendant's hiring practices violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended ("Title VII"),  42 U.S.C. § 1981, as applied by 42 U.S.C. § 1983, and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*. ("PHRA").

4.      BOP's hiring process for entry-level police officers operates as a pattern or practice of systemic disparate treatment and disparately impacts African-American candidates. There is a significant statistical imbalance in the race of BOP's workforce when compared to the qualified labor market for African-American police officers.  African-American males represent 22% of Pittsburgh's labor market for sworn protective services but only 2.45% of police officers hired in the years 2001-2011.  African-American females represent 10% of Pittsburgh's qualified labor market for sworn protective services but only 1.36% of police officers hired in the years 2001-2011.

5.      Although the screening and hiring process appears neutral on its face, as applied it causes a substantial adverse impact on African Americans.  BOP accomplishes this systemic

disparate impact by using a multi-element hiring process that injects standard-less subjectivity, nepotism, and cronyism into the decision-making, thereby enabling BOP to exclude qualified African-American applicants in favor of non-African-American applicants.

6.      Throughout the process, BOP considers factors unrelated to a candidate's merit in order to qualify or disqualify candidates in a manner that results in discriminatory treatment and adverse impact on African Americans.   For example, BOP circulates at the oral examinations one or more lists of candidates who have family members or friends on the police force, and utilizes that list to favor those preferred candidates, to the detriment of African Americans and others who are not on the list.  "Who one knows" is not a legitimate basis to select police officer candidates.  In addition, BOP routinely photographs applicants and circulates those photographs during the final selection stage, known as the "Chief's Roundtable," which allows BOP to determine and consider race in making the final, unappealable selections for who will be admitted to the next class of candidates.

7.      BOP lacks any legitimate business justification for the hiring practices challenged in this Complaint, and there are other, less discriminatory alternatives available to BOP.

8.      Plaintiffs, on behalf of themselves and all other similarly situated persons, seek, among other remedies, injunctive relief to correct BOP's policies and practices that have deprived members of the plaintiff class of their right to equal employment opportunities.

## PARTIES

9.      Plaintiff James M. Foster ("Foster") is an African-American male who lives in Allegheny County, Pennsylvania.

10.     Plaintiff Mike J. Sharp ("Sharp") is an African-American male who lives in Allegheny County, Pennsylvania.

11.     Defendant is a municipality in the Commonwealth of Pennsylvania that operates through a number of agencies, offices, and departments, including the Bureau of Police. Defendant is an employer within the meaning of Title VII and the PHRA, and a state actor for purposes of 42 U.S.C. §§ 1981 and 1983.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this action arises under the laws of the United States.  Supplemental jurisdiction exists over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because Defendant is located in and conducts business in this judicial district and because the events giving rise to the claims set forth herein occurred in this judicial district.

## PROCEDURAL AND ADMINISTRATIVE REQUIREMENTS

14.     Plaintiffs Foster and Sharp have exhausted their administrative remedies as necessary to bring this lawsuit.

15.     Plaintiff Sharp has exhausted the procedural and administrative requirements for his claims as follows:

A.     On or about September 28, 2011, Plaintiff Sharp filed a timely written charge of discrimination (Charge No. 533-2012-00004) against Defendant with the Equal

Employment Opportunity Commission ("EEOC") alleging discrimination based on race and/or color;

      B.     Plaintiff Sharp cross-filed the aforementioned charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC");

      C.     On or about May 30, 2012, the EEOC issued a Notice of Right to Sue on the foregoing charge.  It has been less than ninety (90) days since Plaintiff Sharp received his Notice of Right to Sue.

16.     Plaintiff Foster  has exhausted the procedural and administrative requirements for his Title VII claims as follows:

      A.     On or about November 7, 2011, Plaintiff Foster filed a timely written charge of discrimination (Charge No. 533-2012-00186) against Defendant with the EEOC alleging discrimination based on race and/or color;

      B.     Plaintiff Foster cross-filed the aforementioned charge of discrimination with the PHRC;

      C.     On or about May 30, 2012, the EEOC issued a Notice of Right to Sue on the foregoing charge.  It has been less than ninety (90) days since Plaintiff Foster received his Notice of Right to Sue.

## FACTUAL BACKGROUND

17.     Defendant City of Pittsburgh maintains an active Bureau of Police which, among other things, is responsible for protecting individuals and property in the City of Pittsburgh.

18.     Defendant, through its BOP and Civil Service Commission, is responsible for establishing the terms, conditions, and other practices that bear upon the screening, selection, and employment of the City of Pittsburgh's Police Officer Recruits.

19.     Defendant has maintained, and continues to maintain, a multi-stage screening, testing and/or hiring process by which applicants for the position of Police Officer Recruit are selected.

### The City of Pittsburgh's
### Police Officer Recruit Hiring Process

20.     BOP's hiring process requires candidates to successfully complete 1) the Civil Service Examinations and 2) Processing for an Academy Class ("Processing") before the "Chief's Roundtable" makes final selections for Police Officer Recruits.

### *The Civil Service Examinations*

21.     Candidates must take and pass two Civil Service Examinations – one written and the other oral.

22.     The written examination is the Law Enforcement Aptitude Battery, which consists of a multiple choice cognitive ability test and two non-cognitive measures: The Work Styles Questionnaire and The Life Experience Survey.

23.     Candidates must score seventy percent (70%) or higher in order to pass the written test.  Those who pass are then scheduled for the oral examination.

24.     There is a statistical imbalance between minorities and whites with respect to the failure rate for the written exam.  For the 2008-09 examination, the racial-minority fail rate was 13.8% versus 2.8% for Caucasian applicants.

25.     During the oral examination, candidates are presented with several hypothetical factual scenarios and are asked a series of questions related to each situation, such as particular police rules and regulations that apply or may have been violated.  Different scenarios are used on different days so the candidates do not know the specific scenario(s) applicable to them prior to the examination.

26.     After the written and oral examinations, Police Officer Recruit candidates are given a final score.  Final scores are comprised of a combination of a candidate's passing score on the written and oral examinations and veteran's preference points, where applicable ("Final Scores").

27.     Only those candidates who take and receive a passing score on each examination appear on the Eligibility List.

28.     Candidates are placed on the Eligibility List in descending order based upon their Final Scores.

29.     Fair and objectively scored oral examinations are critical to the Hiring Process because the oral examination score and the written examination score are combined to develop the ranking of candidates on the Eligibility List.  Rather than keeping the scores separate (which the City did at one time) or equally weighting the scores, BOP historically assigned a weight of 60% to the oral examination and 40% to the written test.  Thus, if candidates are assigned a low passing score on the oral examination, they will rank lower on the Eligibility List such that they may never be considered for a position because selection at the Chief's Roundtable (assuming satisfactory completion of other subsequent steps discussed below) begins with the highest ranked candidates.

30.     As explained below, BOP routinely manipulates the oral examination.

31.     For many years, the oral examination panel has generally consisted of 3 BOP personnel: a detective, a patrolman and a supervisor.  Several different panels interview applicants simultaneously and each panel conducts multiple examinations over a two-week period.

32.     The Civil Service Commission for the City has contracted with the firm of EB Jacobs to develop and implement the oral examination process. EB Jacobs has prepared the scenarios, model answers and identified the standard associated with each of the scores.  EB Jacobs has been responsible for training the members of the panel as to what should – and should not – be considered in grading the oral examinations.

    A.  For instance, EB Jacobs has instructed the panel members that they should not participate in an oral examination if a member knows the candidate, which promotes objectivity and avoids bias.

    B.  EB Jacobs has instructed the panel members that they should not seek to learn the identity of the candidates they question prior to the examination.

    C.  EB Jacobs has instructed the panel members that they were not to evaluate whether the candidate would be a good police officer.  Rather, the focus was on whether the candidate identified the correct issues and rules that applied to the factual scenario(s) that was the subject of the examination.

    D.  EB Jacobs has instructed the panel members that the members should not discuss the scores given to a particular candidate with each other prior to submitting the scores.  Rather, each member should independently grade each candidate so panel members do not influence (or attempt to influence or intimidate) other panel members.

33.     BOP's oral examination panels have routinely disregarded and violated the rules and guidelines established by EB Jacobs.

    A.  Certain supervisors have obtained a copy of the list of candidates and looked for candidates who were related to or friends of police officers.  Certain supervisors

then sought to improperly influence or pressure panel members to score the preferred candidates more favorably.

B.  Certain panel members, often higher-ranking officers, knowingly and intentionally learned the identities of candidates in advance and created lists of the favored candidates that were shown to or discussed with other panel members to improperly influence them to score those candidates more favorably.

C.  Certain members knowingly and intentionally participated in panels when they knew the candidates in order to favor family members, friends, or friends of relatives of other police officers, ensuring that those candidates received favorable evaluations.

D.  Some members knowingly and intentionally obtained the application file for certain candidates to ensure that those candidates appeared before their panel in order to receive favorable evaluations.

E.  Certain members knowingly and intentionally lobbied and influenced members of the panel before whom particular candidates were to appear in order to seek favorable scores for the preferred candidates.

F.  Certain members knowingly and intentionally informed their preferred candidates of the factual scenarios and rules and regulations *in advance of the oral examination* such that the preferred candidates knew the answers.  In fact, there have been instances when nervous candidates accurately provided answers to scenarios that had not been provided yet (but were to be part of that examination). Panel members were provided with the scenarios and answers in advance of the examinations so that they could prepare, but certain members either photocopied

or brought the materials home in order to educate the preferred candidates.  The
particular scenarios provided to a candidate varied depending on the day of the
examination, so certain panel members planned in advance to make sure the
candidates received the correct answers for the specific day of the examination.

G. Certain members intentionally gave African-American candidates low scores
during the evaluations based on subjective views of how the candidates looked,
dressed, talked, or spoke or for other reasons unrelated to the merits of the
examination and standards established by EB Jacobs.  These members voiced
those reasons to other panel members.

34.     A recent example of how the oral-examination process is manipulated involved an
African-American candidate for the 2011 class who previously had been a Pittsburgh Police
Officer for approximately fifteen (15) years.  He left in the mid-2000's to pursue another career.
He had a strong police record, including deployments with federal law enforcement task forces,
an assignment given only to the best officers. After being away several years, he decided to
return to the BOP and re-applied.  He received a high score on the written test.  He knew two of
the three proctors for the oral examination, who told him he should not have to do the oral
examination. They did not ask him any questions.  When he received his Final Scores, however,
he was ranked very low on the Eligibility List, demonstrating that he was given an extremely low
score on the oral examination that panel members had told him he did not have to take.  On the
same day, however, the very same panel told a similarly-situated white candidate, also a former
Pittsburgh police officer who appeared immediately before the aforementioned former African-
American police officer, that he did not have to take the oral examination because he had
previously been a Pittsburgh Police Officer.  On information and belief, the white candidate

received high scores on the oral examination and thus was ranked much higher on the Eligibility List than the African-American candidate.  The African-American candidate, a decorated former Pittsburgh police officer, seeing that he was so low on the Eligibility List as to have no chance of selection, quit the process in disgust and is pursuing another career.

35.     The above-described irregularities occurring during the oral examinations have continued to the present.  In 2011, acceding to pressure from community groups to address the statistical disparity in hiring of racial minorities, the City agreed to include a civilian representative on the panels in addition to the three police members. It was hoped and believed that the inclusion of a fourth panel member, someone from the community without ties to law enforcement, would deter any overt discrimination and favoritism by the police officers in connection with the oral examinations.

36.     However, in December 2011, after only two days of using a civilian representative, City officials terminated participation of the civilian representative after one of the community representatives was found to have a prior arrest.  The City had not publicized or established standards for what qualified or disqualified a civilian from serving as the civilian representative. Significantly, that same standard was not applied to the police members of the oral boards as several of them had recent, prior arrests for felony offenses.  They were not, however, disqualified from participation.

37.     Rather than find an alternative civilian representative or establish standards for civilian representatives, City officials immediately halted the inclusion of a civilian representative on the remaining oral review panels.

38.    Nevertheless, even in the day and a half that civilians, many of them clergy from local religious institutions, sat on the panels, some of them observed the same favoritism and irregularities described above.

39.    On information and belief, the City fails to perform any quality control to determine whether the oral examination panels followed the instructions from EB Jacobs and otherwise were properly conducting the oral examinations.

40.    In short, the oral examination process is a vehicle to favor family members and friends of police officers and to disadvantage and otherwise discriminate against African-American candidates.  In that regard, a large majority of the police force is white, so the preference to family members and friends necessarily adversely impacts African-Americans.

41.    BOP has less discriminatory alternatives for how the oral examination is conducted, including but not limited to hiring an outside company to conduct the oral examinations, preserving the confidentiality of the candidate names before the oral examinations occur, and videotaping the oral examinations to ensure the examinations are conducted properly.

*Background Processing*

42.    Once the Eligibility List is created, candidates then undergo additional tests, including the State of Pennsylvania Municipal Police Officers' Education and Training Commission's ("MPOETC") physical fitness test, a reading test, and a background investigation.

43.    If a candidate fails the reading test, the candidate is disqualified from further consideration.

44.    During the physical-fitness test, which occurs in Schenley Park and is open to the public, candidates must perform a 300-meter sprint, sit-ups, a bench press, and a timed 1.5 mile

run.  If a candidate fails this test, the candidate is given one additional opportunity to pass the test.

45.      Rather than using an independent company to perform the MPOETC testing, which is an available alternative, BOP utilizes proctors who are either civilians or retired police officers.  It is common for proctors to be related to individuals who are still on the police force or who are retired from the police force.

46.      Certain proctors exercise discretion in administering the fitness test that favors non-African-American candidates:

A.      They pass certain preferred candidates when they otherwise would have failed, such as by crediting sit-ups that otherwise did not meet the applicable standard.

B.      They run along with and encourage preferred candidates in the sprint or the 1.5 mile run but do not provide that assistance to all candidates.

C.      They do not use calibrated stop watches for the sprint and the 1.5 mile run, and, on information and belief, did not use accurate starting and stopping times.

47.      Further, because the fitness test is open to the public, supervisors and other police officers in uniform often attend the tests for preferred candidates and make it clear to the proctors that they support those candidates, thereby influencing the proctors.

48.      For the 2011 class of candidates, the failure rate for the physical fitness and reading tests was 57% for minorities versus 32% for Caucasians.

49.      Other alternatives exist for conducting the fitness test that are readily available to BOP, including but not limited to treating all candidates the same when conducting the test and preventing contact by police officers with the proctors.

*Background Investigation*

13

50. Assuming a candidate passes the reading and fitness tests, BOP conducts a background investigation that requires candidates to undergo finger printing, criminal-background check, polygraph test and a drug test. BOP also photographs each candidate.

51. Under the established procedure for the polygraph test, which is administered by City employees, questions are based on the answers that a candidate provides in the application submitted to the BOP.

52. On information and belief, some polygraph examiners ask questions of certain candidates that are not in the application. In addition, it is believed and therefore averred that BOP personnel responsible for supervising the background investigation consult with the examiner prior to administration of the polygraph for particular candidates in an effort to have the examiner probe certain issues unrelated to the application, which is a violation of procedure and unnecessary to the polygraph.

53. BOP has nondiscriminatory, available alternatives concerning administration of the polygraph, including but not limited to prohibiting access to the examiner prior to the polygraph test and videotaping the polygraph test.

54. The background investigation also addresses a candidate's employment, education, military service, criminal record, credit, and behavioral history.

55. BOP uses its own officers to perform the background investigations and exercises discretion as to how detailed to make the investigation. On information and belief, BOP is more critical of backgrounds for African-American candidates than for non-African-American candidates.

56. For example, to pass the background investigation, a candidate may not have a misdemeanor or felony conviction. In 2011, BOP investigated an African-American candidate

and claimed that the candidate had violated a domestic-violence ordinance.  However, the candidate in fact had a 10-year old conviction for disorderly conduct, which is a summary offense, and thus should not have been disqualified under the ordinance.  BOP disqualified the candidate anyway.

57.    BOP has nondiscriminatory, available alternatives concerning the background investigation, including but not limited to retaining an outside company to conduct the background investigation and performing the same background investigation for all candidates.

58.     Once again, as with the preceding steps in the recruit selection process, the background checks and polygraph tests are applied to disproportionately disqualify African-American applicants.

59.    For the 2011 Police Officer Recruit Class, BOP disqualified 5 out of the 9 minorities who reached that point in the evaluation, for a 55.6% disqualification rate.  In contrast, only 7 out 64 white candidates (3 had withdrawn) were disqualified, for an 11% disqualification rate.

### *Chief's Roundtable*

*60.*    Candidates who successfully pass the physical-fitness and reading tests and all components of the background investigation, including the polygraph and drug test, are deemed "certified" for employment as Police Officer Recruits and are placed on the Certification for Appointment List ("Certified List") and proceed to the Chief's Roundtable, where the final decision is made whether to accept a candidate as a Police Officer Recruit.

61.    The Certified List is provided to Defendant's Chief of Police.

62.     It is believed and therefore averred that approximately 10 to 12 senior officers and 2 to 3 civil service representatives decide by vote which individuals from the Certified List are to be made a conditional offer of employment for a position as Police Officer Recruit.

63.     This selection process is generally referred to  as the "Chief's Roundtable."

64.     Conditional offers of employment are extended to the candidates selected at the Chief's Roundtable.  A final offer of employment is contingent upon successful completion of a psychological-suitability evaluation and medical examination.

65.     It is believed and therefore averred that members of the Chief's Roundtable are given written materials concerning the candidates on the Certified List.  These materials include, *inter alia*, the candidate's Civil Service Examination scores, physical fitness testing results and background-investigation results.

66.     It is believed and therefore averred that photographs of candidates on the Certified List are included in the file materials that the individuals on the Chief's Roundtable receive, enabling them to determine the race of each candidate.  It is wholly unnecessary for the members of the Chief's Roundtable to receive a photograph of the candidates on whom they are voting.

67.     It is believed and therefore averred that members of the Chief's Roundtable receive the Certified List prior to the Chief's Roundtable and therefore know who will be presented to the Roundtable and the order in which the candidates will be considered.  Members can also determine who is related to a police officer or preferred by a police officer, facilitating their ability to vote based on nepotism and cronyism.

68.     The Chief's Roundtable votes pursuant to the "Rule of Three" methodology.

69.     Under the "Rule of Three" methodology, the first three candidates on the Certified List are reviewed and one is chosen by a vote of the Chief's Roundtable to be made a

conditional offer of employment as a Police Officer Recruit.  The two remaining candidates from the first group of three go into consideration with the next individual on the Certified List.  One of these candidates is chosen by a vote of the Chief's Roundtable to be made a conditional offer of employment as a Police Officer Recruit.  The remaining two candidates go into consideration with the next person on the list.  One of these candidates is chosen by a vote of the Chief's Roundtable to be made a conditional offer of employment as a Police Officer Recruit.

70.     Under the "Rule of Three," if a candidate is rejected after three rounds, the candidate is removed from consideration and will not be made a conditional offer of employment as a Police Officer Recruit.

71.     It is believed and therefore averred that certain members of the Chief's Roundtable do not apply any standards, guidelines or objective criteria on which to base their votes.

72.     It is believed and therefore averred that members of the Chief's Roundtable are not required to state their reasons for selecting a particular candidate.

73.     It is believed and therefore averred that certain members of the Chief's Roundtable routinely vote based on nepotism and cronyism rather than on the merit of a candidate, making decisions that are entirely subjective and discretionary.

74.     When a candidate has been passed over three times during a Roundtable session, the candidate is then removed from the Eligibility List and must re-apply and go through the entire selection process again, even though the candidate previously passed all aspects of the testing.

75.     For the 2011 class, the Chief's Roundtable passed over 3 of the 4 minority candidates presented on the Certified List, for a 75% non-select rate.  They were ranked 3, 11,

and 42 on the Certified List.  In contrast, the Chief's Roundtable passed over only 7 of the 57 white candidates, for a 12.2% non-select rate. Only 1 of the 49 Police Officer Recruits selected by the Chief's Roundtable was African American; that recruit was ranked seventh on the Certified List.

76.    Plaintiff Foster was ranked third and Plaintiff Sharp was ranked eleventh. Candidate 42 was an African-American female who was a combat veteran.  49 candidates were selected.  Consequently, all 3 African-American candidates were passed over for lower ranked white candidates.

77.    BOP had nondiscriminatory alternatives available concerning the Chief's Roundtable, including but not limited to not providing the Chief's Roundtable with photographs of the candidates, establishing standards, and requiring members of the Chief's Roundtable to articulate the reasons for not selecting a candidate.

78.    African-American candidates are disproportionately impacted at every stage of the hiring process, including during the final selection phase, the Chief's Roundtable. The result of these discriminatory practices is that since 2001 less than 4% of police officers hired by Defendant are African-American.  Since 2007, the disparate treatment and impact  are even more stark, with only 2.7% of new recruits being African-American.

## Statistics for 2009 and 2011 Recruit Classes

79.    The 2008 Civil Service examination produced an Eligibility List from which Defendant selected the 2009 and 2011 recruit classes.  Prior to this year, the Eligibility List produced by the Civil Service examinations was good for three years.  That has now been changed so the List is only good for 18 months.

80.     In 2008, 1,357 candidates applied to be a BOP officer, of whom 280 were racial minorities, or about 20.6%.

81.     For the written examination, 135 minority candidates failed to appear, so 145 racial minorities took the examination (19.7% of total applicants sitting for the written test).  Of those, 7 were disqualified for lack of a college transcript, leaving 138 minorities among 712 candidates, which is 19.4%.  Thereafter, 19 of the 138 minorities failed the written test, or 13.8%.  16 out of 574 Caucasian applicants failed the test, which is 2.8%.

82.     For the oral examination, 119 racial minorities remained eligible after the written examination, but 14 did not appear, leaving 105 eligible minority candidates out of 592 total candidates, which is 17.7%. of eligible candidates.  The oral exam "failure" rates were approximately the same for racial minorities and Caucasians, i.e., just under 5%.

83.     Plaintiffs are without information or knowledge sufficient to form a belief as to where the minority candidates were ranked on the Eligibility List, or how the oral-examination scoring affected their standing.

84.     The 2009 class ultimately had 45 Police Officer Recruits.  The Eligibility List included 31 racial minorities out of 202 total applicants, or 15.3%.  The failure rate on the physical fitness and reading tests for minority applicants was 42%, compared to a 15.3% failure rate for white candidates.  At the background-investigation stage, 50% of the 10 remaining African-American candidates were disqualified, while 36 of 101, or 35.6% of Caucasian candidates were disqualified.

85.     The Certified List sent to the Chief's Roundtable had 70 candidates, of whom only 5 were minorities, or about 7%.

86.     Of the 5 minority candidates on the Certified List, 2 were passed over (40%). Another minority candidate was not considered at the Chief's Roundtable.

87.     Thus, 2 minority candidates were selected out of 56 total recruits, or 3.6%. They were an African-American male and an Asian male.

88.     Of the 66 white candidates, only 11 were passed over or dropped out (16%).

89.     The final class had 44 Police Officer Recruits and only 2 were minorities (4.5%), only 1 of whom was African American, or less than 2.3% of the class.

90.     The class was thus 95.5% Caucasian.

91.     For 2011, the Eligibility List contained 292 applicants, of whom 51 were minorities, or about 17.5%. Only 21 minorities showed up for the fitness and reading tests, where 12 failed (57%). The failure rate for Caucasian applicants was only 31.6%. After the testing, therefore, 9 of the 76 remaining applicants were African-American, or 11.8%. At the background-investigation stage, the City disqualified 5 of the 9 minority candidates, or 56%. The disqualification rate for Caucasian applicants was only 11%. Consequently, only 4 African-American candidates were placed on the Certified List sent to the Chief's Roundtable.

92.     At the Roundtable, 3 out of 4 minority candidates, including both plaintiffs, were not selected, for a 75% non-selection rate. Of 57 Caucasian applicants on the Certified List, only 7 were not selected, for a 12.2% non-selection rate. Consequently, of the 49 candidates offered conditional employment, only 1 was African American, or just 2%. The final class included 36 recruits, only 1 of whom was African-American, or 2.8% of the class. The 3 African-Americans not selected by the Chief's Roundtable were ranked 3, 11 and 42.

93.     The disparate treatment of African-American applicants evidenced by the statistics from the past two Recruit Classes mirrors the numbers for other classes since 2001,

confirming that BOP has engaged in continuing violations of the employment laws.  The

following chart shows the demographics of those classes:

| Hiring Statistics for Classes in 2001-2011 | | | | | | |
|---|---|---|---|---|---|---|
| Date | Total Recruits | Male | Female | Black Male | Black Female | Asian Male |
| May 2001-Oct. 2001 | 32 | 29 | 3 | 0 | 1 | 0 |
| Dec. 2001-May 2002 | 39 | 35 | 4 | 2 | 2 | 0 |
| Jan. 2005-July 2005 | 48 | 42 | 6 | 2 | 0 | 0 |
| Sept. 2005-Apr. 2006 | 61 | 55 | 6 | 1 | 1 | 0 |
| Feb. 2007-Aug. 2007 | 27 | 20 | 7 | 1 | 0 | 0 |
| Jul. 2007 | 40 | 35 | 5 | 1 | 0 | 0 |
| Oct. 2007 | 27 | 22 | 5 | 0 | 1 | 0 |
| Sept. 2008 | 13 | 10 | 3 | 0 | 0 | 0 |
| Sept. 2009 | 45 | 40 | 5 | 1 | 0 | 1 |
| June 2011 | 36 | 30 | 6 | 1 | 0 | 0 |
| **Total** | **368** | **318** | **50** | **9** | **5** | **1** |
| **%** | | **86.41%** | **13.59%** | **2.45%** | **1.36%** | **0.27%** |

94.    According to documents filed by the City of Pittsburgh with the EEOC, the

qualified labor market for African-American males seeking law-enforcement jobs is 22%, and

10% for African-American females.  Defendants' above-cited hiring statistics are substantially

below those figures.


**Plaintiff James M. Foster**

95.    Plaintiff James Foster is a college graduate who is studying for a masters degree.

He works in the behavioral-health field.

96.     Plaintiff Foster first applied for the position of Police Officer Recruit with Defendant in 2008.

97.     Plaintiff Foster completed the written and oral examinations and was placed on the Eligibility List.

98.     Based on his Final Score, Foster received a rank of 141 out of approximately 600 candidates.

99.     Plaintiff Foster proceeded to the next phase where he successfully completed the physical fitness and reading testing, background check, polygraph, and drug test.

100.    Defendant took Plaintiff Foster's photograph at the time of his polygraph test in 2008 or 2009.

101.    It is believed and therefore averred that Plaintiff Foster was placed on the Certified List for the 2009 Police Officer Recruit class.

102.    Although he was placed on the Certified List, Foster was not selected for a position in the 2009 Police Officer Recruit class.

103.    Plaintiff Foster was informed by an employee in the Civil Service Office that the last candidate receiving a conditional offer of employment was ranked approximately three places above him on the Certified List.

104.    BOP selected only one African American for the 2009 Police Officer Recruit Class.

105.    It is believed and therefore averred that Plaintiff Foster was placed on the Eligibility List for the next recruit class, at or near the top of the list.

106.    In February of 2011, Defendant notified Plaintiff Foster that another Police Officer Recruit class was to be created and invited Foster to re-apply.

22

107.    Plaintiff Foster re-submitted his application and again successfully completed the various phases of the Hiring Process, including the physical-fitness and reading tests, background check, polygraph, and drug test.

108.    Defendant again took Plaintiff Foster's photograph at the time he took the polygraph test.

109.    On or about May 27, 2011, Plaintiff Foster was placed on the Certified List.

110.    It is believed and therefore averred that Foster was ranked third on the Certified List.

111.    It is believed and therefore averred that Plaintiff Foster's application materials were provided to the Chief's Roundtable for consideration.

112.    It is believed and therefore averred that included in the materials provided to the Chief's Roundtable was at least one photograph, or document containing a photograph, of Plaintiff Foster.

113.    By letter dated June 2, 2011, Plaintiff Foster was informed that in accordance with "Section 14 of the General Civil Service Act," he was "no longer eligible for appointment as a Police Officer Recruit because three or more persons below [him] on the certified list were selected."

114.    The June 2, 2011 letter from Defendant to Plaintiff Foster stated Plaintiff Foster had no right of appeal.

115.    In June of 2011, Defendant selected 36 individuals from the Certified List for its Police Officer Recruit class.  Of those 36 individuals, only 1 recruit was African-American.

116.    Accordingly, at the Chief's Roundtable, at least 32 white applicants ranked lower than Plaintiff Foster on the Certified List were selected for a position in the 2011 Police Officer Recruit class.

117.    Plaintiff Foster again applied for employment with Defendant as a Police Officer Recruit in the winter of 2011.

118.    Plaintiff Foster is currently in the process of going through the Hiring Process set forth above.

119.    In response to Plaintiff Foster's EEOC Charge of Discrimination, BOP asserted that Mr. Foster's "background check showed that he had a bad driving record which included at least nine moving violations and three warrants for failing to respond to citations and also that he'd been discharged from one private employment for violating protocol and from another private employer for failing to appear for training."  Those assertions are pretextual and false and thus do not justify Foster's rejection.

120.    There was no objective, merit-based reason why the Chief's Roundtable failed to select Plaintiff Foster.


**Plaintiff Mike J. Sharp**


121.     Plaintiff Sharp graduated from the Police Training Academy at Indiana University of Pennsylvania in 2007.

122.    Since that time, Plaintiff Sharp has been employed as a police officer in several suburban Pittsburgh police departments, and is currently employed by two different police departments.

123.    Plaintiff Sharp applied for the position of Police Officer Recruit with Defendant in 2009.

124.    Plaintiff Sharp completed the written and oral examinations and was placed on the Eligibility List.

125.    Plaintiff Sharp successfully completed the physical fitness and reading testing in 2009.

126.    Plaintiff Sharp was not selected for a position in the 2009 Police Officer Recruit class.

127.    In February of 2011, Defendant notified Plaintiff Sharp that another Police Officer Recruit class was to be created and invited Sharp to re-apply.

128.    Plaintiff Sharp re-submitted his application and once more successfully completed the physical fitness and reading tests.

129.    Plaintiff Sharp proceeded to the Processing stage where he was subjected to a polygraph test and drug testing.  An extensive background check was also conducted.

130.    During Processing, Defendant took Plaintiff Sharp's photograph.

131.    On or about May 27, 2011, Plaintiff Sharp was placed on the Certified List. Thus, BOP did not find anything disqualifying in his background and he did not test positive for drug use.

132.    It is believed and therefore averred that Plaintiff Sharp was ranked eleventh on the Certified List.

133.    It is believed and therefore averred that Plaintiff Sharp's application materials were provided to the Chief's Roundtable for consideration.

134.    It is believed and therefore averred that included in the materials provided to the Chief's Roundtable was at least one photograph, or document containing a photograph, of Plaintiff Sharp.

135.    By letter dated June 2, 2011, Plaintiff Sharp was informed that in accordance with "Section 14 of the General Civil Service Act," he was "no longer eligible for appointment as a Police Officer Recruit because three or more persons below [him] on the certified list were selected."

136.    The June 2, 2011 letter from Defendant to Plaintiff Sharp stated Plaintiff Sharp had no right of appeal.

137.    In June of 2011, Defendant selected 36 individuals from the Certified List for its police recruit class.  Of those 36 individuals, only 1 recruit was African-American, and upon information and belief he had been ranked seventh.

138.    Accordingly, at the Chief's Roundtable, at least 25 white applicants ranked lower than Plaintiff Sharp on the Certification List were selected for a position in the 2011 Police Officer Recruit class.

139.    There was no objective, merit-based reason why the Chief's Roundtable failed to select Plaintiff Sharp.

140.    In response to Plaintiff Sharp's EEOC Charge of Discrimination, BOP asserted that Mr. Sharp was not hired "because he admitted that between 1996 and 2004 he smoked marijuana between 800 and 1000 times and assisted in arranging drug deals."  Those assertions are pretextual and false.  If in fact they had been true, he never would have passed the background checks and been certified for consideration by the Chief's Roundtable.

141.    Moreover, Mr. Sharp has been a police officer since 2007 and is drug-tested regularly as part of his position.  He has never failed a drug test.

**Racial Discrimination in the City of Pittsburgh's Police Hiring Process**

142.    Defendant has engaged in and continues to engage in employment policies and practices that discriminate against African-American applicants for Police Officer Recruit positions on the basis of their race and/or color.

143.    Defendant has engaged in and continues to engage in employment policies and practices that have a significant disparate impact on African-American applicants for Police Officer Recruit positions.

144.    It is believed and therefore averred that the City of Pittsburgh's population is approximately 26% African-American based on the last census.

145.    It is believed and therefore averred that of the approximately 368 Police Officer Recruits hired by Defendant between 2001 and 2012, only 14 were African-American, approximately 3.8%.

146.    It is believed and therefore averred that of the approximately 188 Police Officer Recruit hired by Defendant between 2007 and 2012, only 5 were African-American, approximately 2.7%.

147.     It is believed and therefore averred that the percentage of minority applicants who began Defendant's Police Officer Recruit application process in 2008 was 19.7%.  These were the Police Officer Recruit applicants that formed the pool of applicants for the 2009 and 2011 Police Officer Recruit classes.

148.     It is believed and therefore averred that the percentage of African-Americans hired as Police Officer Recruits in 2009 and 2011 was 3.3%.

149.     When compared to the relevant labor market, African-Americans are significantly under-represented in the job category of "Protective Services: Sworn," *i.e.* police officers.

150.     It is believed and therefore averred that the qualified labor pool in Pittsburgh for Sworn Protective Services is 22% for African-American males and 10% for African-American females.

151.     Beyond the extreme statistical imbalance generated by the Defendant's overall hiring process, several specific practices employed by the Defendants show discrimination on the basis of race and/or color, including but not limited to:

A.   A higher failure rate on the written examination by minority applicants than white applicants, approximately 13.8% versus 2.8%, respectively, for the 2008 testing, which produced the Eligibility Lists for the 2009 and 2011 Recruit Classes;

B.   The circulation of names of candidates who have relatives on the police force to the individuals administering the oral examination;

C.   Distribution of the oral examination scenarios to certain white candidates prior to testing;

D.   Subjectivity in the scoring of the oral examination which has been more heavily weighted than the written examination and presently is equally weighted;

E.   The provision of assistance and encouragement by proctors of the physical-fitness test to some Police Officer Recruit applicants during the testing;

F.   The use of background and polygraph examinations to screen out minority applicants at a higher rate than white applicants, approximately 56% versus 11%, respectively, for the 2011 Police Officer Recruit class;

G.   The unfettered discretion given to the Chief's Roundtable in the final stage of the selection process that results in the rejection of a disproportionate number of minority applicants compared to white applicants, approximately 75% versus 12.2%, respectively, for the 2011 Police Officer Recruit class.

152.   The elements of the Defendant's hiring process are not capable of separation for analysis and have a cumulative discriminatory effect such that the entire hiring process should be analyzed as one employment practice.

153.   Alternatively, if the elements are capable of separation, numerous elements have a significant disparate impact on African Americans as explained above.

154.   BOP does not have any legitimate business reasons for the discriminatory elements of its hiring process.


**<u>Class Allegations</u>**

155.   Plaintiffs Foster and Sharp have applied to Defendant's Bureau of Police for appointment to the position of  Police Officer Recruit.  Plaintiffs are qualified for appointment to the position of Police Officer Recruit, but have been denied employment because of their race and/or color.

156.   Plaintiffs seek to represent a class of similarly situated individuals pursuant to Federal Rule of Civil Procedure 23.  The proposed class consists of African-American candidates who have sought employment with Defendant's Bureau of Police at any time since 2001 for the

position of Police Officer Recruit and who have been adversely affected by Defendant's discriminatory hiring practices complained of herein ("Class Period").

157.    Plaintiffs also seek to represent a class of future African-American candidates who will be adversely impacted unless BOP's hiring process is changed so that it does not adversely impact African-Americans.

158.    The proposed class is comprised of hundreds of former, current, and future African-American applicants, who are otherwise qualified for employment by Defendant, but who have been denied, or may be denied, employment as a Police Officer Recruit on the basis of their race and/or color.  The members of the proposed class are so numerous that joinder of all members is impracticable.  The precise number of class members, and the identity of each, can be readily determined from Defendant's records.

159.    There are questions of law and fact common to all class members as to whether Defendant's Hiring Process violates Title VII and the Pennsylvania Human Relations Act, and such common questions will predominate over any questions that affect or might affect only individual members of the class in the disposition of this action.  Such common questions of law and fact include but are not limited to the following:

    A.  Whether Defendant violated Title VII by the acts alleged herein;

    B.  Whether Defendant violated the PHRA by the acts alleged herein;

    C.  Whether Defendant has failed or refused to hire African-American applicants for the position of Police Officer Recruit on the same basis as white applicants;

    D.  Whether Defendant's Hiring Process disparately impacts African Americans;

E.   Whether the stark statistical imbalance of hiring white applicants over African American applicants for Police Offer Recruits shows systemic disparate treatment of African American applicants for Police Officer Recruit positions with the BOP;

F.   Whether there is a significant disparity in the failure rate on the written examination between African-American candidates and white candidates;

G.   Whether Defendant circulated names of preferred candidates prior to or during the oral examinations;

H.   Whether members of the oral examination panels considered subjective factors in scoring applicants;

I.   Whether Defendant engaged in preferential treatment to relatives and friends of current or retired police officers at various points in the Hiring Process;

J.   Whether the Chief's Roundtable lacked objective criteria in selecting candidates; and

K.   Whether injunctive relief is suitable to abate the conduct at issue in this Complaint.

160.   Plaintiffs' claims, and the legal theories underlying those claims, are typical of the claims of the class as all are subject to the same hiring processand all class members were disparately treated and impacted as a result of their race and/or color, giving rise to the employment claims herein.

161.    Plaintiffs and their counsel will fairly and adequately represent the class members.  In particular: (a) counsel will vigorously and adequately represent the interests of the class and have significant experience in civil rights and class action law suits; (b) the class representatives have no conflict of interest in maintaining a class action; and (c) the class

representatives do not have to finance this lawsuit as counsel are representing them and the class on a *pro bono* basis.

162.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23 because Defendant has acted, or has refused to act, on grounds generally applicable to the class.

163.    Injunctive relief is appropriate with respect to Plaintiffs and the class as a whole because such relief is necessary to end Defendant's discriminatory hiring policies and practices and/or to remedy the discriminatory effects of said policies and practices.

## CLAIMS

### COUNT I – Title VII (Disparate Impact)
### Plaintiffs Foster and Sharp on Behalf of Themselves and
### All Others Similarly Situated v. Defendant City of Pittsburgh, Bureau of Police

164.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth below.

165.    BOP's hiring process, as identified and set forth at length above, operates as a pattern or practice of systemic disparate treatment and disparately impacts African-American candidates by causing a significant statistical imbalance in hiring.

166.    The elements of the City's hiring process are not capable of separation for analysis and therefore the entire hiring process should be analyzed as one employment practice.

167.    Pleading in the alternative, if the hiring process is not considered to be one employment practice incapable of separation for statistical analysis, then the individual elements identified above each cause a significant statistical imbalance and substantial adverse impact between the hiring of white applicants, on the one hand, and the hiring of African Americans, on the other hand.

168.    BOP's hiring process has adversely affected both Plaintiffs and the class they seek to represent.

169.    BOP's discriminatory practices and procedures are not job-related for the position of Police Officer Recruit.

170.    BOP's hiring practices and procedures deprive, or tend to deprive, African-Americans of employment opportunities with the Bureau of Police because of their race and/or color in violation of Title VII.  BOP has implemented these practices and procedures, in ways that include, but are not limited to, the following:

A.    By failing or refusing to hire African-American applicants for the position of Police Officer Recruit on the same basis as white applicants;

B.    By using employment practices that have an adverse impact on African-American applicants; and

C.    By failing or refusing to take appropriate action to correct the present effects of its discriminatory policies and practices.

171.    BOP's hiring process constitutes a pattern or practice of resistance to the full enjoyment by African-Americans of their right to equal employment opportunities without discrimination based on race and/or color in violation of Title VII.   Defendant has engaged in a continuing violation of Title VII since at least 2001.

172.    BOP does not have a legitimate, nondiscriminatory reason for the challenged employment practices and had available equally valid and less discriminatory alternatives to its discriminatory conduct.

173.     As a direct and proximate cause of BOP's unlawful conduct, Plaintiffs and the proposed class members have suffered and continue to suffer irreparable harm.  This harm will continue indefinitely into the future absent the requested relief.

WHEREFORE, Plaintiffs James M. Foster and Mike J. Sharp, on behalf of themselves and all others similarly situated, respectfully request judgment against BOP as set forth in the Requested Relief below.

## COUNT II – Title VII (Systemic Disparate Treatment)
## Plaintiffs Foster and Sharp on Behalf of Themselves and
## All Others Similarly Situated v. Defendant City of Pittsburgh, Bureau of Police

174.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

175.     It is believed and therefore averred that the BOP representatives employed and/or engaged by BOP to participate in the hiring of Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the MPOETC fitness rest, the polygraph test, the background investigation, and the Chief's Roundtable, intentionally discriminated against Plaintiffs specifically and African-Americans generally as a group because of their race and/or color.

176.     It is believed and therefore averred that accepted statistical methodologies show gross statistical disparities that cannot be explained as a product of chance.

177.     It is believed and therefore averred that discrimination is BOP's standard operating procedure.

178.     As more fully set forth above, Plaintiffs Foster and Sharp were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by BOP for pretextual reasons.

179.    It is believed and therefore averred that other class members were qualified for appointment to the position of Police Officer Recruit; however, BOP denied employment to them because of their race and/or color.

180.    At all times relevant hereto, individuals employed and/or engaged by BOP to participate in the hiring process for BOP's Police Officer Recruits were acting as agents for BOP.

181.    BOP's employment policies, practices, and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of Title VII.

182.    It is believed and therefore averred that BOP acted willfully, intentionally and with callous disregard and reckless indifference to Plaintiffs' and class members' rights under Title VII.

183.    As a direct and proximate cause of BOP's unlawful conduct, Plaintiffs Mike J. Sharp and James M. Foster and class members have suffered damages including, without limitation, lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs James M. Foster and Mike J. Sharp, on behalf of themselves and all others similarly situated, respectfully request judgment against BOP as set forth in the Requested Relief below.

## COUNT III – Title VII (Disparate Treatment)
### Plaintiffs Foster and Sharp vs. Defendant City of Pittsburgh, Bureau of Police

184.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth at length herein.

185.     It is believed and therefore averred that the BOP representatives employed and/or engaged by BOP to participate in the hiring of Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the MPOETC fitness test, the polygraph test, the background investigation, and the Chief's Roundtable, intentionally discriminated against Plaintiffs because of their race and/or color.

186.     It is believed and therefore averred that BOP representatives on the Chief's Roundtable knew Plaintiffs were African-American due to the photographs contained in the application materials provided to the members of the Chief's Roundtable.

187.     As more fully set forth above, Plaintiffs Foster and Sharp were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by BOP.

188.     In each instance, BOP selected many white applicants ranked lower than Plaintiffs on the Certified List for positions in the 2011 police recruit class.

189.     It is believed and therefore averred that BOP selected many white applicants ranked lower than class members on the Certified List for positions in prior years.

190.     At all times relevant hereto, individuals employed and/or engaged by BOP to participate in the hiring process for BOP's Police Officer Recruits were acting as agents for BOP.

191.     BOP does not have a legitimate, nondiscriminatory reason for its failure to hire Plaintiffs as Police Officer Recruits and the reasons given by BOP are pretext for discrimination. Plaintiffs Foster and Sharp allege they were not selected and/or hired as Police Officer Recruits because of their race and/or color.

192.    BOP's employment practices and procedures violate Title VII of the Civil Rights Act of 1964, as Plaintiffs were disparately treated on the basis of their race and/or color.

193.    BOP's employment polices, practices, and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of Title VII.

194.    It is believed and therefore averred that BOP acted willfully, intentionally and with callous disregard and reckless indifference to Plaintiffs' rights under Title VII.

195.    As a direct and proximate cause of BOP's unlawful conduct, Plaintiffs Mike J. Sharp and James M. Foster have suffered lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs James M. Foster and Mike J. Sharp respectfully request judgment against BOP and request an award of the Requested Relief, below.

## COUNT IV – 42 U.S.C. §§ 1981 and 1983
### Plaintiffs Foster and Sharp v. Defendant City of Pittsburgh, Bureau of Police

196.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth at length herein.

197.    At all times relevant hereto, BOP was acting under the color of state law.

198.    As more fully set forth above, Plaintiffs Foster and Sharp were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by BOP.

199.    It is believed and therefore averred that the individuals employed and/or engaged by BOP to participate in the hiring process for Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the MPOETC fitness test, the

polygraph test, the background investigation and the Chief's Roundtable, intentionally discriminated against Plaintiffs because of their race and/or color.

200.    At all times relevant hereto, individuals employed and/or engaged by BOP to participate in BOP's hiring process for BOP's Police Officer Recruits were acting as agents for BOP.

201.    Defendant's hiring process has deprived Plaintiffs of their right to enter into employment contracts guaranteed by 42 U.S.C. § 1981 in that said practices unlawfully and intentionally discriminate against Plaintiffs on the basis of their race and/or color in seeking and obtaining employment contracts with Defendant.

202.    As a direct and proximate cause of BOP's unlawful conduct, Plaintiffs Mike J. Sharp and James M. Foster have suffered damages including, but not limited to, lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs James M. Foster and Mike J. Sharp respectfully request judgment against BOP and seek the relief set forth in the Requested Relief, below.

### COUNT V – Pennsylvania Human Relations Act (Disparate Impact)
**Plaintiffs Foster and Sharp on Behalf of Themselves and
All Others Similarly Situated v. Defendant City of Pittsburgh, Bureau of Police**

203.    Plaintiffs incorporate the allegations in each of the preceding paragraphs as if set forth herein.

204.    BOP's practices, policies, and procedures of discrimination, as identified and set forth at length herein, are not separable for purposes of statistical analysis.

205.     BOP's Hiring Process has adversely affected Plaintiffs and the class they seek to represent and is neither jobrelated for the position in question nor consistent with business necessity.

206.     BOP has pursued and continues to pursue policies and procedures that constitute a pattern or practice that discriminates against African-American applicants and that deprive, or tend to deprive, African-Americans of their right to equal employment opportunities with the Bureau of Police because of their race and/or color in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq*.

207.     BOP has implemented these policies and practices in ways that include, but are not limited to, the following:

A.     By failing or refusing to hire African-American applicants for the position of Police Officer Recruit on the same basis as white applicants;

B.     By using employment practices, policies, and procedures that have an adverse impact on African-American applicants; and

C.     By failing or refusing to take appropriate action to correct the present effects of its discriminatory practices, policies and procedures.

208.     BOP's policies and practices constitute a pattern or practice of resistance to the full enjoyment by African-Americans of their right to equal employment opportunities without discrimination based on race and/or color in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.

209.  As a direct and proximate cause of BOP's unlawful conduct, Plaintiffs and the proposed class members have suffered and continue to suffer irreparable harm.  This harm will continue absent the requested relief.

WHEREFORE, Plaintiffs James M. Foster and Mike J. Sharp, on behalf of themselves and all others similarly situated, respectfully request judgment against BOP and request the Requested Relief set forth below.

**COUNT VI – Pennsylvania Human Relations Act (Systemic Disparate Treatment)**
**Plaintiffs Foster and Sharp on Behalf of Themselves and**
**All Others Similarly Situated v. Defendant City of Pittsburgh, Bureau of Police**

210.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein

211.    It is believed and therefore averred that the BOP representatives employed and/or engaged by BOP to participate in the hiring of Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the MPOETC fitness test, the polygraph test, the background investigation and the Chief's Roundtable, intentionally discriminated against Plaintiffs specifically and African Americans generally as a group because of their race and/or color.

212.    It is believed and therefore averred that accepted statistical methodologies show gross statistical disparities that cannot be explained as a product of chance.

213.    It is believed and therefore averred that discrimination is BOP's standard operating procedure.

214.    As more fully set forth above, Plaintiffs Foster and Sharp were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by BOP for pretextual reasons.

215.    It is believed and therefore averred that other class members were qualified for appointment to the position of Police Officer Recruit; however, BOP denied employment to them because of their race and/or color.

216.    At all times relevant hereto, individuals employed and/or engaged by BOP to participate in the hiring process for BOP's Police Officer Recruits were acting as agents for BOP.

217.    BOP's employment policies, practices, and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.

218.    It is believed and therefore averred that BOP acted willfully, intentionally and with callous disregard and reckless indifference to Plaintiffs' and class members' rights under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.

219.    As a direct and proximate cause of BOP's unlawful conduct, Plaintiffs Mike J. Sharp and James M. Foster and class members have suffered damages including, without limitation, lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs James M. Foster and Mike J. Sharp, on behalf of themselves and all others similarly situated, respectfully request judgment against BOP as set forth in the Requested Relief below.

**COUNT VII – Pennsylvania Human Relations Act**
**Plaintiffs Foster and Sharp v. BOP City of Pittsburgh, Bureau of Police**

220.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth herein.

221.    As more fully set forth above, Plaintiffs Sharp and Foster were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by Defendant City of Pittsburgh, Bureau of Police.

222.     At all times relevant hereto, individuals employed and/or engaged by BOP to participate in the hiring process for BOP's Police Officer Recruits were acting as agents for BOP.

223.     It is believed and therefore averred that the individuals employed and/or engaged by BOP to participate in the hiring process for Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the MPOETC fitness test, the polygraph test, the background investigation and the Chief's Roundtable, discriminated against Plaintiffs because of their race and/or color.

224.     It is believed and therefore averred that the individuals on the Chief's Roundtable knew Plaintiffs were African-American due to the photographs contained in the application materials provided to the Chief's Roundtable.

225.     In each instance, BOP selected many white applicants ranked lower than Plaintiffs on the Certification for Appointment List, for positions in the 2011 police recruit class.

226.     BOP does not have a legitimate, nondiscriminatory reasonfor its failure to hire Plaintiffs as Police Officer Recruits and the reasons given by BOP are pretext for discrimination. Plaintiffs Foster and Sharp allege they were not selected and/or hired as Police Officer Recruits because of their race and/or color.

227.     BOP's employment policies and practices were violative of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*., to the extent Plaintiffs were denied employment on the basis of their race and/or color.

228.     BOP discriminated against Plaintiffs in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*. in failing and/or refusing to hire Plaintiffs because of their race and/or color.

229.     BOP's employment practices, policies and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.

230.     It is believed and therefore averred that there have been numerous other instances of discrimination by BOP in the screening and selection of Police Officer Recruits based on race and/or color.

231.     As a direct and proximate cause of BOP's unlawful conduct, Plaintiffs Mike J. Sharp and James M. Foster have suffered emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs James M. Foster and Mike J. Sharp respectfully request judgment in their favor and request the relief set forth below in the Requested Relief.

## REQUESTED RELIEF

232.     Plaintiffs, individually and on behalf of the class, request the following relief:

A.     An order certifying this lawsuit as a class action;

B.     A permanent injunction restraining BOP from maintaining and enforcing policies, practices, customs, or usages that discriminate on the basis of race or color with respect to the testing, screening, and hiring of Police Officer Recruits in the BOP;

C.     An order enjoining BOP from the use of  its hiring process, as a whole, because it results in systemic disparate treatment and has a disparate impact upon African Americans, is not job related for the position in question and consistent with business necessity, and does not otherwise meet the requirements of Title VII, 42 U.S.C. §2000e, *et seq*. and of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.;

D.      An order enjoining BOP from the use of its written examination in the Hiring Process because it results in systemic disparate treatment and has a disparate impact upon African Americans, is not job related for the position in question and consistent with business necessity, and does not otherwise meet the requirements of Title VII, 42 U.S.C. §2000e, *et seq*. and of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.;

E.      An order enjoining BOP from the use of its oral examination in the screening and selection of Police Officer Recruits that results in systemic disparate treatment and has a disparate impact upon African Americans, is not job related for the position in question and consistent with business necessity, and does not otherwise meet the requirements of Title VII, 42 U.S.C. §2000e, *et seq*. and of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.;

F.      An order enjoining BOP from the use of  its physical fitness test as it results in systemic disparate treatment and has a disparate impact upon African Americans, is not job related for the position in question and consistent with business necessity, and does not otherwise meet the requirements of Title VII, 42 U.S.C. §2000e, *et seq*. and of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.;

G.      An order enjoining BOP from the use of  its background test, as it results in systemic disparate treatment and has a disparate impact upon African Americans, is not job related for the position in question and consistent with business necessity, and does not otherwise meet the requirements of Title VII, 42 U.S.C. §2000e, *et seq*. and of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.;

H.      An order enjoining BOP from th,e use of  the Chief's Roundtable as it results in systemic disparate treatment and results in a disparate impact upon African Americans,

is not job related for the position in question and consistent with business necessity, and does not otherwise meet the requirements of Title VII, 42 U.S.C. §2000e, *et seq*. and of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.;

I.     An order requiring BOP to take appropriate action to correct the present effects of its discriminatory policies and practices;

J.     An order requiring BOP to take other non-discriminatory measures to overcome the effects of its discriminatory policies and practices;

K.     Instatement of Plaintiff Foster to the position of Police Officer Recruit with back pay, front pay, and compensatory damages including, without limitation, for future loss and for emotional distress, pain and suffering, inconvenience, mental anguish and loss of enjoyment of life;

L.     Instatement of Plaintiff Sharp to the position of Police Officer Recruit with back pay, front pay, and compensatory damages including, without limitation, for future loss and for emotional distress, pain and suffering, inconvenience, mental anguish and loss of enjoyment of life;

M.     An award to class members in the form of back pay, front pay, and compensatory damages including, without limitation, for future loss and for emotional distress, pain and suffering, inconvenience, mental anguish and loss of enjoyment of life;

N.     Attorneys' fees, expert fees, costs, and expenses pursuant to Title VII, 42 U.S.C. § 1988, and other applicable laws;

O.     Prejudgment and post-judgment interest where recoverable, and

P.     Such other and further relief as this Court shall deem just and appropriate.

### **Jury Trial Request**

45

Plaintiffs demand a trial by jury.

Respectfully submitted,

/s/  *Witold J. Walczak*
Witold J. Walczak
PA. ID. No. 62976

Sara J. Rose
PA. ID. No. 204936

American Civil Liberties Union of
Pennsylvania
313 Atwood Street
Pittsburgh, PA  15213
Telephone:  412-681-7864
Facsimile:  412-681-8707
vwalczak@aclupa.org

*Attorney for Plaintiffs*
Dated: August 23, 2012                    *James M. Foster and Mike J. Sharp*