# EXHIBIT 2

# C O N F I D E N T I A L

## Review of and Recommendations Regarding

## Pittsburgh Bureau of Police

## Entry-Level Hiring Practices

*Prepared by:*

Leaetta Hough, Ph.D.

The Dunnette Group, Ltd.
370 Summit Avenue
St. Paul, MN 55102
651-227-4888
leaetta@msn.com

*Submitted to:*

City of Pittsburgh &

Plaintiffs' Counsel

[Pennsylvania Civil Liberties Union (PACLU) &

Feinstein Doyle Payne & Kravec, LLC (FDPK])

February 19, 2014

# Table of Contents

**Topic**                                                                **Page No.**

**Chapter 1:  Circumstances and Content of Report** ....................................................1

**Chapter 2:  Sources of Information** .................................................................5

**Chapter 3:  Required Applicant Characteristics – What Should Be Measured in the Pittsburgh BOP Entry-Level Police Officer Selection System?** ..........17

    BOP Mission Statement, Values Statement, and Standard Field Evaluation Guidelines ...................................................................19

    More Formal, Empirical Job Analyses ...................................................22

        Development of Preliminary Duty/Task List...........................................23

        Final Duty/Task List ...................................................................24

        Importance Ratings of Job Duties/Tasks. ...............................................25

        Identification of Physical Requirements of Police Work ..........................26

        Identification of Required Cognitive Abilities ........................................26

        Identification of Required Personality Characteristics .............................30

        Relative Weight of Characteristics ....................................................33

        Overall Summary of Concerns of the Formal Job Analysis .....................34

    Criterion-related Validity Research ....................................................35

        Cognitive Abilities ....................................................................36

        Personality Characteristics............................................................37

    Summary .................................................................................40

**Chapter 4: Quality of the Measurement System – How Well Does the Current Selection System Measure What It Purports to Measure and What Is Its Impact on African Americans?** ....................................................43

    Applicant Preparation Materials ........................................................44

    Written Exam – Law Enforcement Applicant Battery (LEAB).....................45

        LEAB Cognitive Ability Test (CAT) ...............................................45

        Impact of LEAB Cognitive Ability Test (CAT) on Protected Classes ......50

        LEAB Non-cognitive Measure:  Life Experiences Survey (LES).............57

        Impact of LEAB LES on African Americans ....................................63

        LEAB Non-cognitive Measure:  Work Styles Questionnaire...................67

        Impact of LEAB WSQ on African Americans ..................................71

        LEAB Composite (aka Written Exam)..............................................75

    Oral Board Exam .......................................................................77

i

Oral Board Examiner Training ..................................................................82

Impact of the Oral Board on African Americans......................................84

LEAB & ORAL Board Composite Score......................................................85

Description ..............................................................................................85

Impact of LEAB/ORAL Board Composite on African Americans ..........87

MPOETC Fitness and Reading Tests ............................................................89

Nelson-Denny Reading Test ....................................................................89

Physical Fitness Training.........................................................................90

Impact on Protected Classes ...................................................................91

Background Investigation Phase..................................................................91

Pre-Polygraph Procedures ......................................................................92

Polygraph Procedures .............................................................................93

Drug Testing ............................................................................................94

Background Interviews ............................................................................94

Background File Preparation ..................................................................95

Impact on Protected Classes ...................................................................96

Chief's Roundtable ......................................................................................97

Impact of Chief's Roundtable on Protected Classes................................99

Psychological Exam Conducted by Licensed Psychologist .......................100

Medical Exam.............................................................................................101

Analysis of Overall Impact of Selection System on Protected Classes........101

**Chapter 5: Job Relatedness (Validity) of the Current Selection System..................105**

LEAB Written Exam ...................................................................................105

Oral Board ..................................................................................................107

MPOETC Physical Fitness and Reading Tests............................................108

Background Investigation............................................................................108

Chief's Roundtable ....................................................................................108

Summary......................................................................................................109

**Chapter 6: Summary of Evaluation and Recommendations .....................................111**

Update the Job Analysis ..............................................................................112

Improve Applicant Preparation Materials and Classes................................112

Develop a Construct-oriented Measurement Plan for Entire Selection
    Process....................................................................................................113

Improve the Tests .......................................................................................114

Improve the Rating Processes......................................................................115

Conclusion ..................................................................................................116

**Tables**

Table 1:   Documents Examined ....................................................................7
Table 2:   List of Interviewees and Their Roles .........................................15
Table 3:   Ethnic Background and Gender of Interviewees ..........................16
Table 4:   Field Training Officer Criteria for Evaluating Probationary Officers ............20
Table 5:   Absolute and Relative Importance of Job Duties for
           Overall Job Performance...............................................................25
Table 6:   Relative Importance of Physical Abilities for Overall Job Performance.........27
Table 7:   Relative Importance of Cognitive Abilities for Overall Job Performance ......29
Table 8:   Relative Importance of Personality Characteristics for Overall Job
           Performance ...................................................................................31
Table 9:   Relative Importance of Cognitive Abilities, Physical Abilities, and
           Personality Characteristics for Overall Job Performance ...............34
Table 10:  Meta-analytic Evidence of the Usefulness of Personality Variables for
           Predicting Important Police Officer Outcomes...............................39
Table 11:  Sample LEAB Cognitive Ability Test (CAT) Item .........................48
Table 12:  Adverse Impact Analysis of LEAB Cognitive Ability Test (CAT) –
           2011 Test Administration Data.......................................................51
Table 13:  Adverse Impact Analysis of LEAB Cognitive Ability Test (CAT) –
           2008 Test Administration Data.......................................................52
Table 14:  Adverse Impact Analysis of LEAB Cognitive Ability Test (CAT) –
           2006 Test Administration Data.......................................................53
Table 15:  Mean Score Differences between Whites and African Americans on Specific
           CAT Ability Tests and the Effect Sizes of Those Differences ........56
Table 16:  LEAB Life Experience Survey (LES) Initial Scales, Definitions, and
           Reliabilities ....................................................................................58
Table 17:  Comparison of LEAB Life Experience Survey (LES) Initial and Current
           Scales ...............................................................................................64
Table 18:  Mean Score Differences between Whites and African Americans on LES
           Scales & Effect Sizes of Those Differences–2013 Test Administration Data.65
Table 19:  LEAB Work Styles Questionnaire (WSQ) Initial Scales, Definitions, and
           Reliabilities ....................................................................................69
Table 20:  Comparison of LEAB Work Styles Questionnaire (WSQ) Initial and Current
           Scales ...............................................................................................72
Table 21:  Mean Score Differences between Whites and African Americans on WSQ
           Scales & Effect Sizes of Those Differences–2013 Test Administration Data.73
Table 22:  LEAB Composite (aka Written Exam):  Scoring Model Used in Pittsburgh
           2008, 2011, & 2013 Testing Administrations...................................76
Table 23:  Example of Oral Board Work Simulation ......................................80
Table 24:  Mean Score Differences between Whites and African Americans on Oral
           Board Overall and Component Scores and Effect Sizes of Those Differences –
           2013 Test Administration Data........................................................86
Table 25:  Adverse Impact Analysis of LEAB/Oral Board Composite – 2011 & 2013
           Test Administration Data.................................................................88
Table 26:  Overall Adverse Impact Analysis of Selection System – 2013 Data.............103

**Appendices**

Appendix A:  Brief Description of Dr. Hough's Credentials and Experiences
Appendix B:  First Amended Complaint – Class Action
Appendix C:  Interview Materials:  Project Description & Contacts; Interviewee
            Demographic Information Sheet; and Interview Protocol

# Review of and Recommendations Regarding
# Pittsburgh Bureau of Police
# Entry-Level Hiring Practices

## Chapter 1:  Circumstances and Content of Report

The City of Pittsburgh[1] and Plaintiffs (Foster, Sharp, Christian, Jamal-Francis, and Payton – Case No. 2:12-cv-1207) through their Counsel[2] agreed that it was in their best interests to retain a joint expert to review, make recommendations, and provide impartial guidance and evaluation regarding the City's hiring practices for entry-level police officers in a manner that addresses concerns raised in Plaintiffs' First Amended Complaint. The City and Plaintiffs' counsel hired Dr. Leaetta Hough as their joint expert September 15, 2013. (See Appendix A for a one-page description of her credentials and area of expertise.)

In general, the complaint alleges that the City of Pittsburgh's hiring process for entry-level police officers operates as a pattern or practice of systemic disparate treatment, has a disparate impact on African-American candidates, and that the City lacks legitimate business justification for its practices.  The complaint also states that other, less discriminatory alternatives are available to the City. (See Appendix B for a copy of the complaint.)

This report describes:

---

[1]  City of Pittsburgh attorneys involved are Wendy Kobee and Lorraine Mackler.

[2]  Plaintiff attorneys involved are Witold Walczak and Sara Rose with the Pennsylvania Civil Liberties Union (PACLU) and Ellen Doyle and Pamina Ewing with Feinstein Doyle Payne & Kravec, LLC (FDPK).

- information I reviewed or gathered to learn about the tests, processes, and procedures of the system;

- personal characteristics that enable an individual to be an effective police officer and thus what the system should be measuring;

- specifics of the hiring process as I understand them;

- criteria I used to evaluate the selection system including evidence about the reliability, validity, and fairness of the system;

- my evaluation of the system and each of its components; and

- my recommendations for changes to the City of Pittsburgh entry-level police hiring system.

The report is organized into five chapters in addition to this first chapter:

- ***Chapter 2:  Sources of Information*** – what I reviewed and who provided me with information.

- ***Chapter 3:  Required Applicant Characteristics*** – characteristics that are needed for effective performance as a police officer, i.e., characteristics that the measurement system should be measuring.  This chapter focuses on the skills, abilities, and other characteristics that enable a person to perform effectively as a police officer.  This chapter draws upon the Pittsburgh BOP mission and value statements, interviews conducted with civilians, civil servants, applicants, BOP and EB Jacobs' representatives, EB Jacobs' job analyses of police work in Pittsburgh and elsewhere, and training curricula and performance evaluation factors to provide information about the characteristics needed to perform police work effectively as well as scholarly research about the usefulness of physical, cognitive, and personality characteristics for predicting effective police performance.  Also included in this chapter is a description of expected changes in policing requirements over the years ahead and its impact on the hiring system.  This chapter details what should be measured during the hiring process and why.

- ***Chapter 4:  Quality of the Measurement System – How Well Does the Current Selection System Measure What It Purports to Measure and What Is Its Impact on African Americans*** – quality of the procedures and processes of the selection system, i.e., applicant preparation materials and classes, written test, oral board and oral board rater training, physical fitness tests (OPETC testing including the reading test), background investigation, Chief's Roundtable, and the psychological testing performed by licensed psychologists.  This includes the content of the

2

components as well as their scoring and rating procedures. Each process and procedure of the selection system is described and evaluated according to 1) the extent to which scores it generates are likely to be accurate reflections of an applicant's standing on the characteristic, and 2) the impact of each component on African Americans.

- ***Chapter 5:  Job-relatedness (Validity and Fairness) of the Current Selection System*** – the extent to which the components and overall selection system are fair and valid predictors of police performance.  This chapter examines the extent to which the existing selection system measures what should be measured (as identified in Chapter 3).  Also addressed are changes in the environment and circumstances in which the BOP performs its mission that will impact the needs of the BOP in terms of the personnel it hires.

- ***Chapter 6:  Summary of Evaluation and Recommendations*** – this section provides an overview of my evaluation and recommendations for the City of Pittsburgh entry-level police officer hiring processes and procedures.

# Chapter 2:  Sources of Information

The first phase of the project involved identifying information that would be important for understanding the components of the hiring processes and the evidence supporting the system.  I provided the attorneys for the parties with a list of documents that I wanted to examine and other information I wanted to gather.  The list, along with the location of each document in the materials that the City provided, appears in Table 1.

In addition to written documents, I requested interviews with several people – people who participated in the hiring process (evaluators, both civilian and police, and applicants) and people who participated in, had responsibility for, or managed the process.  The face-to-face interviews occurred November 25-26, 2013 in Pittsburgh at an off-site location (conference room at the Sheraton Hotel) to provide a sense of privacy and possibly reduce anxiety levels that some interviewees might feel.  An additional face-to-face interview occurred at the Pittsburgh City County Building November 27, 2013. Telephone interviews were conducted during January 2014 with people who were unavailable earlier or who called me wanting to talk more one-on-one.  I also followed up via phone calls and email asking more questions and requesting more documents from Todd Siegel and Kathy Kraus during January and February 2014. The names and roles of the people I interviewed appear in Table 2.  Table 3 shows their ethnic background and gender.  Appendix C contains the topics covered in the interview.  Not all topics were relevant to every person interviewed.  Each interview focused on topics that about which the interviewee had information. (See Appendix C for all the interview materials.)

While I was in Pittsburgh to conduct face-to-face interviews, I reviewed Oral Board files and background investigation files for several applicants.  I also observed a mock polygraph administration.

During December 2013 and January and February 2014 I requested additional information directly from representatives of EB Jacobs, the consulting firm that provides testing services to the City related to entry-level police officer hiring.  These communications were via telephone conference and email.  The information and additional analyses they provided to me were based on 2013 Pittsburgh testing administrations – data and information that were not previously available.  They reported to me that all of the items, scoring algorithms and models were the same for the 2008, 2011, and 2013 Pittsburgh administrations.  They also provided me with additional analyses that I requested as well as detailed information about the scoring and validation strategies that they use for Pittsburgh entry-level police officer testing and hiring processes.

In all instances, the people with whom I dealt were forthcoming with documents and information that I requested.  I believe the people were straightforward and sincere in providing accurate information as they knew it.

## Table 1:  Documents Examined

| Location[3] (Pittsburgh Law Dept. Numbering System) | | | | Information Requested | Documents Provided |
|---|---|---|---|---|---|
| I | | | | Written Documents | |
| | A A | | | Final Reports | • 2005 Test Administration and Scoring Report<br>• 2006 Final Report<br>• 2008 Final Report<br>• 2011 Final Report |
| | | A | 1 | Job Analyses | • 2008: Final Report Appendices A,D,J<br><br>*See also*, 2006 and 2008 Final Reports at I.AA |
| | | | 2 | Tasks | • 2008: Final Report Appendices C,E<br><br>*See also*, 2006 and 2008 Final Reports at I.A.A. |
| | | | 3 | KSAOs – knowledge, skills, abilities, and other characteristics required to perform effectively as a police officer | • 2008: Final Report Appendices F, G<br><br>*See also*, 2006 and 2008 Final Reports at I.A.A. |
| | | | 4 | Performance appraisal forms and procedures used during the police academy, probationary period, and when working as a police officer | • Basic Training Physical Fitness Evaluation Form<br>• Description of Police Training and Evaluations<br>• Performance Evaluation Sheet<br>• City of Pittsburgh, Bureau of Police Performance Evaluation Reports<br>• Bureau of Police Performance Evaluation Guidelines<br><br>*See also*, Pittsburgh Bureau of Police Field Training Guide at I.E.; City of Pittsburgh Bureau of Police Field Training Officer (FTO) Daily Observation Report used to evaluate on-the-job training performance of new hires at I.E.; City of Pittsburgh Bureau of Police Standard Field Evaluation Guidelines at I.E. |
| | | | 5 | Analyses performed on job descriptive information | See, 2006 and 20080 Final Reports at I.AA; I.A.1; I.A.2; I.A.3 |

---

[3]  The City of Pittsburgh Law Department provided me with four very large 3-ring binders that contained the documents. The numbering system indicates the location of each document in the binders.

| | B | | | Validation Studies | • 2006 Final Report Appendices B,C<br>• 2008 Final Report Appendices K1-M<br>• 2008 Final Report App. I, LEAB Transport Survey (Ability Survey and Instructions)<br>• 2008 Final Report App. H, LEAB Transport Survey (Task Survey and Instructions)<br><br>*See also*, 2006 and 2008 Final Reports at I.A.A. |
| | C | | | All exams | |
| | | 1 | | Written exams | • 2008 Final Report Appendices  B, N-Q<br>• 2006 Final Report Appendices A,D-G<br>• 2011 Final Report Appendix A<br>• 2011 Supp. App. 3: LEAB Test<br><br>*See also*, 2005, 2006, 2008, 2011 Final Reports at I.A.A. |
| | | 2 | | Oral exams | • 2011 Supp. App 5: Oral Board Test Methods (OB Test Assessor Training Manual<br><br>*See also*, 2005, 2006, 2008, 2011 Final Reports at I.A.A.; 2006 Final Report Appendices D-G at I.C.1; 2008 Final Report Appendices N-Q at I.C.1; 2011 Final Report Appendix A at I.C.1; Pittsburgh Bureau of Police Entry-Level Police Officer Examination: Oral Boards Test Assessor Training Manual at I.E.; Police Officer Fitness Exam; Score Card at I.E. |
| | | 3 | | Interviews | |
| | | | a | Chief's Roundtable/"Rule of 3"/Stricken Process | • City of Pittsburgh Police Officer Civil Service Testing & Processing Steps |
| | | | b | Psychological Interview | • MPOETC Psych. Examination<br>• Law Enforcement Psych. Screening Form<br>• Minnesota Multiphasic Personality Inventory-2 |
| | | | c | Medical Exam/Interview | Occurs after a conditional offer of employment has been extended |
| | | 4 | | | |
| | | | a | Physical Fitness Exam (including candidate informational packet from personnel) | • Description of MPOETC Fitness and Reading Exams<br>• MPOETC/Police Academy Entrance Fitness Test Standards-Physical Performance;<br>• Department of Personnel Liability Waiver for Police Officer Physical Fitness Test<br>• Event Descriptions for the Police Officer Recruit |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | <ul><li>Physical Fitness Test</li><li>City of Pittsburgh Physical Fitness Exam Questionnaires</li><li>City of Pittsburgh Physical Fitness Exam Letter</li><li>City of Pittsburgh Physical Fitness Exam Retesting Policy</li><li>Directions to Physical Fitness Test Site</li><li>MPOETC 30th and 50th Percentiles Info</li><li>MPOETC Physical Fitness Test Battery Protocols and Guidelines</li><li>Physical Fitness Test Background Investigation Information Sheet</li><li>MPOETC FAQ Regarding Physical Fitness Test Standards</li></ul> |
| | | | b | Reading Exam | <ul><li>Nelson-Denny Reading Test</li><li>Description of MPOETC Fitness and Reading Exams</li></ul> |
| | | 5 | | | |
| | | | a | Custody Flow of Documents | <ul><li>Police Officer Background Process Summary</li></ul> |
| | | | b | Background Investigation | <ul><li>Office of Municipal Investigations (OMI) Pre-Employment Background Process Summary</li><li>OMI Pre-Employment Background Forms</li><li>City of Pittsburgh Authorization for Release of Information</li></ul> *See also*, Physical Fitness Test Background Investigation Information Sheet at I.C.4.a. |
| | | 6 | | Police Academy | <ul><li>Explanation of Exams Administered in the Pittsburgh Police Basic Recruit Academy (the codes within these documents refer to and are explained by entries in documents at I.K, Basic Police Academy curricula)</li></ul> |
| | D | | | Procedures for gathering information from candidates during each phase | <ul><li>Description of Procedures for Gathering Information from Candidates During Each Phase</li></ul> |
| | E | | | All scoring keys and procedures (including rating guides) for evaluating candidates | <ul><li>Nelson Denny Reading Test Administrator Instructions</li><li>Raw Score to Scale Score to Grade Equivalent</li></ul> |

9

| | | | | |
|---|---|---|---|---|
| | | | during each phase (standards used during each phase) | Conversions (Form G)<br>• City of Pittsburgh Bureau of Police Field Training Officer (FTO) Daily Observation Report used to evaluate on-the-job training performance of new hires<br>• City of Pittsburgh Bureau of Police Standard Field Evaluation Guidelines for evaluating new recruits<br>• Pittsburgh Bureau of Police Field Training Guide<br>• Police Officer Fitness Exam: Score Card<br>• Pittsburgh Bureau of Police Entry-Level Police Officer Examination: Oral Boards Test Assessor Training Manual<br>• Add. Appendix: Original LEAB Validation Report<br>• 2006 Supp. App. 3: LEAB Test<br>• 2006 Final Report: Appendices H-K<br>• 2008 Final Report: Appendices R-V<br>• 2011 Final Report: Appendices B-E<br>• 2011 Supp. App. 6; Phase I Scoring Model (LEAB) |
| | F | | How applicant scores are adjusted, e.g. to equally weigh the written and oral exams | *See*, Final Reports 2006, 2008, 2011 at I.A.A.; I.E.; 2006 Final Report: Appendices H-K at I.E.; 20011 Final Report: Appendices B-E at I.E.; 2008 Final Report: Appendices R-V at I.E. |
| | G | | Description of cut scores and how they were developed | *See*, Final Reports 2006, 2008, 2011 at I.A.A.; I.E.; 2006 Final Report: Appendices H-K at I.E.; 20011 Final Report: Appendices B-E at I.E.; 2008 Final Report: Appendices R-V at I.E. |
| | H | | Preparatory materials provided to applicants | • CCAC Lesson Plan<br>• 2011 Supp. App. 2: CAT Practice Test w/ Key ( LEAB Practice Examination Booklet)<br>• 2011 Supp. App. 1: LEAB Candidate Prep. Guide (Police Officer Recruit Written Examination Assessment Preparation Guide)<br>• Police Officer Applicant Preparation Packet<br>    ○ Announcement of a Competitive Examination for Police Officer<br>    ○ Examination and Selection Critical Information Sheet |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | o   Police Officer Recruit Written Examination Assessment Preparation Guide (2011)<br>o   Police Officer Recruit Oral Examination Candidate Preparation Guide (2012-2013).<br>• Dept. of Personnel and Civil Service Commission Police Recruitment Requirement webpage<br>• 2008 Written Examination Assessment Guide.<br><br>*See also*, 2005, 2006, 2008, 2011 Final Reports at I.A.A. |
| | I | | | Preparation and training provided to applicants | • Letters to Police Officer Applicants (2011, 2013)<br>• Summary of Proposed Agreement between Dept. of Personnel and Civil Service Commission and Community College of Allegheny County for customized applicant preparation for Police Officer positions<br>• CCAC Scope of Services for City of Pittsburgh Public Safety preparation training<br>• CCAC Class Schedule for Training Preparation for City of Pittsburgh Police Officer written entry exam (2011, 2013)<br>• CCAC Applicant Preparation Dates<br><br>*See also*, 2011 Final Report at I.A.A. |
| | J | | | Training classes and training material provided to administrators, proctors, assessors, and evaluators involved in each phase of the hiring process | • 2005  Written Exam: Section Proctor/ Staff Instructions<br>• 2006 Written Exam: Proctor/Staff Instructions<br>• 2008 Written Exam: Proctor/Staff Instructions<br>• 2011 Written Exam: Proctor/Staff Instructions<br>• Police Academy E-mail sent to police officers interested in proctoring physical fitness exam<br>• 2005-2011 Fitness Exam: Proctor/Staff Instructions<br>• Add App. 2011 Oral Board Assessor Training Powerpoint (Bureau of Police Oral Board Test Assessor Training)<br><br>*See also*, 2005, 2006, 2008, 2011 Final Reports at I.A.A; Pittsburgh Bureau of Police Entry-Level Police Officer |

| | | | | Examination: Oral Boards Test Assessor Training Manual at I.E.; Pittsburgh Bureau of Police Field Training Guide at I.E.; City of Pittsburgh Bureau of Police Field Training Officer (FTO) Daily Observation Report used to evaluate on-the-job training performance of new hires at I.E.; City of Pittsburgh Bureau of Police Standard Field Evaluation Guidelines at I.E; Police Officer Fitness Exam: Score Card at I.E.; 2011 Supp. App 5: Oral Board Test Methods (OB Test Assessor Training Manual at I.C.2.) |
|---|---|---|---|---|
| | K | | Police Academy curricula | • Police Academy Curricula (2004 & 2008) <br> • Police Academy Schedule |
| | L | | Police Academy requirements and standards | *See*, MPOETC FAQ Regarding Physical Fitness Test Standards at I.C.4.a. |
| | M | | On-going training objectives and materials | • MPOETC and Pittsburgh Bureau of Police Mandated Training Since 2009 |
| | N | | Application Requirements (for applicable years) | • Announcement for a Competitive Examination for the position of: Police Officer (includes position summary, requirements, etc.: 2005, 2006; 2008; 2011 |
| | O | | Minimum Qualifications (for applicable years) | • Announcement for a Competitive Examination for the position of: Police Officer (includes position summary, requirements, etc.): 2005; 2006; 2008; 2011 |
| | P | | Any and all "preference" factors (e.g., veteran's preference points) and their impact on groups of applicants (pre-existing announcements for years 2007-present) | • Police Officer candidate preference points |
| | Q | | Any and all automatic disqualifiers and Education Requirements | • MPOETC Procedures for Applicants from Out of State <br> • MPOETC audio and visual acuity standards <br> • MPOETC Firearms Requirements <br> • Procedures for Scheduling Police Officer Certification Examination and list or required documents (x 2) <br> • Application for Police Officer Certification |

| | | | | Examination Scheduling (x 2) <br> • Officer Certification Rules and Regulations <br> • Educational Requirements for Police Officer Recruits <br> • Section 10 of the General Civil Service Act disqualifiers summary <br> • Summary of Rules and Statutes Governing the Civil Service. <br> • Civil Service and Police Statutes <br><br> *See also*, I.N-O; Dept. of Personnel and Civil Service Commission Police Recruitment Requirement webpage at I.H; Police Officer Applicant Preparation Packet including 1) Announcement of a Competitive Examination for Police Officer Examination and 2) Selection Critical Information Sheet at I.H. |
|---|---|---|---|---|
| | R | | Numbers, passing rates, drop-out rates for African Americans and Whites from application to hire | • Police Officer- Overall Project Counts and Statistics (each stapled packet contains the statistics generated for each job announcement period between 2005 and 2011. These occurred in 2005, 2006, 2008, 2011). |
| | S | | Organizational Structure; reporting relationships | • Organization of the Bureau of Police diagram <br> • Bureau of Police Distribution of Officers diagram <br> • Department of Personnel Reporting Structure |
| II | | | Interviews required if written documentation not available for the above items, as well as - | |
| | A | | to learn what special issues the department faces as it protects its citizens and enforces laws and regulations | |
| | B | | To learn about the vision for the department as it goes forward; expected/likely changes; challenges the department faces in accomplishing its mission | |

| | | | | |
|---|---|---|---|---|
| | C | | To learn about types of citizen complaints; what citizens feel is important; type of policing citizenry desire of the police department | |
| | D | | To learn why people voluntarily or involuntarily terminate training at the police academy | |
| | E | | To learn about characteristics of problem officers and what they do that is dysfunctional or problematic from the department's point of view | |

**Table 2:  List of Interviewees and Their Roles**

| Person | Role/Title |
|---|---|
| Paul Donaldson | Deputy Chief of Police |
| Catherine McNeilly | Commander, Zone 3 |
| Jennifer Ford | Police Academy |
| James Foster | Plaintiff |
| Maurita Bryant | Assistant Chief – Operations |
| Cynthia McCormick | Civil Service Commissioner |
| Thomas Stangrecki | Commander; Acting Assistant Chief of Administration |
| Tamiko Stanley | Assistant Director and EEO Officer, Personnel |
| Regina McDonald | Acting Chief of Police |
| Kathy Kraus | Manager; Office of Municipal Investigations (OMI) |
| Todd Siegel | Secretary and Chief Examiner Civil Service Commission |
| Rashall Brackney | Commander, Zone 1 |
| Roy Dean | Office of Municipal Investigations (OMI) Administrator |
| Rev Chad Collins | Civilian participant on Oral Boards |
| Judy Hill Finegan | Director, Department of Personnel and Civil Service |
| Brenda Tate | PBP officer; worked with hiring process |
| Scott Evans | Detective – polygraph testing |
| Dr. Anthony Goreczny | Civil Service Psychologist |
| Paul | Detective – polygraph testing |
| Audrey Murrell | Professor/Associate Dean, Civilian participant on Oral Boards |

15

**Table 3: Ethnic Background and Gender of Interviewees**

|  | White | African American | Other | TOTAL |
|---|---|---|---|---|
| **Male** | 6 | 2 | 1 | 9 |
| **Female** | 6 | 5 | 0 | 11 |
| **TOTAL** | 12 | 7 | 1 | 20 |

# Chapter 3:  Required Applicant Characteristics –

# What Should be Measured in the Pittsburgh Bureau of Police Entry-

# Level Police Officer Selection System?

This chapter focuses on the skills, abilities, and other characteristics that enable a person to perform effectively as a police officer.  This chapter draws upon the following information to generate a description of what the hiring system should measure:

- Pittsburgh Bureau of Police (BOP) mission statement,

- Pittsburgh BOP values statement,

- Job descriptive information in the form of position descriptions and summaries,

- Pittsburgh BOP Officer evaluation factors,

- Training curricula,

- Formal job description information and analyses, especially those based on Pittsburgh BOP officer positions,

- Interviews conducted with Pittsburgh community members and BOP personnel about officer characteristics that are important for effective policing,

- Interviews conducted with Pittsburgh BOP leadership about likely changes in policing strategies and circumstances in the years ahead, and

- Prior research examining the relationships between applicant characteristics and effective police performance.

Personal characteristics generated from these sources of information provide a basis for generating a list of characteristics that can be compared to characteristics the current hiring processes purport to measure.  Such a comparison highlights personal

17

characteristics that are not included in (missing from) the hiring process and/or are over- or under-emphasized (weighted inappropriately) in the hiring process.  The *Uniform Guidelines on Employee Selection Procedures* (aka *Uniform Guidelines*), the Society for Industrial and Organizational Psychology's (SIOP's), *Principles for the Validation and Use of Personnel Selection Procedures* (aka *Principles*), and the American Educational Research Association (AERA), American Psychological Association (APA), and National Council on Measurement in Education's (NCME's) *Standards for Educational and Psychological Testing* (aka *Standards*) provide critically important guidance in developing and using hiring procedures.[4]  The guidelines and principles articulated in these documents as well as my own professional experience are brought to bear in evaluating the formal job analyses that are offered in support of the current selection system and in evaluating prior meta-analytic validation research specific to police work.

This chapter (chapter 3) focuses on what personal characteristics should be included in the selection process and how much each should be weighted.  It also examines the quality of the job analytic foundation on which the current hiring procedures are based.  The next chapter (chapter 4) focuses on how well these characteristics are measured in the current selection system.

---

[4] *Uniform guidelines on employee selection procedures*, 29 C.F.R. 1607 (1978).

Society of Industrial and Organizational Psychology, Inc. (2003). *Principles for the validation and use of personnel selection procedures* (3rd ed.). Bowling Green, OH: Society of Industrial and Organizational Psychology.

American Educational Research Association, American Psychological Association, and National Council on Measurement in Education. (1999). *Standards for educational and psychological testing*. Washington, DC: American Education Research Association.

**BOP Mission Statement, Values Statement, and Standard Field Evaluation**

**Guidelines**

The *Pittsburgh Bureau of Police Field Training Guide*[5] contains a copy of the

BOP mission statement, values statement, and field evaluation guidelines.  The mission

statement is:

> "Our mandate is the continued protection and enhancement of our diverse neighborhoods by working in the partnership with our citizens to creatively solve problems always remaining sensitive to the authority with which we're entrusted.
>
> It is our challenge to provide committed service through accountability, integrity and respect."

The values statement is:

> "We    Believe in the value and worth of all members of the Bureau of Police.
>
> We    Believe our **INTEGRITY** is **NOT** negotiable.
>
> We    Believe we are individually **ACCOUNTABLE** upholding the values of organization.
>
> We    Believe we can best earn **RESPECT** by first respecting the rights of others.
>
> We    Believe in striving to achieve the highest moral, ethical and professional standards.
>
> We    Will adapt to the changing future by maintain partnerships built upon *Accountability, Integrity and Respect*"

The Field Training Officer (FTO) evaluates probationary officers using the performance

factors and standards shown in Table 4.

---

[5] 3-ring binders: Tab I.E, 5th bullet.

**Table 4:  BOP Field Training Officer Criteria for Evaluating Probationary Officers**

| | | | **Performance Standard** |
|---|---|---|---|
| **Appearance, Attitude, Relations** | | 1.  General Appearance | Arrives on time for work, uniform is neat, footgear is clean and black in color, duty rig is in good order and possesses necessary gear for patrol work. |
| | | 2.  Acceptance of Feedback | Accepts criticism in a positive manner and applies it to improve performance. Learns from his/her mistakes and is eager to improve. |
| | | 3.  Attitude Towards Police Work | Expresses active interest toward the job.  Maintains a solid attitude toward the roles and responsibilities of the patrol officer. |
| | | 4.  Relations with the Public | Courteous, friendly and empathetic; communicates in a professional and non-demeaning manner.  Show no bias. |
| | | 5.  Relations with Police Personnel | Is able to establish a good teacher student relationship with FTO.  Understands the chain-of-command.  Respects superior officers. |
| **Knowledge of:** | **Policy & Procedure** | 6.  Reflected by Verbal/Written/Simulated Testing | Shows a solid understanding about the Bureau rules and regulations.  Answers most questions thoroughly about Bureau policy. |
| | | 7.  Reflected in Field Performance | Applied Bureau policy and procedures to field situations and is familiar with the most commonly applied procedures. |
| | **PA Crimes Code** | 8.  Reflected by Verbal/Written/Simulated Testing | Shows a solid understanding of the PA Crimes Code and is able to answer most questions on demand by an FTO or supervisor. |
| | | 9.  Reflected in Field Performance | Working knowledge of commonly used sections; able to relate elements to observed criminal activity while on patrol. |
| | **PA Vehicle Code** | 10.  Reflected by Verbal/Written/Simulated Testing | Shows a solid understanding of the PA Vehicle Code and is able to answer most questions on demand by an FTO or supervisor. |
| | | 11.  Reflected in Field Performance | Working knowledge of commonly applied sections; able to related elements to observed violations while on patrol. |
| **Patrol Performance Tasks** | | 12.  Driving Skills:  Non Stress | Ability to maintain control of vehicle while being alert to activity outside of vehicle.  Practices good defensive driving. |
| | | 13.  Orientation Skills:  Non Stress | Reasonable knowledge of location in most situations and can move from one place to another in a reasonable amount of time. |
| | | 14.  Proper Report Form Selection | Knows most of the standard forms and understands format.  Completes forms with a reasonable degree of accuracy. |
| | | 15.  Report Writing:  Organization | Converts field situations into a logical sequence of thought to include the elements of the situation. |
| | | 16.  Report Writing: Grammar/Spelling/Neatness | Grammar, spelling and neatness are satisfactory; errors are rare and do not impair understanding. |
| | | 17.  Report Writing | Completes simple basic reports within 30 minutes |
| | | 18.  Field Performance:  Non stress | Able to assess situation and take proper action. |
| **Patrol Performance Tasks** | | 19.  Problem Solving & Decision Making | Has good perception and is able to reason out problem by using past experience and what has been taught. |
| | | 20.  Radio:  Use of Communication System | Has a good working knowledge of how to communicate, rarely fails to communicate properly. |
| | | 21.  Radio:  Comprehends Transmissions | Comprehends most traffic directed at their call sign; aware of most zone traffic. |
| | | 22.  Radio: Speaks Clearly and Concisely | Uses proper procedure on the radio while using short and concise transmissions most of the time. |
| | | 23.  Self-Initiated Field Activity | Recognizes and identifies suspected criminal activity; makes contact with suspicious activity during daily patrol. |
| **Critical Performance Tasks** | | 24.  Driving Skills:  Stress Conditions/Pursuits | Maintains control of vehicle; evaluates conditions and reacts properly while using lights and sirens. |
| | | 25.  Orientation Skills:  Stress Conditions | Reasonably aware of his/her location; demonstrates a good sense of direction to the call; rarely disoriented during tactical situations. |
| | | 26.  Field Performance: Stress Conditions | Exhibits calm and controlled attitude; does not let situation further deteriorate. |
| | | 27.  Officer Safety:  General | Exhibits sound tactics and is aware of possible threats and dangers to himself or herself. |
| | | 28.  Control of Conflict:  With Encounters/Prisoners | Ensures the safety of the officer and those in custody; maintains a tactical advantage. |
| | | 29.  Control of Conflict:  Verbal Commands | Clear verbal commands; used authority and direction; maintains a tactical advantage and control over suspects. |
| | | 30.  Control of Conflict:  Use of Force | Uses the proper amount of force during an encounter; exhibits good physical skills and tactics. |

Taken together, these three documents indicate that BOP seeks to hire individuals who at the time of hire[6] exhibit:

1. **Integrity** – trustworthy, honest.

2. **Accountability –** for own behavior; conscientiously fulfilling commitments and responsibilities; accepting responsibility; careful about details; dependable; able to work within a chain-of-command.

3. **Respect for Others –** including citizens and other members of the police force regardless of their circumstances, experiences, and ethnic background; courteous, unbiased.

4. **Achievement Orientation –** striving for the highest moral, ethical and professional standards; seeking to continually improve.

5. **Service Orientation –** committed to protecting the community and all its citizens; committed to partnering with community organizations and citizens to enhance the safety of all people and their property.

6. **Cooperative –** in partnering and teaming with citizens, other members of the police force, and other agencies; non-authoritarian; non-defensive.

7. **Problem Solving Ability –** creatively addressing citizen issues; reasoning skills; cognitive flexibility.

8. **Situational Awareness –** observing what is going on in one's surroundings.

9. **Situational Judgment –** appropriate and effective decision making for the situation at hand.

10. **Proactive Behavior –** initiating activity to engage and address situations and people.

11. **Stress Resistance –** remaining focused, calm, and problem solving under duress; resisting long-term effects of stress.

12. **Behavioral Flexibility –** adapting to changing circumstances; flexibility.

13. **Safety Mindedness –** for self and others; attentive to dangers inherent in situations.

---

[6] Specific knowledge of police procedures and practices and federal and state laws are not included in this list because such information is taught in the training academy and on the job.  Selecting applicants on their knowledge of information they will be taught soon after hire is inappropriate as well as prohibited.

14. **Oral Communication Skills –** speaking to others in a clear voice to
transmit sufficient information that ensures understanding of the situation;
understanding the spoken word of others.

15. **Written Communication Skills –** writing information logically and in
sufficient detail as required for the situation.


**More Formal, Empirical Job Analyses**

EB Jacobs conducted multiple job analyses of law enforcement work that bear on

the work of police officers in Pittsburgh BOP.  Information about these job analyses were

reported in their:

- Initial *Law Enforcement Aptitude Battery (LEAB) Validity Report* and
Appendices[7], dated July 2004 – a report describing a consortium test
development and validation project that included a wide variety of entry-
level law enforcement positions including state police, county-level police
officers, and city-level police officer.  This validation study did not
include Pittsburgh BOP.

-  *2006 Pittsburgh BOP Final Report* and Appendices.[8]

- *2008 Pittsburgh BOP Final Report* and Appendices.[9]

-  "Memo to File,"[10]  dated August 20, 2013, describing analyses of 2006
job survey responses.  These analyses compared seven Pittsburgh BOP
subject matter experts' relative importance ratings of job duties and
knowledge, skills, abilities, and other characteristics (KSAOs) with ratings
obtained during the job analysis of law enforcement agencies involved in
the original LEAB validation study.[11]

The most current formal job analysis was undertaken in 2008 and reported in the

2008 Pittsburgh BOP Final Report).  EB Jacobs asked subject matter experts to complete

time-consuming and arduous rating and linkage tasks.  Although EB Jacobs was attuned

---

[7] 3-ring binders: Tab I.E, 8th bullet.

[8] 3-ring binders: Tabs I.AA;  I.B, 1st bullet; I.C.1;  I.E, 8th bullet.

[9] 3-ring binders: Tabs I.AA;  I.A.1;  I.A.,2;  I.B;  I.E 8th bullet.

[10] 3-ring binders: Tabs I.B, 1st bullet.

[11] These analyses were done to assess the "validity transportability" of the LEAB test validities obtained in
the original study to Pittsburgh BOP entry-level police positions.

to the *Uniform Guidelines* and the *Americans with Disabilities (ADA) Guidelines* in documenting job-relatedness and identifying essential requirements of the job, the job analysis is not without problems.  Some of the steps and issues are described below, along with an overall summary of concerns about the formal job analysis.

**Development of Preliminary Duty/Task List**.  This list consisted of 16 officer duties identified during EB Jacobs' 1998 job analysis work that included  a) examination of the City of Pittsburgh Police Office Job Description, b) organizational information provided by City of Pittsburgh, and c) task lists previously developed by EB Jacobs for entry-level police officers in other departments.  The 16 officer duties[12] (consisting of 174 tasks categorized into duty areas) were:

- o  Patrol Duties and Responsibilities
- o  Traffic Enforcement and Control
- o  Preliminary Searches
- o  Preliminary Investigations
- o  Control Suspects
- o  Arrests
- o  Evidence/Property
- o  Safeguard Life/Property at Incident Scene
- o  Notifications/Communications/Administration
- o  Reports, Forms and Memo Books
- o  Court Appearance Activities
- o  Program Support
- o  Public Relations
- o  Safeguard Police Department Property
- o  Department Policies, Procedures, Rules and Laws
- o  Professional Development

**Final Duty/Task List**.  Seven subject matter experts (sergeants) reviewed the duty areas and tasks and two EB Jacobs' representatives conducted several one-on-one ride-alongs to develop a final set of tasks and duty areas.  The final list of 16 duty areas and

---

[12] Page 194 of 3-ring binder (Tab I.B).

their definitions remained exactly the same albeit with a slightly different set of tasks. The final set of job tasks numbered 190.

***Importance Ratings of Job Duties/Tasks***.  Dozens of police officers completed a very lengthy job analysis questionnaire.  Part of the survey asked respondents to rate job duties and tasks according to their importance as well as their relative importance. Table 5 shows the mean ratings for the absolute and relative importance of the 16 job duties. According to Pittsburgh police officers the four most important job duties are 1) Control Suspects; 2) Arrests; 3) Safeguard Life/Property at Incident Scene; and 4) Patrol Duties and Responsibilities although the variations in ratings (as indicated by the standard deviations) suggest a wide range of opinion.  Based on the ratings, Program Support was deemed a non-essential part of the police work in Pittsburgh[13].  (This finding is important and will be discussed later.)

About 79% of the approximately 75 police officers who completed "Part I: Task Survey" of the job analysis task questionnaire reported that the duties/tasks in the task survey encompassed all, or most of their job responsibilities.[14]  About 21% of the police officers indicated that the task survey encompasses "About Half," "A Limited Portion," or "None or Almost None" of their job responsibilities (7% indicated that only "A Limited Portion" or "None or Almost None" of their job responsibilities were covered by the survey).  Although a follow-up question asking respondents to list missing duties/tasks, the technical report does indicate if any job duties or tasks were listed.  The report does not describe any data quality checks that were performed.  Thus, it is possible that these respondents were careless in completing the survey.  If so, data from such

---

[13] 3-ring binder page 418.
[14] 3-ring binder pages 112 and 306. See also page 276. Appendix H of the 2008 Final Report.

## Table 5:  Absolute[15] and Relative Importance[16] of Job Duties for Overall Job Performance

| Duty | Absolute Importance[1] Rating | SD | N | Relative Importance Rating | SD | N |
|------|---|---|---|---|---|---|
| **Control Suspects**: Activities involving pursuit, isolation, containment, search, and apprehension of suspects. | 4.1 | 0.77 | 74 | 7.5 | 4.45 | 91 |
| **Arrests**:  Activities involving arrest processing procedures, detention, and lodging of prisoners or juveniles. | 3.9 | .079 | 73 | 9.8 | 11.63 | 91 |
| **Safeguard Life/Property at Incident Scene**:  Activities involving safeguarding and securing people and property at the scene of specific incidents. | 3.9 | 0.83 | 73 | 9.0 | | 91 |
| **Patrol Duties and Responsibilities**:  Activities involving observing zone conditions or responding to incidents as required. | 3.6 | 0.71 | 71 | 16.5 | 15.16 | 91 |
| **Evidence/Property**:  Activities involving the safeguarding, storing, and otherwise accounting for evidence, and non-Police Department property at a zone station. | 3.7 | 0.81 | 67 | 5.8 | 4.67 | 91 |
| **Safeguard Police Department Property**:  Activities involving safeguarding or accounting for the proper condition of all police property and equipment. | 3.7 | 0.82 | 62 | 7.5 | 5.90 | 91 |
| **Preliminary Searches**:  Activities involving searches to locate suspects, evidence, or missing/injured persons. | 3.7 | 0.75 | 69 | 5.8 | 6.97 | 91 |
| **Preliminary Investigations**:  Activities involving initial investigations of incidents and decisions. | 3.6 | 0.65 | 69 | 5.3 | 3.19 | 91 |
| **Reports, Forms, and Memo Books**:  Activities involving the preparation of written forms, reports, or memo books.  Forms and reports maybe of a variety of types, such as:  captioned (fill-in-the-blank), written narrative, or a combination of these types. | 3.6 | 0.69 | 82 | 5.8 | 4.39 | 91 |
| **Department Policies, Procedures, Rules and Laws**:  Activities involving using and explaining the department policies and rules, and City, State, and Federal laws that govern the activities of police officers. | 3.5 | 0.68 | 66 | 5.3 | 4.63 | 91 |
| **Notifications/Communications/Administration**:  Activities involving official requests for assistance inside and outside the Department. Distribution of information regarding incidents and conditions in the zone.  Activities involving communications with superior officers and other officers to coordinate the activities of the zone. | 3.5 | 0.77 | 61 | 3.5 | 2.70 | 91 |
| **Court Appearance Activities**:  Activities involving your appearance in court and presentation of testimony. | 3.5 | 0.76 | 81 | 4.2 | 4.59 | 91 |
| **Professional Development**:  Activities to improve your skills or to improve the department. This includes participating in specific training or education, participating in professional organizations, or attending conferences. | 3.4 | 0.79 | 60 | 4.0 | 2.89 | 91 |
| **Traffic Enforcement and Control**:  Activities performed at the scene of traffic accidents and activities involved in traffic enforcement, such as issuing parking and moving traffic violations. | 3.4 | 0.74 | 74 | 9.0 | 9.52 | 91 |
| **Public Relations**:  Activities involving gathering and giving information concerning the community, and attending community meetings.  This includes planning activities to address community conditions and problems. | 3.1 | 0.66 | 14 | 3.8 | 4.41 | 91 |
| **Program Support**:  Activities involved with implementation and evaluation of programs to address community problems or conditions.  Activities involving taking action or initiating programs to address community problems. | 2.9 | 0.58 | 18 | 2.0 | 1.9 | 91 |

[1]  On a 5-point scale where 5 = Critical, 3 = Important, and 1 = Not important.
[2]  Where respondents divide 100 points among the 19 job duties based on their importance relative.

[15] 3-ring binder p. 308.
[16] 3-ring binder p. 421.

respondents should have been removed from the data set with further analyses based only on high-quality data.

***Identification of Physical Requirements of Police Work[17]***.  This part of the job analysis work was done to document the physical demands of the job.  Respondents were asked to make several types of judgments.  "Part II:  Duty/Ability/Characteristic Survey" of the job analysis questionnaire[18] asked respondents to distribute 100 points among 7 physical abilities for each of the 16 task/duty areas, thus indicating the importance of each physical ability (relative to the other physical abilities) for each task/duty cluster. Respondents were also asked to compare the importance of the entire set of cognitive abilities to the importance of the entire set of physical abilities and to the entire set of personality characteristics for each job duty.  In addition, respondents were also asked to distribute 100 points among the 7 physical abilities to indicate their relative importance for overall job performance.  Table 6 shows the relative importance of the 7 physical abilities for overall job performance.  The job analysis provides evidence that the requirements of the job include physical abilities, especially 1) Reaction Time; 2) Fine Hand/Body Movements; and 3) Cardiovascular Fitness.  The definitions of the characteristics were not included in the materials provided but I presume the definitions are well-accepted definitions that appear in the scholarly literature.  In spite of the many and difficult ratings, unknown is the absolute importance of each of the physical abilities is unknown.

***Identification of Required Cognitive Abilities***.  EB Jacobs started with an existing taxonomy of cognitive abilities, consolidating it to a set of 15 abilities that they

---

[17] 3-ring binder pages 99-100; 262-271; 361-416; 423; 427.

[18] 3-ring binder pages 279-304. Appendix I of the 2008 Final Report.

**Table 6: Relative Importance of Physical Abilities
for Overall Job Performance[19]**

| Physical Ability | Mean Relative Importance[1] Rating |
|---|---|
| Reaction Time | 18.9 |
| Fine Hand/Body Movements | 17.1 |
| Cardiovascular Fitness | 16.5 |
| Balance/Coordination | 13.5 |
| Muscular Endurance | 12.6 |
| Muscular Strength | 12.4 |
| Flexibility | 9.0 |
| | 100.00 |

[1] Where 100 points is divided among the abilities according to their importance relative.

---

[19] 3-ring binder page 427.

had previously found to be relevant to police work.[20]  Those 15 abilities are:  Deductive Reasoning, Fluency of Ideas; Inductive Reasoning; Information Ordering; Memorization, Oral Comprehension, Oral Expression; Originality; Problem Sensitivity; Selective Attention; Spatial Orientation; Time Sharing; Visualization; Written Comprehension; and Written Expression.  They included these 15 abilities along with definitions of them in the job analysis survey although I could not find the definitions in the materials provided to me.

As with the physical abilities, survey respondents were asked to make several types of judgments.  "Part II:  Duty/Ability/Characteristic Survey" of the job analysis questionnaire[21] asked respondents to distribute 100 points among the 15 cognitive abilities for each of the 16 task/duty areas, thus indicating the importance of each cognitive ability (relative to the other cognitive abilities) for each task/duty cluster.  Respondents were also asked to compare the importance of the entire set of cognitive abilities to the importance of the entire set of physical abilities and to the entire set of personality characteristics for each job duty.  In addition, respondents were also asked to distribute 100 points among the 15 cognitive abilities to indicate their relative importance for overall job performance.  Table 7 shows the relative importance of the 15 cognitive abilities for overall job performance.  Relative to other cognitive abilities, Reasoning is most important followed by Oral Expression, Memorization, Oral Comprehension, Written Expression, and Written Comprehension.  In spite of the many and difficult ratings, the absolute importance of each of the cognitive abilities is unknown.

---

[20] 3-ring binder pages 100-101; 218-220;

[21] 3-ring binder pages 279-304. Appendix I of the 2008 Final Report.

**Table 7: Relative Importance of Cognitive Abilities
for Overall Job Performance[22]**

| Cognitive Ability | Mean Relative Importance[1] Rating |
|---|---|
| Deductive Reasoning | 10.6 |
| Oral Expression | 9.5 |
| Memorization | 8.5 |
| Oral Comprehension | 8.4 |
| Written Expression | 8.0 |
| Written Comprehension | 7.7 |
| Information Ordering | 7.5 |
| Visualization | 7.4 |
| Problem Sensitivity | 6.1 |
| Inductive Reasoning | 6.1 |
| Selective Attention | 5.3 |
| Fluency of Ideas | 4.7 |
| Originality | 3.5 |
| Spatial Orientation | 3.4 |
| Time Sharing | 3.2 |
|  | 100.00 |

[1]  Where 100 points is divided among the abilities according to their
      importance relative.

---

[22] 3-ring binder page 425.

**Identification of Required Personality Characteristics.**  EB Jacobs included 13 other personal characteristics, often referred to as personality characteristics, in their job analysis survey. These 13 characteristics are: Achievement Oriented; Agreeable; Calm; Concerned; Conscientious; Integrity; Laid Back; Open to Experiences; Outgoing; Prefers Routine/Consistency; Reserved; Spontaneous; Strong Willed.

As with the physical and cognitive abilities, survey respondents were asked to make several types of judgments.  "Part II:  Duty/Ability/ Characteristic Survey" of the job analysis questionnaire[23] asked respondents to distribute 100 points among the 13 personality characteristics for each of the 16 task/duty areas, thus indicating the importance of each personality characteristic (relative to the other personality characteristics) for each task/duty cluster.  Respondents were also asked to compare the importance of the entire set of personality characteristics to the importance of the entire set of cognitive abilities and to the entire set physical abilities for each job duty.  In addition, respondents were also asked to distribute 100 points among the 13 personality characteristics to indicate their relative importance for overall job performance.  Table 8 lists the 13 personality characteristics along with definitions of each.[24] Table 8 also shows the relative importance of the 13 personality characteristics for overall job performance.  Relative to the other personality characteristics, "Integrity", "Achievement Oriented", "Conscientious", and "Calm" are the most important.

An interesting difference between the way EB Jacobs treated personality characteristics and physical and cognitive abilities is that they included the polar opposite characteristic (the opposite end of the continuum) as a separate characteristic for all but

---

[23] 3-ring binder pages 279-304. Appendix I of the 2008 Final Report.
[24] 3-ring binder, pages 103; 429; Appendix L-5 of the 2008 Final Report.

**Table 8: Relative Importance of Personality Characteristics
for Overall Job Performance[25]**

| Personality Characteristic | Definition | Mean Relative Importance Rating[1] |
|---|---|---|
| **Integrity** | Tells the truth; avoids cheating and other ways of misrepresenting him/herself to other people (except when working undercover). | **20.2** |
| **Achievement Oriented** vs. **Laid Back** | Prefers to be a leader rather than a follower; is competitive and focused on achieving desired outcomes; sets high personal objectives; is career-focused. vs. Prefers to be a follower rather than a leader; enjoys taking part in competition more than winning; sets fairly easy goals for him/herself; getting ahead at work is really not important. | **12.5** vs. **4.0** |
| **Conscientious** vs. **Spontaneous** | Almost always follows the rules; is careful, predictable and dependable; prefers taking systematic and analytical approach to problem solving; prefers to plan ahead. vs. Considers rules to be general guidelines; disregards rules if following them would be inconvenient; is impulsive and likely to do almost anything; prefers using intuition to solve problems. | **10.3** vs. **3.2** |
| **Calm** vs. **Concerned** | Seems to relax easily; problems don't seem to bother him/her; is in control of his/her emotions, and never seems to get very excited or upset. vs. Tends to worry most of the time; is concerned about problems that face him/her; responds emotionally so that other people know what he/she is feeling. | **10.2** vs. **8.4** |
| **Agreeable** vs. **Strong Willed** | Is sensitive to the interpersonal needs of other people; is supportive of other people; attempts to include other people in decision making. vs. Is primarily concerned with his/her own needs; is critical of other people; makes decisions quickly, with little or no input from other people. | **6.0** vs. **6.6** |
| **Open to Experiences** vs. **Prefers Routine/ Consistency** | Prefers trying new approaches and participating in new activities; is curious about how things work and why people do what they do; enjoys schedules and activities that vary; tried his/her own ideas of how things can be done; welcomes change. vs. Uses "tried and true" methods for solving problems; would rather have a consistent schedule and set of work activities; often adopts conventional ways of accomplishing goals; finds routines to be comforting. | **5.6** vs. **5.2** |
| **Outgoing** vs. **Reserved** | Prefers to be with other people; is socially confident when around other people; is comfortable being persuasive. vs. Prefers to be by him/herself; is self-conscious around other people; is passive around groups of people. | **5.2** vs. **2.5** |

[1]  Where 100 points is divided among the abilities according to their relative importance.

[25] 3-ring binder pages 103; 429; Appendix L-5 of the 2008 Final Report

one of the personality characteristics.  Thus, survey respondents evaluated the relative importance of both types of characteristics, positive and negative.  But, how is an important negative characteristic to be rated in terms of relative importance?  What does a low number of points assigned to a negative characteristic mean?  The entire characteristic – both ends of the continuum – is important.  Thus, even though the relative importance ratings of the polar opposites of Integrity, Achievement Oriented, Conscientious, and Calm (i.e., Laid Back, Spontaneous, and Concerned) are lower, those polar opposites are as important as their positive end.

Consider, for example, physical abilities.  If the opposite or low end of Reaction Time, i.e., Slow Reaction Time, were included in a list of physical abilities and was rated in terms of its relative importance, it should be rated as important as Reaction Time.  Yes, one is negative, but they are equally important.   Similarly, if the low end of Reasoning, i.e., Dim-witted, were included in a list of cognitive abilities and was rated in terms of its relative importance, it should be rated as important as Reasoning.  The two are equally important, even though Dim-Witted is a negative characteristic, i.e., the low end of Reasoning.

An example of the confusion created by including characteristics that represent both ends of a continuum is the EB Jacobs' conclusion that the "two least important areas are Spontaneous and Reserved."[26]  In fact, Spontaneous is the opposite (other end of the continuum) of Conscientious which EB Jacobs concludes is one of the three most important characteristics for effective performance as a police officer.

This discussion highlights the importance of considering the expected relationship (positive or negative) between a characteristic and job performance when developing the

---

[26] 3-ring binder, page 119; i.e., page 41 of 2008 Final Report.

list of characteristics respondents are asked to rate. This discussion also highlights the importance of asking for ratings that yield interpretable results. It is impossible to know how to interpret the results of the relative importance ratings. Absolute levels of importance are more meaningful.

*Relative Weighting of Characteristics.* EB Jacobs asked survey respondents to compare the importance of the entire sets of cognitive abilities, physical abilities, and personality characteristics to each other. That is, respondents indicated on a 100 point scale the relative importance of the set of cognitive abilities, set of physical abilities, and set of personality characteristics for overall performance. The results are shown in Table 9. EB Jacobs translates these relative importance ratings into relative weights for the three types of required characteristics. However, the ratings were based on the entire sets of physical abilities, cognitive abilities, and personality characteristics that were presented in the job analysis questionnaire, not just the ones deemed important by the respondents. Thus, these relative weights should be considered approximates – the three sets of characteristics are roughly equally important.

*Overall Summary of Concerns of the Formal Job Analysis.*

- Respondents were asked to make thousands of difficult ratings resulting in a very tedious rating task. Yet, there was very limited data-quality checking, at least as reported in the technical reports and documentation that I reviewed.

- Respondents often were asked to provide relative judgments, such as instructions to 'assign 100 points among these physical abilities to indicate their relative importance for performance'. Unfortunately, relative judgments do not provide information about the level of skill or ability that is needed to perform the work. Thus, although a skill or ability might be more important than another skill or ability, it is possible that neither is important or that both are critically important.

- The list of personality characteristics in the job analysis questionnaire included characteristics that were the same characteristic, but opposite

33

**Table 9:  Relative Importance of Cognitive Abilities, Physical Abilities, and Personality Characteristics for Job Performance[27]**

| Type of Characteristic | Mean Relative Importance[1] Rating |
|---|---|
| Cognitive Abilities | 42.6 |
| Physical Abilities | 25.9 |
| Personality Characteristics | 31.5 |
| | 100.00 |

[1]  Where 100 points is divided among the abilities/skills/characteristics according to their importance relative.

---

[27] 3-ring binder p. 423

34

o ends of the continuum. Respondents were asked to rate their relative importance resulting in confusing conclusions such that the same characteristic was both important but not important.

o There appears to have been limited, if any, input from community members about what they value in their police force. There may well be characteristics that are important that are not reflected in the formal job analysis list of characteristics that should be included in the selection system.

o There may be characteristics that are over-emphasized (even unnecessary) that can 1) affect the overall validity of the procedures and 2) have an adverse impact on African Americans.

o Conversely, there may be characteristics that are under-emphasized (or missing) that if added, might 1) improve validity and 2) reduce adverse impact on African Americans.

o Issues in the job analysis can compromise the job relatedness of the selection system[28].

**Criterion-related Validity Research**

In personnel selection, criterion-related validity refers to empirical evidence derived from a study in which individuals' scores on tests are correlated with their performance on some criterion or outcome variable. Often test scores and criterion/outcome scores are obtained at the same time – a research design called concurrent validation strategy. The index of relationship is often a correlation coefficient which ranges from a -1.0 (perfect negative relationship) to +1.0 (perfect positive relationship. A 0.00 correlation indicates no relationship between the two (predictor-criterion) variables. Several criterion-related validity studies have been conducted involving police work, enough that the studies have been summarized in a meta-analysis. A meta-analysis is a quantitative analysis and summary of results across many

---

[28] *Uniform guidelines on employee selection procedures*, 29 C.F.R. 1607 (1978).

Society of Industrial and Organizational Psychology, Inc. (2003). *Principles for the validation and use of personnel selection procedures* (3rd ed.). Bowling Green, OH: Society of Industrial and Organizational Psychology.

independent studies.  The results of these studies are described below according to type of characteristic, i.e., cognitive, physical, and personality.

***Cognitive Abilities***.  A meta-analysis of the correlations between cognitive abilities (e.g., reasoning, quantitative, verbal, and memory) and job performance of police officers found that observed[29] criterion-related validities were modest, lower than that found in other types of work.  Correlations were higher for predicting training criteria. The combination of Reasoning ability and Verbal ability predicted performance better than either alone, indeed, for training criteria, the zero-order correlation was in the high .40s.[30]  Reviews and summaries by others[31] have found reasonably similar results.  Hirsh and colleagues hypothesized that one reason for "…the low validities associated with job performance is that personality variables or interpersonal skills play a large role in determining proficiency as a police officer…" (p. 417).

Recently, research examining individual difference characteristics of police officers involved in shootings of unarmed citizens has produced interesting results.  This research focuses on Working Memory and its usefulness in predicting which people are more prone to be involved in such incidents.  The research indicates that in experimental settings, when threatened, individuals with low working memory capacity make more shooting errors such as shooting unarmed targets and not shooting armed targets than

---

[29] An "observed correlation" is a zero-order correlation coefficient between two variables, in this case, a predictor and criterion (outcome) that has not been corrected for unreliability in the predictor or criterion or for other artifacts.

[30] Hirsh, H. R., Northrop, L. C., & Schmidt, F. L. (1986). Validity generalization results for law enforcement occupations. *Personnel Psychology, 39*, 399-420.

[31] Ghiselli, E. E. *The validity of occupational aptitude tests*. (1966). New York: Wiley & Sons.

Salgado, J. F., Anderson, N., Moscoso, S., Bertua, C., de Fruyt, F., & Rolland, J. P. (2003). A meta-analytic study of general mental ability validity for different occupations in the European Community. *Journal of Applied Psychology, 88*, 1068-1081.

people with higher working memory capacity.[32]  The logic behind the research and finding is that people who possess a limited Working Memory capacity have fewer available cognitive resources to regulate behavior and thus make poor or reactive decisions in general.  That is, when threatened, people with limited Working Memory capacity are more prone to shooting errors.  Although this research is recent and more research is warranted, given Memory was shown to be relatively important in the EB Jacobs' job analysis of Pittsburgh police officer jobs and in other research has been shown to have a smaller mean score difference between Whites and African Americans than general cognitive ability, a test of Working Memory may be appropriate in the selection battery.

    *Personality Characteristics*.  Several meta-analytic studies have been conducted investigating the criterion-related validity of personality characteristics for predicting performance of police officers, including overall job performance, training performance, interpersonal performance, task performance, teamwork, counterproductive behavior, substance abuse, integrity, and safety[33].  The most extensive meta-analysis summarized

[32] Kleider, H. M., & Parrott, D. J. (2009). Aggressive shooting behavior:  How working memory and threat influence shoot decisions. *Journal of Research in Personality, 43*, 494-497.

Kleider, H. M., Parrott, D. J., & King, T. Z. (2010). Shooting behavior:  How working memory and negative emotionality influence police officer shoot decisions. *Applied Cognitive Psychology, 24*, 707-717.

[33] Barrick, M. R., & Mount, M. K. (1991). The big five personality dimensions and job performance:  A meta-analysis. *Personnel Psychology, 44*, 1-26.

Christian, M. S., Bradley, J. C., Wallace, J. C., & Burke, M J. (2009). Workplace safety:  A meta-analysis of the roles of person and situation factors. *Journal of Applied Psychology, 94*, 1103-1127.

O'Brien, S. G. (1996). *The predictive validity of personality testing in police selection:  A meta-analysis*. Unpublished master's thesis, University of Guelph, Guelph, Onatrio.

Ones, D. S., Viswesvaran, D., & Dilchert, S. (2004).  *Personality and police officer work performance:  A construct-based, comprehensive meta-analysis and implications for pre-offer screening and psychological evaluations*. Paper presented at the annual meeting of the International Association of Chiefs of Police (IACP), Los Angeles, CA.

Ones, D. S., Viswesvaran, D., & Schmidt, F. L. (1993). Comprehensive meta-analysis of integrity test validities:  Findings and implications for personnel selection and theories of job performance [Monograph]. *Journal of Applied Psychology, 78*, 679-703.

over 19,000 criterion-related validity coefficients within several criteria/outcomes according to 1) the five (Big 5) variables of the Five-Factor Model of personality, 2) facets of the five broad personality variables, and 3) compound variables (combinations of facets from multiple, broad personality variables)[34] using the taxonomic structure of personality variables developed by Hough and Ones.[35] Table 10 shows their results and my conclusions about the possible usefulness of the personality variables for the Pittsburgh BOP entry-level selection system.

Another significant meta-analysis examined the validity of measures of integrity for predicting overall job performance and counterproductive behavior (such as theft, disciplinary action, tardiness, mishandling of cash). The results indicate that personality measures of "integrity" correlate with overall job performance and counterproductive behavior in the mid .20s (corrected to .30s)[36]. Importantly, the validities generalize across types of work indicating that the results are relevant for police work. Other research indicates that measures of integrity consist of three Big Five Factors, i.e., Conscientiousness, Agreeableness, and Emotional Stability.[37]

---

Salgado, J. F. (1997). The five factor model of personality and job performance in the European Community. *Journal of Applied Psychology, 82,* 30-43.

[34] Ones, D. S., Viswesvaran, D., & Dilchert, S. (2004). *Personality and police officer work performance: A construct-based, comprehensive meta-analysis and implications for pre-offer screening and psychological evaluations.* Paper presented at the annual meeting of the International Association of Chiefs of Police (IACP), Los Angeles, CA.

[35] Hough, L. M., & Ones, D. S. (2001). The structure, measurement, validity, and use of personality variables in industrial, work, and organizational psychology. In N. R. Anderson, D. S. Ones, H. K. Sinangil, & C. Viswesvaran (Eds.), *Handbook of Work Psychology* (pp. 233-377). London and New York: Sage.

[36] Ones, D. S., Viswesvaran, C., & Schmidt, F. L. (1993). Comprehensive meta-analysis of integrity test validities: Findings and implications for personnel selection and theories of job performance [Monograph]. *Journal of Applied Psychology, 78,* 679-703.

[37] Ones, D. S. (1993). *The construct validity of integrity tests.* Unpublished doctoral dissertation, University of Iowa, Iowa City, IA.

**Table 10: Meta-analytic Evidence of the Usefulness of Personality Variables for Predicting Important Police Officer Outcomes[38]**

| Personality Variable | Job Performance | Training Performance | Task Performance | Interpersonal Performance | Teamwork | Avoiding Counter-productive Behavior | Avoiding Substance Abuse | INCLUDE? |
|---|---|---|---|---|---|---|---|---|
| **FIVE-FACTOR MODEL & FACETS** | | | | | | | | |
| **Agreeableness (A)** | + | | | + | + | + | + | **Y** |
| **Conscientiousness (C)** | | + | | | | | | **Y** |
| Achievement | + | | | | | | | **Y** |
| Dependability | | | + | | | | | **Y** |
| Order | + | | | | | | | **Y** |
| Impulse Control/Cautiousness | + | + | | | + | + | + | **Y** |
| Persistence | | | | | | | + | **Y** |
| **Emotional Stability (ES)** | | | | | | | | |
| Self Esteem | + | | + | | + | | | **Y** |
| Low Anxiety | | + | | | | | | **\*\*** |
| Even-tempered | + | | | + | + | | | **Y** |
| **Extraversion (E)** | | | | | | | | |
| Dominance | | | | | | | | |
| Activity/Energy Level/Persuasiveness | + | | + | | | | | **Y** |
| **Open to Experience (OE)** | | | | | | | | |
| Change/Variety | | | | | | | | |
| Curiosity | | | | | | | | |
| Intellect | | + | | | | | | **\*\*** |
| **COMPOUND VARIABLES (Combinations of Five-Factor & Facet Variables)** | | | | | | | | |
| Self-Control (ES+ C+) | + | | + | + | + | | | **Y** |
| Tolerance (OE+ A+) | | + | | + | | | | **Y** |
| Lack of Aggression (A+ C+) | | | + | | | | | **Y** |
| Fair & Stable Leadership (ES+ A+ C+) | | | + | | | | | **Y** |
| Socialization (ES+ A+ C+) | | | | | + | | + | **Y** |

**Note:**  "+" indicates results based on Ones, Viswesvaran, and Dilchert (2004) report. "Y" indicates Hough recommendation about whether or not the variable should be included in a police test battery.

**\*\*** Not recommended for inclusion: Low Anxiety scales may be challenged on basis of Americans with Disability Act implementation guidelines. Intellect scale is not recommended because tests of cognitive ability are recommended.

---

[38] Ones, D. S., Viswesvaran, D., & Dilchert, S. (2004). *Personality and police officer work performance: A construct-based, comprehensive meta-analysis and implications for pre-offer screening and psychological evaluations.* Paper presented at the annual meeting of the International Association of Chiefs of Police (IACP), Los Angeles, CA.

**Summary**

The information from the mission statement, values statement, training officer evaluation factors (performance appraisal forms), EB Jacobs' formal job analysis results, and published research of the criterion-related validities of skills, abilities, and other characteristics for predicting performance of police officers suggest the following characteristics are relevant:

**Physical Abilities:**

1. ***Reaction Time***[39] – ability to give a fast response to a signal (sound, light, picture) when it appears.  This ability is concerned with the speed with which the movement can be started with the hand, foot or other parts of the body.

2. ***Fine Hand/Body Movements***[40] – ability to make fine motor movements involving hands, wrists, fingers, feet, toes, lips and tongue. Examples are picking up objects between the thumb and finger, using a pencil to write carefully, and other small muscle tasks that occur on a daily basis.

3. ***Cardiovascular Fitness*** – ability of the lungs and circulatory systems to perform efficiently over long time periods; involves aerobic capacity and general systemic fitness; stamina.

**Cognitive Abilities:**

4. ***Problem Solving Ability/Reasoning/Situational Judgment*** – reasoning skills; appropriate and effective decision making for the situation at hand; creatively addressing citizen issues; cognitive flexibility.

5. ***Verbal Communication Skills*** – ability to speak to others in a clear voice to transmit sufficient information that ensures understanding of the situation; understanding the spoken word of others; ability to read and write.

---

[39] Although the formal job analysis indicates this is a relatively important physical ability, the typical response-time ability test is not likely a good differentiator of on-the-job performance of police officers. This ability is more likely useful for differentiating performance on video games.  A measure of this ability is not recommended for inclusion in the Pittsburgh BOP hiring procedures.

[40] Again, this is not a likely differentiator of on-the-job performance of police officers.  The formal job analysis indicates this is a relatively important ability and is thus useful for documenting the physical needs of police officers from an American's with Disability Act (ADA) perspective.  A measure of this ability is not recommended for inclusion in the Pittsburgh BOP hiring procedures.

6. *Working Memory* – short-term memory; temporarily storing and managing information; information-processing functions involving encoding, storing, and retrieving data in the short-term.

**Personality Characteristics:**

7. *Integrity* – trustworthiness; honesty. (Big 5 factor compound variable consisting of Conscientiousness, Agreeableness, and Emotional Stability.)

8. *Conscientiousness/Accountability/Dependability/Achievement Orientation* – consciously fulfilling commitments and responsibilities; accepting responsibility; striving for the highest moral, ethical and professional standards; trying to accomplish assignments and responsibilities as effectively as possible; careful about details; seeking to continually improve; working effectively within a chain-of-command. (Big 5 Conscientious facets consisting of Achievement, Dependability, Order, Impulse Control/Cautiousness, and Persistence.)

9. *Stress Resistance* – remaining focused, calm, and problem solving under duress; resisting long-term effects of stress. (Big 5 Emotional Stability facets consisting of Self Esteem and Even-tempered.)

10. *Respect for Others* – including citizens and other members of the police force regardless of their circumstances, experiences, and ethnic background; courteous, unbiased. (Big 5 compound variable Tolerance.)

11. *Service Orientation/Cooperation* – committed to protecting the community and all its citizens; committed to partnering with community organizations, other agencies, citizens, and other members of the police force to enhance the safety of all people and their property; teamwork; non-authoritarian; non-defensive. (Big 5 compound variable consisting of Agreeableness, Conscientiousness, and Emotional Stability.)

12. *Proactive Behavior* – initiating activity to engage and address situations and people. (Big 5 Extraversion facet Activity/Energy Level/Persuasiveness.)

13. *Safety Mindedness* – for self and others; attentive to dangers inherent in situations. (Big 5 compound variable consisting of Conscientiousness and Emotional Stability facets.)

**Other:**

14. *Situational Awareness* – observing what is going on in one's surroundings.

The next chapter (Chapter 4) examines the current Pittsburgh entry-level police officer selection system to evaluate what it purports to measure and how well it measures what it purports to measure.  Chapter 5 evaluates the validity evidence for the current selection system.  That chapter also evaluates the extent to which the current selection system measures the above characteristics identified as important for predicting police officer effectiveness.

# Chapter 4:  Quality of the Measurement System – How Well Does the Current Selection System Measure What It Purports to Measure and What Is Its Impact on African Americans?

This chapter describes and evaluates the procedures, processes, and implementation of the current Pittsburgh BOP entry-level police officer selection system. The components of the current system include applicant preparation materials, the LEAB (written exam), oral board and oral examiner training, OPETC physical fitness and reading tests, background investigation, Chief's Roundtable, and the psychological exam (performed by licensed psychologists).[41]  Each component is evaluated according to the extent to which it accomplishes its objective.  For example, the extent to which the scores that the procedure generates are likely to be accurate reflections of an applicant's standing on the characteristic(s) it is intended to measure is examined and evaluated along with extent to which its weight in the overall scoring scheme is appropriate.  My knowledge about the specifics of the selection system is based on my review of materials provided to me by the City attorneys, EB Jacobs' representatives, and my interviews with civilians, civil servants, applicants, and BOP representatives who are knowledgeable about or have been involved in the selection process of entry-level BPO police applicants. The chapter concludes with an analysis of the overall impact of the selection system on protected classes.

---

[41] This chapter does not address the medical examination.

**Applicant Preparation Materials**

Significant effort is devoted to providing applicants with the opportunity to prepare for the written test and oral board exams. The City and EB Jacobs are commended for this effort.

Inspection of the materials reveals the extent to which reading skills are required to benefit from the preparation materials and classes. Greater emphasis might well be placed on actual practice taking the tests and oral board experience. Feedback is an essential part of learning and the more that feedback can be incorporated into the preparation, the more effective the preparation will be. The community college preparation classes could be improved if greater emphasis were placed on oral feedback in both the written and oral board preparation.

The oral board consists of three parts – Work Situation, Personal Safety Promotion Exercise, and Structured Interview. The preparatory materials provide potential applicants with a sample Work Situation but virtually no information about the Personal Safety Promotion Exercise and Structured Interview. There are four generic questions that Oral Board examiners ask applicants about the Work Situation and four generic questions about the Personal Safety Promotion Exercise. These questions would be very helpful to candidates as they prepare for the Oral Board exam. EB Jacobs has developed alternate forms of the Work Situation and Personal Safety Promotion Exercise for which the generic questions apply. Thus, it would seem that test security would not be compromised if candidates were informed of the generic questions.

The applicant preparation materials for the Oral Boards provide information about how to perform well in the oral exam. The materials inform the applicants that they will

be evaluated on three characteristics – Oral Expression, Comprehension, and Reasoning.

Definitions for each are provided.  For example, "Oral Expression" is defined as:

> Ability to use language orally to communicate information or ideas to other
> people.  This ability involves organizing information or ideas and expressing them
> in a clear and logical manner using a tone and vocabulary that is appropriate for
> the audience.  The audience might include suspects, victims, witnesses, other
> police officers, supervisors, shop owners, or any individuals with whom the police
> office might come in contact.  Examples might include explaining a new
> department procedure or policy to a police officer or group of police officers
> and/or explaining investigation procedures to a victim. (p. 4).[42]

It is very important to have a definition of each of the characteristics but it would be very

helpful to also inform applicants about the standards that examiners use to evaluate them.

For example, exactly half of the behavioral anchors/statements defining the "Highly

Effective" rating on the Oral Expression rating scale refer to the applicant's voice or pace

of speaking, i.e., "Spoke in a clear and concise manner," "Spoke loudly enough to be

heard and used a calm tone of voice," "Rarely paused or hesitated when responding," and

"Spoke at a pace which was easy to follow".  Yet, nothing in the preparatory materials

provides the applicant with advice about voice or pace of speaking.  Instead, applicants

learn about the context in which police officers who are on the job might need to express

themselves orally. The Oral Board applicant preparatory materials should be more

explicit about what standards or criteria examiners use to evaluate applicants.

An incorrect detail in the "EB Jacobs Law Enforcement Aptitude Battery (LEAB)

Assessment Preparation Guide" is the description of the response options for the Work

Styles Questionnaire (WSQ) items.  In the Preparation Guide the values of the response

options are reversed such that "Strongly Disagree" is a 5 rating and "Strongly Agree" is a

1 rating whereas in the actual LEAB, the WSQ response option "Strongly Disagree" is a

---

[42]  "City of Pittsburgh Department of Personnel and Civil Service Commission Police Officer Recruit Oral
Examination Candidate Preparation Guide."  3-ring binder Tab H.

1 rating and "Strongly Agree" is a 5.[43]  I have no way of knowing if this was confusing to applicants.  Enough time may have passed before applicants actually completed the LEAB that they didn't recognize the reversal.  Nonetheless, it is wise to have preparation materials correspond to what the actual experience will be.

In short, the preparatory materials could be more explicit, more informative, and more accurate.

**Written Exam – Law Enforcement Applicant Battery (LEAB)[44]**

The LEAB currently consists of three parts – a cognitive ability test (CAT), and two tests intended to measure personality characteristics, i.e., the Life Experience Survey (LES) and the Work Styles Questionnaire (WSQ). The following sections describe and evaluate the LEAB:  1) LEAB Cognitive Ability Test (CAT); 2) Impact of LEAB Cognitive Ability Test (CAT) on Protected Classes; 3) LEAB Non-cognitive Measure: Life Experiences Survey (LES); 4) Impact of LEAB LES on Protected Classes; 5) LEAB Non-cognitive Measure: Work Styles Questionnaire (WSQ); 6) Impact of LEAB WSQ on African Americans; and 7) and LEAB Composite.

*LEAB Cognitive Ability Test (CAT)*.[45]  The cognitive ability test consists of 48 items intended to measure the following 6 cognitive abilities with 8 items each:

- Written Comprehension,
- Problem Sensitivity,
- Inductive Reasoning,
- Deductive Reasoning,
- Written Expression, and
- Information Ordering.

---

[43] Compare 3-ring binder page 537 to page 610.
[44] Information about the LEAB is found in 3-ring binder Tabs AA, C, E, especially pp.30-38; 83-91; 153-167; 437-631; 696-735; 793.
[45] 2006 Final Report, 3-ring binder, Tab AA.  Law Enforcement Aptitude Battery (LEAB) Validity Report dated 2004, 3-ring binder Tab E.

Originally, the LEAB included items to measure the following 3 additional abilities:

- Spatial Orientation,
- Memorization, and
- Visualization.

EB Jacobs eliminated these three abilities to reduce testing time, simplify test administration, and achieve a closer correspondence between paper-and-pencil and computer-administered testing.[46]  But, Memory, presumably measured by Memorization, was one of the relatively more important cognitive abilities for effective police performance whereas Problem Sensitivity and Inductive Reasoning were not rated as important (relatively).  This analysis suggests that the cognitive abilities included in the CAT may not be the most appropriate set of cognitive abilities to measure as indicated in EB Jacobs' job analysis of Pittsburgh police positions.

A sample item is shown in Table 11.  All the cognitive ability items are multiple-choice, with one correct answer and three incorrect answers.

Applicant CAT scores are computed by summing the number of correct answers, with scale scores for each cognitive ability ranging from 0 to 8. According to the EB Jacobs 2011 Final Report,[47] "the ability scale scores were then weighted by the cognitive importance ratings collected through our LEAB validation efforts to reflect the importance of the cognitive abilities." (p. 165).  The weights are as follows:

- Written Comprehension    24%
- Written Expression    23%
- Deductive Reasoning    15%
- Information Ordering    13%
- Problem Sensitivity    13%
- Inductive Reasoning    12%

---

[46] Law Enforcement Aptitude Battery (LEAB) Validity Report dated 2004, 3-ring binder Tab E, pp. 706-7.
[47] 3-ring binder Tab AA.

47

**Table 11: Sample LEAB Cognitive Ability Test (CAT) Item[48]**

Use the information in the following passage to answer question 2.

Officer Thompson has noticed that in his patrol area, most of the assaults occur in the eastern and northern sections, while most automobile thefts occur in the southern and western sections and most traffic accidents occur in the western section.

The majority of automobile thefts take place between 3 a.m. and 7 a.m.  Most of the traffic accidents occur either between 7 a.m. and 9 a.m. or between 5 p.m. and 8 p.m.  Most of the assaults occur between 7 p.m. and 9 p.m. or between 11 p.m. and 4 a.m.

In addition, the traffic accidents almost always occur on Mondays and Fridays, the assaults take place on any day from Wednesday through Saturday, and automobile thefts typically take place on weekday mornings.

2.  According to the preceding passage, Officer Thompson mostly likely would be able to reduce the number of assaults by patrolling the:

    A.  eastern section between 5 a.m. and 1 p.m.
    B.  eastern section between 11 a.m. and 5 p.m.
    C.  western section between 10 p.m. and 6 a.m.
    D.  northern section between 8 p.m. and 1 a.m.

---

[48] From "Law Enforcement Aptitude Battery (LEAB) Candidate Preparation Guide," 3-ring binder page 536.

These weights are based on job analysis data from the original LEAB validation project.[49]

This weighting approach has several drawbacks.  First, it assumes that the importance ratings are accurate and relevant.  However, the job analysis for the 2004 LEAB validation study did not include Pittsburgh BOP.  Second, the importance ratings are relative importance ratings.  As described previously, relative importance ratings do not provide information about absolute importance of the abilities. Third, some of the more important abilities (at least based on the EB Jacobs' Pittsburgh police job analysis) were not included in the CAT.  Fourth, some of the less important cognitive abilities (at least based on the 2008 Pittsburgh police job analysis[50]) were included in the CAT. Fifth, differentially weighting these cognitive abilities assumes that the scores actually measure the specific, different abilities.  Evidence that the scale scores do indeed measure separate, distinguishable abilities is not reported.  For example, internal consistency estimates (reliability estimate using coefficient alpha) of the separate scales are not reported.  Only the reliability of the <u>overall</u> CAT score is reported.  Using 2013 Pittsburgh test administration data, the reliability of the overall CAT score is .74.[51]

Presumably, the weighting strategy of cognitive ability scores to form a cognitive ability composite is intended to map the requirements of the job, but evidence for such a correspondence is lacking.  Some cognitive abilities are relevant.  The appropriate ones should be included in the selection system, and differential weighting may not be necessary.

---

[49] Email from Joe Hinish (EB Jacobs employee) dated February 4, 2014.

[50] 2008 Final Report; 3-ring binder Tab AA.

[51] Email from EB Jacobs dated February 4, 20014.

49

*Impact of LEAB Cognitive Ability Test (CAT) on Protected Classes*.  EB Jacobs set a passing cut-score of 5 percent.[52]  That is, people scoring in the bottom 5 percent of the applicant pool are disqualified from further consideration. The rationale for setting a cut-score was to "safeguard against the possibility that very low cognitive performance could be compensated for by very high performance on the other, non-cognitive components."[53]

EB Jacobs examined the impact on protected classes of the 6-ability CAT composite versus 9-ability CAT composite and concluded that the adverse impact on African Americans and females was less with the 6-ability CAT composite.  However, the adverse impact at the cut score they set for the CAT, i.e., bottom 5 percent of the test takers, was essentially the same for the 6- and 9-ability composite.[54]

I examined the impact, possible adverse impact, of the 5% passing cut-score on the 6-ability composite, the composite that was implemented in Pittsburgh.  The numbers of people of each ethnic and gender group that were disqualified as a result of applying the cut score are shown in Tables 12, 13, and 14 for the 2011, 2008, and 2006 test administrations respectively.

Adverse impact analysis involves comparing the selection ratios of two groups to determine if different pass/fail rates exist. The *Uniform Guidelines on Employee Selection Procedures* provides guidance, i.e., the 4/5th (80 percent) rule of thumb, in determining whether or not the ratios are different.  If a selection ratio for a protected group is less than 4/5th that of the selection ratio of the group with the highest rate, it is

---

[52] 2011 Final Report, Tab AA, p. 165.

[53] 2011 Final Report, p. 15; [3-ring binder Tab AA, p. 166].

[54] Law Enforcement Aptitude Battery (LEAB) Validity Report dated 2004; p. 8 [3-ring binder Tab E, p. 707].

**Table 12:  Adverse Impact Analysis of the LEAB
Cognitive Ability Test (CAT) –
2011 Test Administration Data[55]**

| Ethnic Background | Took CAT | Failed CAT | Passed CAT[1] | Selection Ratio[2] | Adverse Impact Analysis[3] |
|---|---|---|---|---|---|
| White | 894 | 30 | 864 | 96.6% | -- |
| African American | 144 | 23 | 121 | 84.0% | **87%** |
| Hispanic | 32 | 2 | 30 | 93.4% | 96.7% |
| Asian | 6 | 1 | 5 | 83.3% | 86.2% |
| American Indian | 3 | 0 | 3 | 100% | 103.5% |
| Other/Unknown | 11 | 0 | 11 | 100% | 103.5% |
| | | | | | |
| **Gender** | | | | | |
| Male | 910 | 39 | 871 | 95.7% | -- |
| Female | 180 | 17 | 163 | 90.6% | 94.7% |

[1]  The figures in this column may differ from those in the column "Passed LEAB" on 3-ring binder page Tab E, page 770 because some people failed the Work Styles Questionnaire (WSQ) and Life Experiences Survey (LES) but passed the CAT.

[2]  Selection Ratio is the percent of people of a group that passed the test. It is calculated by dividing the number of people of a particular group that passed the CAT by the number of people of that group that took the CAT.  Thus, the selection ratio for the White group is 96.6%, i.e., $864 \div 894 = 96.6\%$.

[3]  Adverse Impact is calculated by dividing the selection ratio of the protected group, e.g., African American group, by the selection ratio of the comparison group, e.g., White group.  In this case, the African American selection ratio is 87 percent that of the White selection ratio, i.e., $84.0 \div 96.6 = 87\%$.  A value that is less than 4/5 (or 80%) is generally regarded as evidence of adverse impact.

---

[55]  Data taken from 2011 Final Report, Appendix E p. 1; 3-ring binder Tab E, page 770.

**Table 13:  Adverse Impact Analysis of the LEAB**
**Cognitive Ability Test (CAT) –**
**2008 Test Administration Data[56]**

| Ethnic Background | Took CAT | Failed CAT | Passed CAT[1] | Selection Ratio[2] | Adverse Impact Analysis[3] |
|---|---|---|---|---|---|
| White | 579 | 16 | 563 | 94.3% | -- |
| African American | 127 | 17[4] | 110 | 86.6% | **91.8%** |
| Hispanic | 9 | 2 | 7 | 77.8% | 82.5% |
| Asian | 6 | 0 | 6 | 100% | 106% |
| American Indian | 2 | 0 | 2 | 100% | 106% |
| Other/Unknown | 7 | 1 | 6 | 85.7% | 90.9% |
| | | | | | |
| **Gender** | | | | | |
| Male | 580 | 27 | 553 | 95.3% | -- |
| Female | 150 | 9 | 141 | 94.0% | 98.6% |

[1]   The figures in this column may differ from those in the column "Passed LEAB" on 3-ring binder page Tab E, page 788 because some people failed the Work Styles Questionnaire (WSQ) and Life Experiences Survey (LES) but passed the CAT.

[2]   Selection Ratio is the percent of people of a group that passed the test. It is calculated by dividing the number of people of a particular group that passed the CAT by the number of people of that group that took the CAT.  Thus, the selection ratio for the White group is 94.3%, i.e., $563 \div 579 = 94.3\%$.

[3]   Adverse Impact is calculated by dividing the selection ratio of the protected group, e.g., African American group, by the selection ratio of the comparison group, e.g., White group.  In this case, the African American selection ratio is 91.8 percent that of the White selection ratio, i.e., $86.6 \div 94.3 = 91.8\%$.  A value that is less than 4/5 (or 80%) is generally regarded as evidence of adverse impact.

[4]   The number provided in Appendix U of the 2008 Final Report, i.e., 14, is likely incorrect.

[56]  Data taken from 2008 Final Report, Appendix U, p. 1; 3-ring binder Tab E, page 788.

**Table 14:  Adverse Impact Analysis of the LEAB
Cognitive Ability Test (CAT) –
2006 Test Administration Data[57]**

| Ethnic Background | Took CAT | Failed CAT | Passed CAT[1] | Selection Ratio[2] | Adverse Impact Analysis[3] |
|---|---|---|---|---|---|
| White | 593 | 21 | 572 | 96.4% | -- |
| African American | 76 | 10 | 66 | 86.8% | **90%** |
| Hispanic | 7 | 0 | 7 | 100% | 103.7% |
| Asian | 8 | 2 | 6 | 75% | 77.8% |
| American Indian | 0 | -- | -- | -- | -- |
| Other/Unknown | 5 | 1 | 4 | 80% | 83% |
|  |  |  |  |  |  |
| **Gender** |  |  |  |  |  |
| Male | 559 | 27 | 532 | 95.2% |  |
| Female | 127 | 7 | 120 | 94.5% | 99.3% |
| Unknown | 3 | 0 | 3 | 100% | 105% |

[1]   The figures in this column may differ from those in the column "Passed LEAB" on 3-ring binder page Tab E, page 749 because some people failed the Work Styles Questionnaire (WSQ) and Life Experiences Survey (LES) but passed the CAT.

[2]   Selection Ratio is the percent of people of a group that passed the test. It is calculated by dividing the number of people of a particular group that passed the CAT by the number of people of that group that took the CAT.

[3]   Adverse Impact is calculated by dividing the selection ratio of the protected group, e.g., African American group, by the selection ratio of the comparison group, e.g., White group.  A value that is less than 4/5 (or 80%) is generally regarded as evidence of adverse impact.

---

[57]   Data taken from 2006 Final Report, Appendix K, p. 1; 3-ring binder Tab E, page 749.

generally regarded as evidence of adverse impact.  Typically, the selection ratio of the White group is used even if there is a group with a higher selection ratio.  First, the selection ratio of each group is computed.  Selection ratio is the percent of people of a group that passed the test. In this case, it is calculated by dividing the number of people of a particular group that passed the CAT by the number of people of that group who took the CAT.  For example, for the 2011 test administration, the number of Whites that passed the CAT is 864; the number of Whites that took the CAT is 894. Thus, the selection ratio of the White group is $864 \div 894$, which equals 96.6%.  The selection ratio for the African American group is 84%, i.e., $121 \div 144$.  Then, the selection ratio of the protected class is divided by the selection ratio of Whites.  For the CAT, the African American selection ratio is .87 or 87 percent that of the Whites, i.e., $84.0 \div 96.6 = 87\%$. As shown in Table 13, the results for the 2008 test administration indicate that the selection ratio for African Americans is 91.8% that of the White group.  As shown in Table 14, the selection ratio for African Americans is 90% that of the White group for the 2006 test administration.

None of these values meets the $4/5^{th}$ "rule of thumb" standard as evidence of adverse impact against African Americans, but when 1) successive cut scores are applied, which is done in the Pittsburgh selection system, and 2) hiring is top-down in essentially rank order, again a feature of the Pittsburgh selection system, the effects are cumulative. This effect will become clear as the cumulative effect of different selection ratios of each component of the selection system is examined.  In general, the decision to form a composite and set a cut-score for the composite rather than setting individual ability cut-scores is wise – setting cut-scores on multiple tests increases adverse impact, as will be discussed more in later sections.

Although the impact of using 5% passing cut-score on African Americans does not meet the $4/5^{th}$ rule of thumb standard for adverse impact, the cognitive ability composite appears to include some less important abilities and overlook some more important abilities.  It is possible to reduce the negative effect of the cognitive ability composite by including a set of more relevant cognitive abilities that have a smaller mean score difference between African Americans and Whites.

An important determinant of the impact of a selection test on minority groups is the mean score difference on the test between Whites and the protected class.  Although I do not have the mean scores of the Whites and African Americans on the overall CAT score, a more molecular review of the mean score differences between Whites and African Americans on the specific cognitive ability tests included in the CAT provides useful information.  Means and standard deviations of Whites and African Americans on each of the specific CAT ability tests are shown in Table 15.  Effect sizes of the differences between Whites and African Americans range from .28 to .50.  Also important to note in this table is the high mean scores of both Whites and African Americans on each of the specific abilities.  For example, on Written Comprehension, the average score of Whites and African Americans is 7.77 and 7.60 respectively, on a scale consisting of 8 items with a maximum score of 8.  The majority (actually more than 75 percent) of both groups got all of the items in the Written Comprehension scale correct.  An examination of the frequency distribution of scores reveals that 96.8 percent of Whites got either a score of 7 or 8, and 89.7% of African Americans got either a score of

**Table 15:  Mean Score Differences between Whites and African Americans on Specific CAT Ability Tests and Effect Sizes of Those Differences 2013 Test Administration Data[58]**

| Specific CAT Ability Test | Mean Score[1] Total Group (N = 918) | Standard Deviation of Total Group | | Mean Score Whites (N= 762) | Mean Score African Americans (N= 107) | | Effect Size[2] of Difference |
|---|---|---|---|---|---|---|---|
| *Written Expression* | 6.95 | 1.01 | | 7.01 | 6.50 | | **.50** |
| *Inductive Reasoning* | 6.17 | 1.26 | | 6.23 | 5.73 | | **.40** |
| *Information Ordering* | 7.42 | .89 | | 7.47 | 7.13 | | **.38** |
| *Deductive Reasoning* | 7.13 | .99 | | 7.17 | 6.81 | | **.36** |
| *Problem Sensitivity* | 7.04 | 1.08 | | 7.09 | 6.75 | | **.31** |
| *Written Comprehension* | 7.73 | 1.08.60 | | 7.77 | 7.60 | | **.28** |

[1]  Mean score based on number of items correct.   Possible scores range from a minimum of 1 to a maximum of 8 for each specific CAT ability test.

[2]  Effect sizes are calculated as follows:  Mean score of White group minus the mean score of the African American group divided by the standard deviation of the total group.  Effect size is interpreted in terms of standard deviations.  Thus, an effect size of .50 indicates that the White mean score is one-half standard deviation higher than the African American mean score.

---

[58]  Data from email attachment dated February 4, 2014 from EB Jacobs.

7 or 8.[59]   Although EB Jacobs does not provide criterion-related validities of the specific

CAT ability tests, it would be useful to know if validities vary for the specific abilities.

*LEAB Non-cognitive Measure:  Life Experiences Survey (LES).*[60]  Two parts of

the LEAB measure personality characteristics (often called non-cognitive variables).

This section of the present report describes and evaluates the Life Experiences Survey

 (LES).  The next section evaluates the impact of LES on African American applicants,

and the following sections describe and evaluate the LEAB Work Styles Questionnaire

(WSQ.

An example of an LES item[61] is:

> Within the past two years, how many times have you taken a day off
> because you did not feel like going to work?
> A.  never.
> B.  once.
> C.  twice.
> D.  three times.
> E.  more than three times.

The Life Experiences Survey (LES) initially consisted of 96 such biodata items

grouped into seven scales listed and defined in Table 16.  The initial criterion-related

validation study of the LEAB was done with these scales.  The internal consistency

estimates (alpha reliability coefficients) and the number of items in each of these initial

scales is also shown in Table 16.  Based on the information contained in Chapter 2 of this

report, all of these scales appear to have relevance for predicting job performance of

police officers.

---

[59]  Based on 2013 testing administration data provided by EB Jacobs. Communication dated February 4,
2014.
[60]  Law Enforcement Aptitude Battery (LEAB) Validity Report, dated  2004; 3-ring binder Tab E pp. 696-
730.  2006, 2008, 2011 Final Reports; 3-ring binder Tab AA, pp. 25-185.
[61]  "City of Pittsburgh Department of Personnel and Civil Service Commission Police Officer Recruit
Written Assessment Preparation Guide" page 6 [3-ring binder Tab H]. 2006 Final Report, Appendix B
[3-ring binder Tab C1.]

**Table 16:  LEAB Life Experience Survey (LES)
Initial Scales, Definitions, & Reliabilities[62]**

| LES Scale | Definition | Reliability Initially | No. Items Initially |
|---|---|---|---|
| *Attendance* | Prior absenteeism and tardiness rates, as well as previous lengths of tenure with previous employers. | .65 | 12 |
| *Carefulness* (original) | Previous work- and driving-related instances in which carefulness/attentiveness played a role in performance. | .52 | 14 |
| *Dependability* | Experiences that display responsibility in personal, professional and educational endeavors and relationships.  This includes such factors as disciplinary history with previous employers and/or educational institutions. | .62 | 5 |
| *Integrity* | Personal history of cheating, stealing, lying, and other instances were ethics were involved. | .57 | 10 |
| *Interpersonal Relations and Demeanor* | Previous professional relationships with co-workers, fellow students, supervisors, and instructors, and also relate to how the individual deals with interpersonal conflict.  Also, items refer to candidates' emotional stability in dealing with other people. | .74 | 24 |
| *Motivation* (original) | Candidates' report of grade point averages, involvement in organizations, and other means by which motivation to succeed are manifested. | .85 | 20 |
| *Motivation* (revised) | Candidates' report of grade point averages, involvement in organizations, and other means by which motivation to succeed are manifested. | .72 | 11 |
| *Validity* (*Response Validity Scale*) | Items with options that describe extremely unlikely behavior that if selected indicate less than truthful responding. | .74 | 10 |

---

[62] From Law Enforcement Aptitude Battery (LEAB) Validity Report, dated 2004; 3-ring binder Tab E, p. 708 and Tab C1 p. 465.

Only three of these scales, however, have been or are currently used in Pittsburgh.[63]  They, along with the number of items in each scale, are:[64]

- o  ***Carefulness*** – Previous work- and driving-related instances in which carefulness/attentiveness played a role in performance.

   This scale has been shortened to 7 scored items (including one or more WSQ items).

- o  ***Motivation*** – Candidates' report of grade point averages, involvement in organizations, and other means by which motivation to succeed are manifested.

   This scale now consists of 8 scored items.

- o  ***Interpersonal Relations/Demeanor*** – Previous professional relationships with co-workers, fellow students, supervisors, and instructors, and also relate to how the individual deals with interpersonal conflict.  Also, items refer to candidates' emotional stability in dealing with other people.

   This scale now consists of 13 scored items.

It is difficult to track changes to the LES.  The 2006 Final Report refers to a LES consisting of 47 items;[65] the 2008 and 2011 Final Reports[66] refer to a LES consisting of 68 items.  The actual LEAB test battery contains 68 LES items.[67]  Regardless of the number of items in the LES only 28 or fewer are scored (one or more of the WSQ items is scored in the Carefulness scale of the LES).

The LEAB criterion-related validation study examined the criterion-related validities of the six substantive LES scales for predicting three criteria – core performance, interactive performance, and overall performance.  A scale needed to

---

[63] Law Enforcement Aptitude Battery (LEAB) Validity Report dated 2004 [3-ring binder Tab E, p.792].

[64] EB Jacobs email dated January 13, 2014.

[65] 2006 Final Report [3-ring binder Tab AA, p. 31].

[66] 2008 Final Report [3-ring binder Tab AA, p. 81]. 2011 Final Report [3-ring binder Tab AA, p. 156].

[67] EB Jacobs, LLC Law Enforcement Aptitude Battery Examination Booklet [3-ring binder Tab C1, p. 631].

correlate greater than or equal to .10 to be retained.  Only three revised scales qualified as sufficiently criterion-valid to be included. [68]

Given the meta-analytic validities described in Chapter 2, it is difficult to understand how personality constructs such as Integrity and Dependability presumably measured by the LES did not qualify.  Perhaps additional performance constructs (criteria) were needed to evaluate the usefulness during the LEAB validation study.  For example, as described in Chapter 2, Integrity and Dependability predict counter-productive performance criteria such as theft, tardiness, absenteeism, and other disciplinary problems.  Perhaps the criteria in the LEAB criterion-related validation study were incomplete.  The factor analysis of the performance ratings that were collected during the LEAB validation study indicated that 55 percent of the variability in overall performance ratings was accounted for by core performance and interactive performance.  Forty-five percent (45%) of the variability in ratings of police officer performance was unaccounted for by core and interactive performance.  Perhaps archival personnel records might have revealed useful criterion information about counter-productive behavior of the incumbent police officers involved in the study.  If this type of criterion had been included in the LEAB criterion-related validation study, perhaps the LES scales Integrity and Dependability would have met the EB Jacobs' standard of criterion-related validity of equal to or greater than .10 for inclusion in the test battery.

As mentioned, the scoring model that was used in Pittsburgh in 2008, 2011, and 2013 includes only three LES scales.  The scoring algorithm for each of these scales is as follows:

---

[68] From Law Enforcement Aptitude Battery (LEAB) Validity Report, dated 2004; 3-ring binder Tab E.

- Each response option has an EB Jacobs' rationally assigned point value of 0, 1, or 2. (Each item, which consists of a stem and 5 response options, has a point value that can range from 0 to 2.) An individual's score on the item is the point value of the response option he or she endorsed.

- These values are summed across the items in the scale, and then

- divided by the number of items in the particular scale.

An individual's score on each scale is his or her average item score for the items in the scale.

Before scoring begins, EB Jacobs checks that the candidate answered at least "…70% of the WSQ items (i.e., 73 of 103 items) and 70% of the LES items (48 of 68) items, or…at least 60% of the items comprising each WSQ and LES scale used in scoring."[69]  If the candidate does not respond to these minimum numbers of items in the WSQ and LES, he or she is disqualified from further consideration.  The 60% screen means that, to avoid being disqualified, the applicant needs to answer at least 5 of the 7 Carefulness scale items, 5 of the 8 Motivation scale items, and 8 of the 13 Interpersonal Relations/Demeanor scale items.

EB Jacobs established this screening procedure for two reasons.  One reason was to avoid the possibility that an applicant might improve his/her score on LES (and WSQ) scales by answering only items that are favorable to him/herself, a possibility because the scoring procedure computes an average item response for the scale based only on items the person answered.  Another way to avoid this problem is simply to sum the point values of the options the person endorsed.  This scoring strategy eliminates the need to disqualify a candidate for lack of responding.  Instead, if a person leaves one or more

---

[69] 2011 Final Report, p. 13; [3-ring binder Tab AA, p.164].

items blank, he or she receives a low score on the LES (or WSQ) scale(s) and is less likely to advance to the next step in the selection process.

The second reason EB Jacobs established the screen is to "ensure the scale scores generated for a given candidate provide a sufficiently reliable reflection of the personal characteristic under consideration." [70]  The type of reliability EB Jacobs is referring to is internal consistency reliability – an important type of reliability that is an indicator of the construct validity of the measure although other evidence is also required to document construct validity.  That is, internal consistency is an indicator of the accuracy/validity of a measure for measuring what it is intended to measure.

The 60% percent screen means that for the Carefulness scale, only 5 items need to be answered to receive a score.  This also means that with so few items scored, an applicant can improve his or her score by not responding to an item that reflects poorly on him- or herself.  Of course, an applicant does not know which items are scored on which scales so it would be risky to use this approach to try to improve his or her score. However, it does mean that as few as 5 items is considered adequate to obtain a reliable, valid measure of Carefulness.  Similarly, for the other two scales – Motivation and Interpersonal Relations/Demeanor – only 5 items and 8, respectively, need to be answered to remain in the applicant pool.

Five items is too few items to have confidence in the construct validity of a measure unless the characteristic being measured is a very "narrow" characteristic, and neither Interpersonal Relations/Demeanor nor Motivation is considered narrow.  On the contrary, they are considered compound variables because they are complex, consisting

---

[70] 2006 Final Report, p. 25 [3-ring binder Tab AA, p.53].

of other broad characteristics[71].  Even the full set of items in the Carefulness, Motivation, and Interpersonal Relations/Demeanor scales (i.e., 7, 8, and 13 respectively) is too few items to have confidence in the accuracy/validity of measures of such broad characteristics.

Number of items in a scale is an important determinant of reliability of a scale or measure.  Table 17 shows the number of items in the LES scales and their internal consistency estimates when they were in their longer, initial form as well as the number of items in the LES scales that are currently used.  Clearly, the current versions of the scale are less reliable than the longer versions.

Reliability affects validity – both construct validity and criterion-related validity.  Greater reliability increases construct validity and increases the chances of criterion-related validity for predicting a relevant outcome.  The items that were retained in the LES scales are criterion-valid, i.e., they correlate with job performance of police officers involved in the 2004 LEAB validation study.[72]  Thus, it is likely that the criterion-related validities of the LES measures would be stronger if the measures had greater reliability and construct-validity.

*Impact of LEAB LES on African Americans*.  Mean scale scores based on 2013 Pittsburgh testing administration data are shown in Table 18 for Whites and African Americans.  African Americans score essentially the same as Whites on the Motivation scale.  This is a typical finding in studies that have examined large data sets.[73]  However,

---

[71] See for example, Schneider, R. J., Ackerman, P. L., & Kanfer, R. (1996). To 'act wisely in human relations': Exploring the dimensions of social competence. *Personality and Individual Differences, 21*, 469-481.

[72] Email from EB Jacobs dated February 4, 20014.

[73] Hough, L. M., Oswald, F. L., & Ployhart, R. E. (2001). Determinants, detection, and amelioration of adverse impact in personnel selection procedures: Issues, evidence, and lessons learned. *International Journal of Selection and Assessment, 9,* 152-194.

**Table 17:  Comparison of LEAB Life Experience Survey (LES)
Initial and Current Scales**

| LES Scale | Definition | Reliability of Longer Form of Scale[74] | No. Items in Longer Form of Scale | | No. Items in Current Form of Scale | Reliability[75] of Current Form of Scale |
|---|---|---|---|---|---|---|
| | | | | | | |
| *Carefulness* | Previous work- and driving-related instances in which carefulness/attentiveness played a role in performance. | .52 | 14 | | 7 | .34 |
| | | | | | | |
| *Interpersonal Relations and Demeanor* | Previous professional relationships with co-workers, fellow students, supervisors, and instructors, and also relate to how the individual deals with interpersonal conflict.  Also, items refer to candidates' emotional stability in dealing with other people. | .74 | 24 | | 13 | .53 |
| | | | | | | |
| *Motivation* | Candidates' report of grade point averages, involvement in organizations, and other means by which motivation to succeed are manifested. | .72 | 11 | | 8 | .65 |

---

[74]  From Law Enforcement Aptitude Battery (LEAB) Validity Report, dated 2004; 3-ring binder Tab E, p. 708 and Tab C1 p. 465.

[75]  From EB Jacobs communication dated February 4, 2014.

**Table 18:  Mean Score Differences between Whites and African Americans on LES Scales and Effect Sizes of Those Differences 2013 Test Administration Data[76]**

| LES Scale | Mean Score[1] Total Group (N=918) | Standard Deviation of Total Group | | Mean Score Whites (N = 762) | Mean Score African Americans (N = 107) | | Effect Size[2] of Difference |
|---|---|---|---|---|---|---|---|
| *Carefulness* (7 items) | 1.6819 | .23067 | | 1.6888 | 1.6101 | | **.34** |
| | | | | | | | |
| *Interpersonal Relations & Demeanor* (13 items) | 1.76713 | .138855 | | 1.76680 | 1.75413 | | **.09** |
| | | | | | | | |
| *Motivation* (8 items) | 1.64743 | .260528 | | 1.64661 | 1.65654 | | **-.04** |

[1]  Minimum possible score is 0. Maximum possible score is 2.

[2]  Effect sizes are calculated as follows:  Mean score of White group minus the mean score of the African American group divided by the standard deviation of the total group.  Effect size is interpreted in terms of standard deviations.  Thus, an effect size of .34 indicates that the White mean score is about 1/3[rd] standard deviation higher than the African American mean score.

---

[76]  Data from email attachment dated February 4, 2014 from EB Jacobs.

African Americans score about 1/3 of a standard deviation lower than Whites on Carefulness. This is a noticeable difference and will add to the negative effect of the selection procedures on African Americans. Moreover, the size of this difference is larger than is typical for this type of characteristic.[77]

As will be discussed in Chapter 5, the criterion-related validities of the Carefulness, Interpersonal Relations/Demeanor, and Motivation are .13, .02, and .21,[78] respectively. This means that the LES scale with the highest validity of LES scales is the scale on which African Americans score about the same as Whites. Fortunately, as will be described later (see Table 22), this scale receives the most weight in the LEAB Composite. Also, the Carefulness score, a scale on which African Americans score noticeably lower than Whites, contributes the least to the LEAB Composite. Thus, for Carefulness, the size of the mean score difference is minimized.

In communications with EB Jacobs I learned that they identify and include LES items that have the smallest mean score differences between protected classes and Whites and still maintain criterion-related validity. My understanding is that they go back to the 2004 LEAB validation data set and recalculate criterion-related validity of the scales. Although this seems at odds with other information from EB Jacobs that suggests that the scoring model remains the same from administration to administration in Pittsburgh, this practice does reduce the effect of any mean score differences.

Importantly, on the three LES scales which were not included in the LEAB test because they did not demonstrate criterion-related validity for predicting core,

---

[77] Ibid.

[78] Criterion-related validities range from -1.0 to +1.0 with higher absolute values indicating higher relationship. Thus, higher values are good. In contrast with effect sizes where values near zero are preferable when comparing mean score differences between groups.

interpersonal, and overall job performance in the 2004 LEAB validation study, African Americans score about the same as Whites[79].

The 70% and 60% LES/WSQ cut scores established to ensure that a minimum number of LES/WSQ items are answered does not appear to have a large negative impact against African Americans.  During the 2006, 2008, and 2011 test administrations, only three applicants were disqualified for neglecting to answer enough LES and WSQ items.  Of the three, two were White and one was African American.

*LEAB Non-cognitive Measure:  Work Styles Questionnaire.*[80]  Another portion of the LEAB that measures personality characteristics is the Work Styles Questionnaire (WSQ).  It is described and evaluated in this section of the present report.

The Work Styles Questionnaire (WSQ) is a "personality inventory that was developed by EB Jacobs in 1998 in recognition of the motivational, value-related and attitudinal characteristics important to the successful performance of public safety personnel.  The WSQ represents an adaptation of the SHL Occupational Personality Questionnaire (OPQ) to the public safety environment."[81]  Initially, the WSQ consisted of 224 items measuring 26 work styles (personality characteristics) plus one response validity/social desirability scale.  The version administered in Pittsburgh in 2008 and 2011 consisted of 103 items of which 22 are scored.[82]  These 22 items constitute the four

---

[79] Hough, L. M., Oswald, F. L., & Ployhart, R. E. (2001). Determinants, detection, and amelioration of adverse impact in personnel selection procedures: Issues, evidence, and lessons learned. *International Journal of Selection and Assessment, 9,* 152-194.

[80]  Law Enforcement Aptitude Battery (LEAB) Validity Report dated 2004; 3-ring binder Tab E pp. 696-730.  2006, 2008, 2011 Final Reports; 3-ring binder Tab AA, pp. 25-185.

[81] Appendix B of the 2006 Final Report – LEAB Overview and Appendices, p. Appendix A-4 [3-ring binder Tab C1, p. 507].

[82] 2008 Final Report [3-ring binder Tab AA, p. 81]; 2011 Final Report [3-ring binder Tab AA, p. 156]; EB Jacobs, Inc. Law Enforcement Aptitude Battery Examination Booklet [3-ring binder Tab C1, p. 614]; and EB Jacobs' communication (document attached to email) of January 13, 2004.

WSQ scales that are included in the current selection system.[83]  All 27 scales and their

original definitions are shown in Table 19.

Each WSQ item has a stem with the following five response options:  Strongly

Disagree, Disagree, Unsure, Agree, and Strongly Agree.  A sample WSQ item is:[84]

> I find that it is not necessary to have all of the facts before making a
> decision.
> - o   Strongly Disagree
> - o   Disagree
> - o   Unsure
> - o   Agree
> - o   Strongly Agree

The response options are scored 1, 2, 3, 4, or 5, with 5 assigned to the end of the

continuum that is descriptive of a positive characteristic for police work.[85]  An

individual's score on an item is the point value of the response option he or she endorsed.

These values are summed across the items in the scale and then divided by the number of

items in the particular scale.  Thus, an individual's score on each scale is his or her

average item score for the items in the scale.

Again, as with the LES, this method of scoring means that if a person

intentionally or carelessly neglects to respond to all the items in the scale, his or her score

is unaffected by the missing responses.  Therefore, before scoring begins, EB Jacobs

checks that the candidate responded to at least "…70% of the WSQ items (i.e., 73 of 103

items) and 70% of the LES items (48 of 68) items, or…at least 60% of the items

---

[83] One or more WSQ items is included the LES Carefulness scale.

[84] Appendix B of the 2006 Final Report – LEAB Overview and Appendices, p. Appendix A-4 [3-ring
binder Tab C1, p. 537].

[85] EB Jacobs email attachment dated January 24, 2014.

68

## Table 19:  LEAB Work Styles Questionnaire (WSQ)
### Initial Scales, Definitions, & Reliabilities[86]

| WSQ Scale | Definition | Reliability Initially | No. Items Initially |
|---|---|---|---|
| *Achieving* (revised) | Ambitious and career-centered, likes to set demanding goals and targets. | .75 | 7 |
| *Adaptable* | Adapts approach to different people, changes behavior to suit the situation. | .65 | 8 |
| *Affiliative* | Enjoys others' company, likes to be around friends. | .79 | 10 |
| *Analytical* | Enjoys using information, working with data, investigating the facts and solving problems. | .72 | 8 |
| *Behavioral* | Tries to understand the motives and behavior, enjoys analyzing people. | .78 | 10 |
| *Caring* | Feels sympathetic and considerate, particularly helpful and supportive | .72 | 10 |
| *Conscientious* | Likes to get things finished on time, persists until the job is done. | .79 | 8 |
| *Controlling* | Likes to be in charge, takes the lead, tells others what to do. | .81 | 10 |
| *Conventional* | Prefers well-established methods, favors more traditional approaches | .43 | 8 |
| *Decisive* | Makes fast decisions, draws rapid conclusions. | .35 | 8 |
| *Democratic* | Consults widely, involves others in decision-making. | .72 | 8 |
| *Detail Conscious* | Focuses on detail, likes to be methodical and organized | .83 | 10 |
| *Emotionally Controlled* | Rarely expresses feelings, avoids displaying emotion. | .66 | 8 |
| *Evaluative* | Critically evaluates information, identifies potential limitations | .75 | 10 |
| *Forward Planning* | Sets longer term goals, thinks well ahead, more likely to take a strategic perspective. | .84 | 10 |
| *Independent Minded* | Willing to speak one's mind, support own position even if unpopular | .53 | 8 |
| *Innovative* | Enjoys being creative, generates new ideas, think of original solutions. | .81 | 8 |
| *Persuasive* | Enjoys selling, comfortable using negotiation and persuasion. | .72 | 8 |
| *Relaxed* | Relaxes easily, free from tension and pressure. | .65 | 8 |
| *Rule Following* | Likes to follow procedures, prefers clear guidelines, finds it hard to break rules. | .79 | 8 |
| *Social Desirability* (Response Validity Scale) | Has been less self-critical in responses, is more concerned to make a good impression. | .84 | 8 |
| *Socially Confident* | Feels comfortable when first meeting people, feels at ease in formal situations. | .77 | 8 |
| *Tough Minded* | Not easily offended, can ignore insults, rarely takes criticism personally. | .70 | 8 |
| *Trusting* | Trusts people's good intentions, believes what people say. | .87 | 8 |
| *Variety Seeking* | Prefers variety, tried out new things, like changes to regular routine. | .68 | 10 |
| *Worrying* | Feels nervous on important occasions, worries about key events. | .79 | 8 |

*Note:*  The 2006 Final Report included an additional scale, i.e., "Intuitive", defined as prefers to deal with feelings and emotions rather than facts and figures.

---

[86]  From Law Enforcement Aptitude Battery (LEAB) Validity Report, dated 2004; [3-ring binder Tab E, p. 709]; 2006 Final Report, Appendix B [Tab C1 pp. 461-462].

comprising each WSQ and LES scale used in scoring."[87]  Individuals who do not pass this screen are disqualified from further consideration.  The 60% screen means that, to avoid being disqualified, the applicant needs to respond to at least 3 of the 4 Achieving scale items, 3 of the 5 Rule Following scale items,  4 of the 6 Forward Planning items, and 5 of the 7 Controlling scale items.

EB Jacobs established this screening procedure for two reasons.  The first reason is to avoid the possibility that an applicant might improve his/her score on WSQ (and LES) scales by not answering items that might reflect poorly on him- or herself, a possibility because the scoring procedure computes an average item response for the scale based only on items the person answered.

As described in the LES section, another way to avoid this problem is simply to sum the point values of the options the person endorsed.  This scoring strategy eliminates the need to disqualify a candidate for lack of responding.  Instead, if an applicant leaves one or more items blank, he or she receives a low score on the WSQ (or LES) scale(s) and is less likely to advance to the next step in the selection process.

The second reason EB Jacobs established the screen is to "ensure the scale scores generated for a given candidate provide a sufficiently reliable reflection of the personal characteristic under consideration."[88]  The type of reliability EB Jacobs is referring to is internal consistency reliability – an important type of reliability that is an indicator of the construct validity of the measure although considerable other evidence is required to document construct validity.  That is, internal consistency is an indicator of the accuracy/validity of a measure for measuring what it is intended to measure.

---

[87] 2011 Final Report, p. 13; [3-ring binder Tab AA, p.164].
[88] 2006 Final Report, p. 25 [3-ring binder Tab AA, p.53].

The 60% percent screen means as few as 3 items is considered adequate to obtain a valid, reliable measure of Achieving and Rule Following, as few as 4 items for Forward Planning, and as few as 5 items for Controlling. This is too few items to have confidence in the construct validity of a measure. Even the full set of items in these scales (i.e., 4, 5, 6, and 7) is too few items to have confidence in the accuracy/validity of measures.

Number of items in a scale is an important determinant of reliability of a scale or measure. Table 20 shows the number of items in the WSQ scales and their internal consistency estimates when they were in their longer, initial form as well as the number of items in the WSQ scales that are currently used. The current versions of the scale are less reliable than the longer versions.

Reliability affects validity – both construct validity and criterion-related validity. Greater reliability increases construct validity and increases the chances of criterion-related validity for predicting relevant outcomes. Items in the WSQ scales are criterion-valid, i.e., they correlate with job performance of police officers involved in the 2004 LEAB validation study.[89] Thus, it is likely that the criterion-related validities of the WSQ scales would be stronger if the measures had greater reliability and construct-validity.

***Impact of the LEAB WSQ on African Americans***. Mean scale scores based on 2013 Pittsburgh testing administration data are shown in Table 21 for Whites and African Americans. African Americans score slightly higher than Whites on Achieving, about the same as Whites on Forward Planning, slightly lower than Whites on Rule Following, and somewhat lower, i.e., about 1/5 of a standard deviation lower, than Whites on Controlling. The mean score difference between African Americans and Whites on the

---

[89] Email from EB Jacobs dated February 4, 2014.

**Table 20:  Comparison of LEAB Work Styles Questionnaire (WSQ)
Initial and Current Scales**

| WSQ Scale | Definition | Reliability of Longer Form of Scale[90] | No. Items in Longer Form of Scale | | No. Items in Current Form of Scale | Reliability[91] of Current Form of Scale |
|---|---|---|---|---|---|---|
| | | | | | | |
| *Achieving* | Ambitious and career-centered, likes to set demanding goals and targets. | .75 | 7 | | 4 | .65 |
| | | | | | | |
| *Controlling* | Likes to be in charge, takes the lead, tells others what to do. | .81 | 10 | | 7 | .71 |
| | | | | | | |
| *Forward Planning* | Sets longer term goals, thinks well ahead, more likely to take a strategic perspective. | .84 | 10 | | 6 | .80 |
| | | | | | | |
| *Rule Following* | Likes to follow procedures, prefers clear guidelines, finds it hard to break rules. | .79 | 8 | | 5 | .77 |

---

[90]  From Law Enforcement Aptitude Battery (LEAB) Validity Report, dated 2004; 3-ring binder Tab E, p. 709-710.
[91]  From EB Jacobs communication dated February 4, 2014.

**Table 21:  Mean Score Differences between Whites and African Americans on WSQ
Scales and Effect Sizes of Those Differences
2013 Test Administration Data[92]**

| WSQ Scale | Mean Score[1] Total Group (N=918) | Standard Deviation of Total Group | Mean Score Whites (N = 762) | Mean Score African Americans (N = 107) | | Effect Size[2] of Difference |
|---|---|---|---|---|---|---|
| *Achieving* (4 items) | 4.63562 | .472228 | 4.63189 | 4.67290 | | **-.09** |
| | | | | | | |
| *Controlling* (7 items) | 3.94227 | .563922 | 3.95782 | 3.84246 | | **.20** |
| | | | | | | |
| *Forward Planning* (6 items) | 4.43537 | .543067 | 4.43788 | 4.42368 | | **.03** |
| | | | | | | |
| *Rule Following* (5 items) | 4.45882 | .569627 | 4.46903 | 4.42056 | | **.09** |

[1]  Minimum possible score is 1. Maximum possible score is 5.

[2]  Effect sizes are calculated as follows:  Mean score of White group minus the mean
score of the African American group divided by the standard deviation of the total
group.  Effect size is interpreted in terms of standard deviations.  Thus, an effect size of
.20 indicates that the White mean score is 1/5th standard deviation higher than the
African American mean score.  An effect size of -.09 means that the African American
mean score is about 1/10th standard deviation higher than the White mean score.

---

[92]  Data from email attachment dated February 4, 2014 from EB Jacobs.

Controlling scale (i.e., effect size equal to .20) is in the opposite direction of other research that has examined the mean score difference between Whites and African Americans on Dominance, a similar characteristic.[93] This other research, which is based on thousands of people, indicates that African Americans score higher than Whites on Dominance. Perhaps the items in the WSQ Controlling scale focus on aspects of the characteristic that is different from items in Dominance scales. A comparison of items in the WSQ Controlling scale with items in Dominance scales, which meta-analytic research indicates predict police officer performance, would be instructive.[94]

Chapter 5 describes and evaluates the criterion-related validities of the Pittsburgh selection system. As described there, the criterion-related validities of the WSQ scales is .19 for Achieving, .10 for Controlling, .08 for Forward Planning, and .09 for Rule Following.[95] As with the LES scales, the WSQ scale with the highest validity is the scale that receives relatively more weight than the other WSQ scales.

The 70% and 60% LES/WSQ cut scores established to ensure that a minimum number of LES/WSQ items are answered does not appear to have an large negative impact against African Americans. During the 2006, 2008, and 2011 test administrations, only 3 applicants were disqualified for neglecting to answer enough LES and WSQ items. Of the three, two were White and one was African American.

---

[93] Hough, L. M., Oswald, F. L., & Ployhart, R. E. (2001). Determinants, detection, and amelioration of adverse impact in personnel selection procedures: Issues, evidence, and lessons learned. *International Journal of Selection and Assessment, 9,* 152-194.

[94] Ones, D. S., Viswesvaran, D., & Dilchert, S. (2004). *Personality and police officer work performance: A construct-based, comprehensive meta-analysis and implications for pre-offer screening and psychological evaluations.* Paper presented at the annual meeting of the International Association of Chiefs of Police (IACP), Los Angeles, CA.

[95] Criterion-related validities range from -1.0 to +1.0 with higher absolute values indicating higher relationship. Thus, higher values are good. In contrast with effect sizes where values near zero are preferable when comparing mean score differences between groups.

In sum, the non-cognitive portions of the LEAB have little adverse impact on African Americans in the Pittsburgh selection procedures.  Importantly, as seen in Chapter 5 and as referred to above, the LES and WSQ have been shown to be criterion-valid in the 2004 LEAB validation study.

**LEAB Composite (aka Written Exam).**  The three sections of the LEAB, i.e., Cognitive Ability Test (CAT), Life Experiences Survey (LES) scales, and Work Styles Questionnaire (WSQ) scales, are each scored as described above.  The scale scores are then standardized[96] and combined using the weights shown in Table 22.  This scoring model has been used in Pittsburgh during the 2008, 2011, and 2013 testing administrations.

Weights assigned to scores on two scales, Motivation and Achieving, together constitute 50 percent of the overall score on the written test.  Thus, 12 items determine 50 percent of an applicant's score on the written test.  These scales are important.  They need to be measured very well; they need to exhibit good levels of internal consistency (reliability) and construct validity.  African Americans and Whites score about the same on these two scales, with African Americans scoring on average slightly higher than Whites on both.

The cognitive ability test consists of 48 items, 50 percent of the total items in the LEAB written exam. It is assigned 10 percent of the overall score on the written test.

The oral instructions given to applicants at time of testing suggest that applicants spend approximately 2 hours on the ability items, 15 minutes on the Work Styles

---

[96] Scale scores are standardized to enable differential weighting that corresponds to intentional weights.  If a raw (unstandardized) score were combined with another raw score, the amount each score would contribute to the composite score would be determined by the mean and standard deviation of the individual scale distributions.  Thus, to enable specified, intentional weighting of scores from two or more scales, the scores are standardized.

**Table 22:  LEAB Composite (aka Written Exam):**
**Scoring Model Used in Pittsburgh 2008, 2011, & 2013 Testing Administrations**[97]

| LEAB Scale | % Weight | LEAB Component | Number of Items |
|---|---|---|---|
| Motivation *(revised)* | 35% | LES | 8 |
| Achieving *(revised)* | 15% | WSQ | 4 |
| Controlling | 10% | WSQ | 7 |
| Rule Following | 10% | WSQ | 5 |
| Interpersonal Relations/Demeanor | 10% | LES | 13 |
| Forward Planning | 5% | WSQ | 6 |
| Carefulness | 5% | LES & WSQ[98] | 7 |
| | | | |
| **TOTAL** | **90%** | | **50** |
| | | | |
| Cognitive Abilities (Written Comprehension, Problem Sensitivity, Inductive Reasoning, Deductive Reasoning, Written Expression, Information Ordering) | 10% | CAT | 48 |
| | | | |
| **LEAB Total Written** | **100%** | | **98** |

---

[97] From 3-ring binder Tab E, p. 792.

[98] The LEAB scoring model shown on p. 792 of the 3-ring binder indicates that this scale consists of LES items.  Other information indicates the Carefulness scale consists primarily of LES items but also has one or more WSQ items.

Questionnaire, and 15 minutes on the Life Experience Survey.  Although 2 hours is probably a good recommendation for completing the 48 cognitive ability items, it seems like a lot of testing time to devote to 10% of a total score.  I do not recommend reducing the suggested testing time.  Perhaps more scored items could be added to the LES and WSQ parts of the LEAB.

The LEAB Composite is equally weighted with the Oral Board exam composite. The Oral Board is described and evaluated in detail below.

**Oral Board Exam**

The Oral Board, designed by EB Jacobs, is intended to measure Oral Expression, Comprehension, and Reasoning.  The definitions of the three characteristics are:

- *Oral Expression* – This is the ability to use language orally to communicate information or ideas to other people.  This ability involves organizing information or ideas and expressing them in a clear and logical manner using a tone and vocabulary that is appropriate for the audience. The audience might include suspects, victims, witnesses, other police officers, supervisors, shop owners, or any individuals with whom the police officer might come in contact.  Examples might include explaining a new departmental procedure or policy to a police officer or group of police officers and/or explaining investigation procedures to a victim.

- *Reasoning* – This is the ability to recognize or identify the existence of a problem or issue that needs to be addressed, critically evaluate the problem or issue, evaluate alternative solutions and arrive at a sound decision.  This ability includes considering all relevant information, distinguishing important from unimportant information, and applying general rules or principles to specific situations or drawing general conclusions based on multiple specific situations.  Examples might include identifying a particular situation as a civil or criminal case, and or/recognizing that the same pattern applies to a series of burglaries or purse snatchings.

- *Comprehension* – This is the ability to understand written or spoken language.  This involves receiving information not giving it.  It is the ability to hear or read a description of an event and understand what happened.  This ability might be used in listening to descriptions of events,

77

places, or people, and/or reading narrative material such as an arrest
report.

As discussed in Chapter 2, these are important abilities for effective police officer
performance.  However, I question the wisdom of using the Oral Board to gather ratings
about cognitive abilities such as Reasoning and Comprehension.  Cognitive abilities are
regarded as better measured by other strategies such as written cognitive ability tests.
The reliability of the scores is an indicator of the quality of the measure, and the inter-
rater reliability of the Oral Board ratings is very high, i.e., .98.[99]  However, the rating
process ensures very high agreement – as described below, raters are instructed to discuss
ratings that differ by 2 or more points and then make a final rating.  Thus, high inter-rater
reliability of the Oral Board scores is not persuasive evidence that the ratings are
providing high quality indicators of Reasoning and Comprehension.  Moreover, these
characteristics are already included in the Cognitive Ability Test (CAT) portion of
LEAB.  The LEAB-Oral Board Composite is the score that, once the Veteran's
Preference Points are added, constitutes the Eligibility List.  The composition of the
LEAB and Oral Board exam is critically important in determining the rank order of
applicants.

Structurally, the Oral Board consists of three parts[100]:

- *Work Situation* – candidates prepare and then orally present which of a set
  of regulations they were given apply to the situation described.  The
  candidate has a maximum of 7 minutes to present their understanding of
  the situation to the examiners and answer any questions.  An example of
  an Oral Board Work Situation is shown in Table 23.

- *Personal Safety Promotion* – candidates prepare and then orally present
  the arguments they would make to a community to persuade the citizens to
  be more safety aware and thus more safe.  Candidate has a maximum of 6

---

[99] Email communication from EB Jacobs dated January 13, 2014.

[100] 2006, 2008, 2011 Final Reports; [3-ring binder Tab AA].

minutes to present their ideas to the examiners and answer the examiners' questions.

- *Structured Interview*[101] – candidates answer four questions about important police officer abilities.  They are provided no materials in their preparation packet.  They have a maximum of 8 minutes to respond to the examiners' questions.

Procedurally, when candidates arrive at the testing site, they are checked in, and then in very small groups at the appointed time they are instructed (orally) about the testing procedures.  Each is handed a preparation packet, informed they will have 15 minutes to prepare, shown to a preparation room, and informed that the examiners will not observe them during their preparation.  The preparation packet contains a description of the Work Situation and set of possible applicable regulations as well as a description of the Personal Safety Promotion situation.  After 15 minutes has elapsed, a test administrator escorts each candidate to a separate testing room where three or four oral board examiners are seated at a table.  The test administrator hands the lead examiner the candidate's rating forms which include the candidate's identification number.  The lead examiner greets the candidate by name and introduces him or herself as well as the other examiners by name.  The examiners proceed with the Oral Board exam, enforcing the time limits and ending the exam promptly at the designated time.  They review their notes and complete the rating process.

---

[101] Initially the Oral Board was a discussion of assignment preferences. Pittsburgh Police Department 2005 Police Officer Test Administration and Scoring Report p. 6 [3-ring binder Tab AA, p. 9].

**Table 23:  Example of Oral Board Work Simulation[102]**

**Sample Regulations:**

- Political Activity – A uniformed police officer shall not support or oppose any political candidate in public.

- Gambling – No police officer shall participate in any illegal gambling or any gambling while on duty.

**Example:**

You are a police officer and have been on the job now for approximately 6 months. Today, you received an assignment to work a driver's license checkpoint with another police officer.  The other police officer is Officer Chris Mathews who has been on the job for approximately four years now.  You and Officer Mathews stop the first vehicle which approaches your checkpoint.  The motorist provides a driver's license but was unable to provide proof of insurance.  While speaking with the motorist, you notice that he is wearing a pin supporting a political candidate by the name of Richard Boone.  You tell Officer Mathews that you are going to run the motorist's license and ask the officer to keep an eye on the motorist.  You run a check on the motorist's license and everything turns out fine so no further action is needed with the motorist.  When you return to the motorist's vehicle, you overhear Officer Mathews telling the motorist that Boone would never get elected.  The motorist responds by saying that he would bet Mathews 20 dollars that Boone would win.  Officer Mathews replies "It's a bet!"

**Question:**

In general, you will be asked to identify the problem(s) in the situation presented and describe what you would do.

---

[102] From 3-ring binder Tab H, City of Pittsburgh Department of Personnel and Civil Service Commission Police Officer Recruit Oral Examination *Candidate Preparation Guide*, 2011-2012.

There are at least five different (alternate) forms of the Work Situation Exercise.[103] The different forms help ensure test material security, preventing test questions from becoming known to candidates.  However, there are no analyses to document that the forms are in fact equivalent or parallel.  Without such analyses, it is possible that a candidate might be disadvantaged because he or she was given one form rather than another whereas another candidate might be advantaged because he or she was given a different form.  That is, one test form might be more difficult than the other form.  Similarly, the Personal Safety Promotion exam has five different (alternate) forms.  Again, analyses are needed to document that the forms are in fact equivalent or parallel.

The forms that Oral Board examiners use to evaluate candidates are highly structured – a good characteristic.  However, the forms appear to reward candidates for simply regurgitating information in the scenario they were given to present to the examiners.[104]

For example, the form provides the specific details in the Work Situation scenario with a check-off list to indicate which details were mentioned, and a place to total the details for the two exercises.  Even though candidates were instructed to describe what they would do and what they would do if they encountered opposition to their actions, the rating form provides no instruction on how to evaluate that information.  Possible work scenarios with 'what would you do" questions are Situational Judgment tests that are often used to assess practical judgment or situational judgment.  Research with these types of test indicates they 1) predict performance (criterion-related validity); 2) show smaller mean score differences between Whites and African Americans than cognitive

---

[103] Oral Board Test Assessor Training Manual, p. 29-38 [3-ring binder Tab E.].

[104] Oral Board Test Assessor Training Manual [3-ring binder Tab E.].

ability tests; and 3) do not measure the same thing as personality inventories or cognitive ability tests.  Not evaluating this information obtained in the Work Situation exercise is a missed opportunity.

Similarly, the form provides the specific details in the Personal Safety Promotion scenario with a check-off list to indicate which details were mentioned, and a place to total the details for the two exercises.  Even though candidates were instructed to think of and present as many ways as possible to accomplish the objective, the rating form provides no instruction on how to evaluate that information.  In a sense, the instructions to candidates are misleading.  The oral board preparation classes and materials provided during that training are also lacking in specific instructions about how to do well in the Oral Board. As a result, allegations that some candidates appear coached are understandable.  Even if the candidates did not have access to the actual test materials, an understanding of how candidates are evaluated is an advantage.  Accurate information about the scoring criteria should be available to all candidates.

The rating form provides no information about how to evaluate information gathered during the Interview part of the Oral Board.  Review of the rating scales indicates that they provide little guidance as well.  Responses to the Interview questions could provide valuable information about important characteristics other than Oral Expression, Reasoning, and Comprehension.

***Oral Board Examiner Training***.  Oral Board examiners are volunteers, typically from the Pittsburgh BOP.  They attend a day-long, in-person training session.  They are provided with a written training manual but are not allowed to keep the materials for test security reasons.  A short refresher session would be helpful.  During the day-long training, the volunteer examiners are provided with information about the following:

- Pittsburgh police officer testing process in general;

- Pittsburgh police officer job duties and activities in detail;

- Skills assessed in the Oral Board exam, specifically the definitions of the three abilities (Oral Expression, Reasoning, and Comprehension);

- Rating scales for each of the three abilities, including standards for evaluating each of the three abilities (ratings are made on a 5-point scale, where 5 = Highly Effective; 3 = Moderately Effective, and 1 = Ineffective);

- Potential rating errors that are common to subjective evaluations;

- Strategies for minimizing rating errors;

- All versions of the test forms – the Work Situation and Personal Safety Promotion.  (Each have multiple, alternate versions of the test for test security reasons.)

- Evaluation forms, including details about the how to use the forms (Note-Taking Form, Consolidation Form, and Rating Form) and the rating process, specifically:
  - initial ratings are made independently of other examiners;
  - once initial ratings are completed and recorded, the panel discusses any differences of 2 or more points;
  - then, final ratings are made and recorded.

- Importance of standardized testing conditions.

According to people who attended the training, the training should include more practice time, more facilitators to provide feedback to trainees, and more time devoted to cross-cultural awareness and competence.  As described earlier in the chapter in the section on application preparation, feedback is a key element in training.

Some Oral Board examiners reported that, at times during the actual testing process, the procedures learned during the training were not followed.  Some examples reported to me are:

- Examiners not recusing themselves when they knew the candidate or a relative of the candidate.

- Favoritism toward candidates who have family members who are police officers.

- Examiners requesting folders of particular candidates.  Lead examiners picking up candidates' folders resulting in suspicions that the lead examiner sometimes asked for particular candidates.

- Examiners evaluating "eye contact" in spite of being told in training not to do so because direct eye contact in some cultures is a sign of disrespect.

I reviewed some of the applicants' Oral Board files to learn how examiners completed their rating forms, and in the process found examples of examiners' notes about whether the candidate had good or not good eye contact.  These notes, intended to provide reasons for the examiners' ratings, indicate evaluations were, at times, based on inappropriate information.

Some Oral Board examiners reported that some candidates appeared coached, that they appeared to have information about the test that others did not have.  They appeared "too informed."

Community member examiners commented that they felt threatened and intimidated rather than welcomed by several of the police officers who also attended training.  If in the future, community members are included in the BOP hiring process, the opportunity it presents to enhance the image of the department and help build and maintain effective relations with the community should not be overlooked.

*Impact of the Oral Board on African Americans*.  People who score in the bottom 5% of all applicants taking the Oral Board are disqualified.[105]  That is, a pass/fail cut score is set for the Oral Board.  Based on 2011 test administration data, there is no

---

[105] 2011 Final Report p. 24 [3-ring binder Tab AA p. 175].

difference between White and African American passing/failing rates, i.e., White and African American selection ratios equaled 95%.  Based on 2013 test administration data, the selection ratio for African Americans was higher than that for Whites.  More specifically, the African American selection ratio was 97.6 percent whereas the White selection ratio was 95.2%.  Thus, the 5 percent cut score to disqualify applicants does not adversely affect African Americans.

An examination of the rest of the distribution is appropriate and necessary.  Mean scale scores based on 2013 Pittsburgh testing administration data are shown in Table 24 for Whites and African Americans.  White and African American mean scores are the same on Oral Expression but Whites score, on average, higher than African Americans on the Reasoning and Comprehension.  On the Overall Oral Board score, Whites score somewhat higher than African Americans, i.e., .08 standard deviations higher.  This amount, though very small, will add to an overall negative impact against African Americans which is accumulating across the several selection procedures.

**LEAB & ORAL Board Composite Score**

*Description.*  The LEAB and Oral Board scores are equally weighted to form a composite score.  They are each rescaled to 150 points, with the combined total scores ranging from 225 to 300.  By rescaling the scores such that the maximum score is 300 points, the impact of the Veterans Preference Points is reduced.  Previously, virtually all non-veterans were excluded from being viable candidates because the Veteran points moved veterans to the top of the ranked list of candidates.  The rescaling addresses that issue.  Another reason for rescaling was to eliminate the effects of an arbitrary hurdle set

**Table 24:  Mean Score Differences between Whites and African Americans on Oral Board Overall and Component Scores and Effect Sizes of Those Differences 2013 Test Administration Data[106]**

| Test | Mean Score Total Group (N=787) | Standard Deviation of Total Group | | Mean Score Whites (N = 665) | Mean Score African Americans (N = 84) | | Effect Size[3] of Difference |
|---|---|---|---|---|---|---|---|
| *Oral Expression* | 3.7[1] | 1.18 | | 3.7 | 3.7 | | **.00** |
| | | | | | | | |
| *Reasoning* | 3.5[1] | 1.21 | | 3.6 | 3.4 | | **.17** |
| | | | | | | | |
| *Comprehension* | 3.5[1] | 1.24 | | 3.5 | 3.4 | | **.08** |
| | | | | | | | |
| *OVERALL Oral Board* | 10.7[2] | 3.54 | | 10.8 | 10.5 | | **.08** |

[1]  Minimum possible score is 1. Maximum possible score is 5.

[2]  Minimum possible score is 3. Maximum possible score is 15.

[3]  Effect sizes are calculated as follows:  Mean score of White group minus the mean score of the African American group divided by the standard deviation of the total group.  Effect size is interpreted in terms of standard deviations.  Thus, an effect size of .17 indicates that Whites, on average, score almost 1/5[th] standard deviation higher than African Americans, on average.

---

[106]  Data from email attachment dated February 4, 2014 from EB Jacobs.

by Civil Service.  Specifically, the Civil Service has a requirement that applicants must attain a passing score of 75% "correct".  By rescaling the scores to a minimum of 225, the 75% "correct" requirement is achieved,[107] and the arbitrariness of the 75% passing score requirement overcome.

After adding the appropriate preferences points to each applicant's LEAB/Oral Board Composite score, the names are placed on the Eligibility List.  This list is valid for 18 months.[108]

***Impact of LEAB/ORAL Board Composite on African Americans.***  An important analysis of the impact of the LEAB/ORAL Board composite examines the composition of the group that is in the top ranked 250 applicants.  Two hundred fifty (250) is the number of applicants that is needed to constitute a group of approximately 150 applicants to be evaluated during the Chief's Roundtable.

At this stage in the selection process, one does not know which of the 250 candidates will receive a "conditional job offer", but the 250 applicants provide a basis for establishing the most realistic "cut-score" for the LEAB/Oral Board composite.  It is this group of 250 that represents the pool of candidates that have a chance of being evaluated during the Chief's Roundtable.  Applicants with scores below the score of the 250th ranked candidate have virtually no chance of being selected.  Thus, the score of the 250th ranked candidate is a good estimate of the operational cut score for the LEAB/Oral Board composite.

Table 25 shows the impact of the operational cut score for the LEAB/Oral Board composite on African Americans for the 2011 test administration data and during the life

---

[107] Civil Service information provided January 24, 2014.
[108] 3-ring binder Tab C3a.

87

**Table 25:  Adverse Impact Analysis of LEAB/Oral Board Composite –
2011 & 2013 Test Administration Data[109]**

### 2011 Test Administration Data

| Ethnic Group | Took Written Exam (LEAB) | Scored in Top 250 of LEAB/OB Composite (Passed Operational Cut Score) | Selection Ratio[1] | Adverse Impact Analysis[2] |
|---|---|---|---|---|
| White | 897 | 210 | 23.4% | -- |
| African American | 144 | 24 | 16.7% | **.59** |

### 2013 Test Administration Data

| Ethnic Group | Took Written Exam (LEAB) | Scored in Top 250 of LEAB/OB Composite (Passed Operational Cut Score) | Selection Ratio[1] | Adverse Impact Analysis[2] |
|---|---|---|---|---|
| White | 762 | 224 | 29.4% | -- |
| African American | 107 | 17 | 15.9% | **.54** |

[1]  Selection Ratio is the percent of people of a group that passed the test. It is calculated by dividing the number of people of a particular group that passed the test by the number of people of that group that took the test.  Thus, during the life of the 2011 test administration data, the selection ratio for the White group is 23.4%, i.e., 897 ÷ 210 = 23.4%.

[2]  Adverse Impact is calculated by dividing the selection ratio of the protected group, e.g., African American group, by the selection ratio of the comparison group, e.g., White group.  During the life expectancy of the 2013 test data, the African American selection ratio is .59 percent that of the White selection ratio, i.e., 16.7 ÷ 23.4 = 59%. A value that is less than 4/5 (or 80%) is generally regarded as evidence of adverse impact.

---

[109]  3-ring binder Tab 3, pp. 754-770; 2013 Final Report, Appendix E.

expectancy of the 2013 test data.  It shows that the White selection ratio for the LEAB/Oral Board composite (which is the basis for the Eligibility List) for the 2011 testing administration is 23.4 percent, whereas the African American selection ratio is 16.7 percent for an adverse impact ratio of .59.  Using the $4/5^{th}$ (80 percent) rule-of-thumb standard, the LEAB/Oral Board composite has adverse impact against African Americans.  During the life expectancy of the 2013 testing data, the LEAB/Oral Board composite is likely to have a similar level of adverse impact against African Americans.

**MPOETC Fitness and Reading Tests[110]**

When Personnel is informed that an Academy class has been scheduled, they contact the people on the Eligibility List to schedule them for the MPOETC tests.  The Municipal Police Officers' Education & Training Commission (MPOETC) requires that applicants for the position of police officer pass both a reading test and a set of physical fitness tests before they are certified as qualified to enter the training Academy. If a candidate fails one or both, they have one opportunity to retake both, but if they fail either one a second time, they are disqualified.  MPOETC test results are effective for 6 months.  After 6 months have elapsed, the tests need to be administered.  Thus, only when BOP Personnel learns that an academy/training class is needed, do they notify candidates and schedule the MPOETC testing.  Each of the two MPOETC components is described below.

***Nelson-Denny Reading Test***.  The reading test is administered first. It is a well-known reading test.  The exam consists of two parts – an 80-item multiple-choice, timed Vocabulary test and a 38-item 7-passage, multiple-choice Reading Comprehension test.

---

[110] 3-ring binder, Tab C4a, C4b, H.

89

Currently, MPOETC sets the cut score at the 9th grade reading level.  The City of Pittsburgh Personnel administers the tests.  The tests are immediately scored and if the candidate passes, he or she proceeds to the physical fitness testing location.  If the candidate fails, he or she is rescheduled for retesting at a later time.  If a candidate fails the reading test twice, he or she is disqualified.

The LEAB already contains six specific cognitive ability tests.  One of the six is Written Comprehension.  Clearly, the Nelson-Denny Reading test overlaps significantly with other parts of the Pittsburgh BOP entry-level police officer selection tests.

***Physical Fitness Testing.***  The physical fitness test consists of four events or subtests, each of which the candidate must pass.  The pass-score is based on a comparison with one's peers in terms of age and gender.  The pass-score is the 30th percentile for one's norm (comparison) group.  That is, separate passing scores exist for men and women and people of different ages.  The tests and standards are based on the Cooper Institute for Aerobics Research Standards for Law Enforcement Fitness Assessment.  Test administration is overseen by the Academy's Fitness Instructor.  The BOP web-site has a video describing each event in the physical fitness test as well as suggested exercises to prepare for the test.

The four subtests are:

- 300 Meter Run – measure of anaerobic power.

- One Repetition Maximum (RM) Bench Press – an absolute strength test that measures a muscle group's maximum force.

- One Minute Sit-ups – a measure of muscular endurance (abdominal) which is the ability to contract the muscle repeatedly over a specified time without excessive fatigue.

- 1.5 Mile Run – a measure of aerobic power (cardiovascular endurance).

A "testing escort" is assigned to each candidate.  Some people who have been involved in the testing allege that the behavior of the testing escorts vary with some escorts providing encouragement whereas others do not.

During the Pittsburgh BOP job analysis, Reaction Time, Fine Hand/Body Movements were rated more important than any of the above physical abilities.  (See Table 6, this report.)  Muscular Strength and Muscular Endurance were rated as of lesser importance.  However, MPOETC controls the police certification process.

***Impact on Protected Classes***.  Results of the Reading and Physical Fitness tests are not separately reported.  Thus, the impact of these two different types of ability tests, cognitive and physical abilities, on African Americans cannot be examined.  Apparently, it is rare for anyone to fail the Reading test; failures at this stage of the selection process are typically a result of failing the Physical Fitness tests.[111]

MPOETC is considering increasing the reading level requirement to 11th or 12th grade.  If they do, several people will fail the Reading test[112] with a likely disproportionate effect on African Americans and other minorities.

The numbers of people passing the MPOETC tests are reported for Whites and Minorities but not for specific ethnic groups.  Thus, I am unable to examine the effects of the MPOETC tests specifically on African Americans.

### Background Investigation Phase[113]

The Office of Municipal Investigations handles the Background Investigation process.  It runs concurrently with MPOETC testing phase and continues thereafter for

---

[111] Phone conversation with Todd Siegel (Manager of Employment), January 24, 2014.

[112] Interview and phone conversation with Todd Siegel, November 25, 2013 and January 24, 2014.

[113] 3-ring binder Tab C5a, C5b, and D, and interviews.

those who pass the MPOETC tests.  It is a very thorough process and consists of four main components – Pre-polygraph Procedures, Polygraph Procedures, Drug Testing, Background Interviews, and Background File Preparation.  Each is described below.

*Pre-Polygraph Procedures.*  Several activities are performed during this phase, with all information and documents obtained placed in the candidate's "Background File".  Information gathered is checked to ensure that the person involved is indeed the candidate.  Activities performed during this phase include:

- Verifying authenticity of prior employment.

- Pulling "Background Files" of those candidates who applied previously. (Background Files of all candidates are kept indefinitely.)

- Conducting a computerized criminal history, including nation-wide search, and following up with appropriate law enforcement agencies to obtain copies of reports and determine disposition.

- Conducting a computerized driving record search for both in-state and out-of-state candidates to obtain "Driver Detail" and "Driver History" records.

- Conducting a computerized police records check through the Pittsburgh's BOP IMS and APRS systems to identify incidents in which the applicant was a victim, witness, suspect, or actor.  If an incident is found, for those candidates that live in Allegheny County but not within the City of Pittsburgh, a detective visits the police department to obtain information and copies of the report.  Non-local police agencies are contacted by phone and reports requested.

- Conducting a Civil Court Records check.  Multiple sources are checked to gather information about lawsuits, family court cases, civil appeals and so forth.

- Conducting Pennsylvania state-wide Traffic/Criminal/Non-Traffic Citations/Summary Appeal Court Records searches as well as to state-wide checks in the relevant states of applicants living outside the state.  A detective contacts the appropriate law enforcement agencies to obtain copies of the reports.

- Conducting a search for Warrants, both arrest warrants and bench warrants.  Searches are conducted both state-wide and nationwide.

Candidates with active arrest warrants are advised to clear the warrant before appearing at the Physical Fitness test. Candidates who pass the MPOETC tests and have warrants that are the result of not paying court fines are advised to clear the warrants.

- Conducting a <u>Protection from Abuse</u> (PFA) database search. This is a state-wide search.

- Conducting a <u>Domestic Relations Warrants</u> search. This is a search for warrants related to child support.

- Conducting a <u>Credit</u> check using Equifax reporting service.

- Conducting a <u>Residency</u> check. Clerical staff checks that residents of Allegheny County live in the City of Pittsburgh.

The information gathered is corroborated to ensure that the information in the file is about the candidate. Identify theft is an ever-increasing issue that makes this part of the process critically important.

All the information is kept in the Background File for review during the Chief's Roundtable.

***Polygraph Procedures.*** Candidates who pass the MPOETC tests are scheduled for a polygraph exam. Prior to a candidate's appearance for the polygraph exam, OMI reviews the candidate's Background File, comparing information in it with the candidate's admissions on the candidate processing forms to identify areas for the polygraph examiner to explore during the polygraph interview. Examples of interest include: arrests, admitted drug use, gaps in employment, omission of information and so forth. Upon arriving at the testing site, the candidate's driver's license is checked to confirm their identity. The candidate is finger printed and his/her picture taken. The picture is used strictly for documentation of who appeared for the polygraph and is not included in the Background File that assessors see during the Chief's Roundtable part of the selection process.

93

Pittsburgh BOP has certified polygraph examiners on staff to conduct the polygraph exam.  They are trained to follow highly standardized procedures.  With each candidate, they spend several minutes explaining what they will be doing and how the equipment works. They attempt to put the candidate at ease.  They, then, administer the exam.  The examiner first asks questions to establish a base line of the candidate's physiological responses against which the candidate's answers to the exam questions are compared to evaluate whether or not the candidate is providing accurate information. The exam questions cover such areas as driving, education, drug use, finances, and work experiences.

The polygraph does not produce a pass or fail outcome.  It does, however, provide information about whether or not the candidate appears to be providing accurate information.  It is the information obtained during the exam that is important.[114]

***Drug Testing.***  Upon completion of the polygraph exam, candidates are sent to a hospital for a 10-panel urine and hair drug test.  The hospital follows all DOT standards. Candidates can "fail" the Background as a result of failing the drug test.

***Background Interviews.***  One detective/investigator is responsible for conducting field interviews and data gathering for each candidate.  During the application process, candidates provide names of references along with contact information, people who know and can provide information about the candidate.  Detectives/investigators try to interview three references.  They use a standardized interview questionnaire.  They also contact and interview employers, again using a standardized employer questionnaire. Often, employers only verify dates of employment.  If a candidate has prior work

---

[114] Interviews conducted November 26-27, 2013.

experience as a police officer, the candidate's supervisor is asked to complete a

standardized police employment questionnaire.

  ***Background File Preparation.***  Several activities are undertaken.  For each

candidate's Background File:

- A general internet search as well as a search for profiles on Facebook, Twitter, and other social networking sites.

- Then, all the information in the Background File is organized into type of information:  Police Record, Driving History, Military Record, Education, Legal, Residence, Employment History, Equifax Credit Check, Polygraph, and Miscellaneous.

- A summary report is prepared.  It highlights information in the file and directs the reader to sections of the report for further information.

- The Pennsylvania Driver detail is removed.

- Files are sent to the Personnel Department.

- Personnel reviews each file and determines whether the candidate should be disqualified under Section 10 of the general Civil Service law.

It is this section of the Civil Service law that provides language that is open to

interpretation, very likely intentionally so.  However, for purposes of the Pittsburgh BOP

entry-level police officer selection system, some of the reasons for disqualifying a

candidate should be more clearly specified.  Section 10 (23442) of the Civil Service law

states:

   …The said commission may refuse to examine an applicant, or after examination, to certify an eligible, who is found to lack any of the established preliminary requirements for the examination or position or employment for which he applies; or who is physically so disabled as to be rendered unfit for the performance of the duties of the position to which he seeks appointment; or who is addicted to the habitual use of intoxicating liquors or drugs; or who has been guilty of any crime or of infamous or notoriously disgraceful conduct; or who has been dismissed from the public service for delinquency or misconduct, or who has made a false statement of any material fact, or practiced or attempted to practice any deception or fraud in his application, in his examination, or in

securing he eligibility; or who refuse to comply with the rules and regulations of the commission.

The phrase "infamous or notoriously disgraceful conduct" is subjective, dependent upon individual interpretation. Other conditions that justify disqualification are also subjective.

During Personnel's review of the files, it can and sometimes does disqualify candidates. Once this process is complete, the Background Files are sent to the BOP for the next step in the selection process, the Chief's Roundtable. Applicants have the right to appeal to the Civil Service Commission if they are disqualified during the Background Investigation phase. Applicants who pass the Background Investigation remain in the process and their names placed on the "Certified List".[115]

The Background Investigation phase could be improved by developing and applying a standard set of guidelines for evaluating the information in the candidate Background files. This would help eliminate voiced concerns that different standards are applied to African Americans and other protected classes.

*Impact on Protected Classes*. Very few candidates are disqualified at a result of the Background Investigation. A complete review of all the Background Files would need to be undertaken to assess whether a systemic problem exists. I did not do such a review. An appeal process exists that provides aggrieved candidates an opportunity to plead their case. Nonetheless, a uniform set of standards that is transparent to all should be developed to evaluate the information in the Background files and that uniform set of standards should be applied to all candidates.

---

[115] 3-ring binder, Tab C31.

**Chief's Roundtable**[116]

The purpose of the Chief's Roundtable is to review the entire file that has been accumulated about a candidate to determine whether or not to make a conditional job offer to the candidate.  The offer is conditional because additional steps in the process remain, e.g., the psychological and medical exams.  Candidates must pass those exams before a final job offer is made to a candidate.  The examiners involved in the Chief's Roundtable come from the leadership ranks (Command Staff) in BOP.

The files of the top 60 to 70 or so candidates on the Certified List are presented in strict rank order to the reviewers for their evaluation.  They evaluate candidates in sets of three, known as the "Rule of Three" from Section 14 (23446) of the Pennsylvania General Civil Service Act for Cities of the Second Class.  Section 14 states:

> Every position or employment in the competitive class, unless filled by promotion, transfer, reinstatement, or reduction, shall be filled only in the following manner:  The appointing officer shall notify the Civil Service Commission of any vacancy in the service which he desires to fill, and shall request the certification of eligible.  The commission shall forthwith certify, from the appropriate eligible list, the names of the three persons thereon who received the highest averages at examinations held under the provisions of this act.  The appointing officer shall, thereupon, with sole reference to the relative merit and fitness of the candidates, make an appointment from the three names so certified:  Provided, however, that should he make objection, to the commission, to one or more of these persons, for any of the reasons stated in section ten of this act, and should such objections be sustained by the commission, the commission shall thereupon strike the name of such person from the eligible list, and certify the next highest name for each person so stricken off.  As each subsequent vacancy occurs, in the same or a similar position, precisely the same procedure shall be followed:  Provided, however, that after any name has been three times rejected, for the same or a similar position, in favor of a name or names below it on the same list, the said name shall be stricken from the list.  When there are a number of positions of the same kind to be filled at the same time, each appointment shall, nevertheless, be made separately and in accordance with the foregoing provisions.  When an appointment is made under the provisions of this section, it shall be, in the

---

[116] 3-ring binder Tab C3a and interviews.

first instance, for the probationary period of three months, as provided in section eight of this act.  The provisions of this section (fourteen) shall not apply in making appointments to competitive positions which are specially exempted by the commission from competitive examinations under the authority conferred in section fifteen.

Operationally, this works as follows:

- Each reviewer is given one applicant's file to review and present to the "roundtable" of reviewers.

- A Personnel Analyst present at the meeting writes the names of the top three candidates on an African American/white board or chart.

- The reviewer with the top ranked candidate presents information about the candidate to the roundtable reviewers.

- The next two top ranked candidates are presented.

- The three candidates are discussed.

- At least one of the three candidates must be selected.  If the first candidate from the group of three is passed over, and the second and third are selected, the passed over candidate receives two strikes.  The Personnel Analyst tracks all the selections and strikes.

- The next set of three candidates, which includes the candidate who was passed over, is presented and discussed. Once a candidate receives three strikes, he or she is disqualified.

- The process continues until there is no group of three remaining. Candidates must be evaluated in groups of 3, even if there are insufficient people to make a group of 3.[117]  That is, if only 1 or 2 people remain to be evaluated, they cannot be evaluated.  They must be processed at a subsequent Roundtable when another academy class is scheduled.

- The Roundtable decisions cannot be appealed.

Currently, reviewers understandably game the system.  When, for example, the reviewers encounter a group of three excellent candidates, they will "strike" one of the candidates so that if/when they encounter a group of three "not-so-good" candidates, they

---

[117] 3-ring binder, Tabs C3a, R, and interviews.

98

are not required to pick one of the not-so-good candidates.  Instead, they will have planned ahead for this occurrence; they have seeded the group with one good candidate.

It is difficult to understand the usefulness of the Rule of Three.  It is not a "best practice".  It lacks merit when evaluated from a measurement or psychometric point of view.  Each candidate should be evaluated either on his or her own, independent of others or in comparison with all the other candidates, not just a very limited number of the larger group.  Everyone involved in the Chief's Roundtable that I interviewed questioned the merits of the Rule of Three.

The Chief's Roundtable is procedurally structured but it lacks a measurement-focused structure.  That is, examiners are not provided with a set of characteristics to focus their evaluations.  Specifically, raters should be provided with a set of characteristics along with definitions and standards for evaluating the information in a candidate's file.

*Impact of Chief's Roundtable on Protected Classes*.  As it is currently conducted, allegations of unfair treatment and double-standards are possible, maybe even legitimate.  But such allegations are possible regardless of the ethnic status of the candidate; the process is unfair for all candidates.

It is unclear what is being measured in the Chief's Roundtable and what standards are being used or how they are applied.  As a result, individuals can argue that a different set of standards were applied to them and point to examples that might support their allegation.  Since a set of standards is lacking, Whites and minorities alike are disadvantaged.

**Psychological Exam Conducted by Licensed Psychologist**[118]

This phase is a requirement of MPOETC and involves each candidate completing the Minnesota Multiphasic Psychological Inventory–2 (MMPI-2) and being interviewed by a licensed psychologist.  The objective is for a licensed psychologist to determine if a candidate is "psychologically fit for work as a Law Enforcement Officer" or "not psychological fit for work as Law Enforcement Office".

Each licensed psychologist involved in this phase of the project is informed in detail about the job duties, activities, and responsibilities of police work. They understand the requirements and stress of the job.  They are expert in interpreting and understanding the meaning of scores on psychological inventories, including the MMPI-2.  They are also expert at conducting personal interviews to learn about the characteristics of an individual.  They are expert in the psychology of human behavior.

The interview is not a "clinical" interview.  Instead, it is an "administrative" interview with the important distinction that interviewees (job applicants) do not receive feedback.  The result of the administrative interview is a recommendation about whether or not the candidate is fit for police work.

The psychologist's determination can be appealed.  In that event, a second licensed psychologist interprets the meaning of the scores on the MMPI-2 scales and interviews the candidate.  If the second psychologist determines the candidate is "fit" for police work, a third licensed psychologist independently reviews the entire record.  The three licensed psychologists then meet to discuss the candidate and their evaluation of the candidate.  A resolution is reached.  The determination by the three licensed psychologists cannot be appealed, nor is feedback about the specifics provided to the

---

[118] 3-ring binder Tabs C3a, C3b, and interview.

candidate which is in keeping with American Psychological Association guidelines for this type of psychological assessment.

**Medical Exam**

This phase of the selection process is a requirement of MPOETC. I did not review this step of the BOP police selection system.  Once an applicant passes all the prior steps of the selection process, he or she is offered a job as a police officer with the condition that he or she must pass the Academy training requirements.

**Analysis of Overall Impact of Selection System on Protected Classes**

Each of several steps in the hiring process of Pittsburgh police officers was examined for its impact on African Americans.  The minimum cut scores that were set on the LEAB CAT did have a negative effect on African American hiring.  Although the 84 percent selection ratio of African Americans compared to 96.6 percent selection ratio of Whites did not meet the 4/5th rule of thumb standard for adverse impact, it was the first in a series of analyses that revealed steps where the mean scores of Whites was higher than that of African Americans.  These differences have a cumulative effect.

An analysis of the number of White compared to African American candidates who survived the selection process to the point of the Chief's Roundtable is informative. Using 2013 testing data, analysis of the selection ratios of Whites and African Americans that reached the Chief's Roundtable step in the process indicates that the White selection ratio is 14.2 percent, and the African American selection ratio is 4.7 percent for an adverse impact ratio of .33. That is, the selection ratio of African Americans is 1/3rd that of Whites.  Using the 4/5th rule of thumb standard, the selection procedures have adverse impact against African Americans.  The numbers and results are shown in Table 26.

The Chief's Roundtable and Background steps further acerbate the problem but by then the number of African Americans still remaining in the candidate pool is so small, the analysis is uninformative – it is an unstable estimate of the adverse impact. Nonetheless, the results are shown in Table 26.  Using the most recent Chief's Roundtable data (candidates processed for the March 17, 2014 class), the African American selection ratio is .9 percent whereas the White selection ratio is 6.0 percent for an adverse impact ratio of .15.  That is, the selection ratio of African Americans is less than 1/5[th] that of Whites, even more negative than the impact at the stage just prior to the Chief's Roundtable.  Using the 4/5[th] (or 80 percent) rule-of-thumb standard, this is considered adverse impact against African Americans.

**Table 26:  Overall Adverse Impact Analysis of Selection System
2013 Data[119]**

| Ethnic Group | Took LEAB | Survived to Chief's Roundtable | Selection Ratio[1] | Adverse Impact Analysis[2] | | Received Conditional Job Offer | Selection Ratio | Adverse Impact Analysis |
|---|---|---|---|---|---|---|---|---|
| White | 762 | 108 | 14.2% | -- | | 46 | 6.0% | -- |
| African American | 107 | 5 | 4.7% | **.33** | | 1 | **.9%** | **.15** |

[1]  Selection Ratio is the percent of people of a group that passed the test. It is calculated by dividing the number of people of a particular group that passed the test by the number of people of that group that took the test.  Thus, the selection ratio for the White group is 14.2%, i.e., $108 \div 762 = 14.2\%$.

[2]  Adverse Impact is calculated by dividing the selection ratio of the protected group, e.g., African American group, by the selection ratio of the comparison group, e.g., White group.  In this case, the African American selection ratio is .33 percent that of the White selection ratio, i.e., $4.7 \div 14.2 = 33\%$.  A value that is less than 4/5 (or 80%) is generally regarded as evidence of adverse impact.

---

[119]  Information provided by City of Pittsburgh January 28, 2014 and EB Jacobs February 4, 2014.

# Chapter 5:  Job Relatedness (Validity) of Current Selection System

This chapter reviews the validity evidence for each step in the BOP entry-level police officer selection process.  The procedures evaluated in this chapter are:

- LEAB written exam which consists of the Cognitive Abilities Test (CAT), the Life Experience Survey (LES), and the Work Styles Questionnaire (WSQ),

- Oral Board,

- MPOETC Physical Fitness and Reading Tests,

- Background Investigation, and

- Chief's Roundtable.

**LEAB Written Exam**

Evidence of validity for the LEAB is based on the 2004 LEAB validation study that consists of data collected prior to 2004.  The validity data are more than 10 years, which may not be a serious problem.  The Pittsburgh Bureau of Police (BOP) was not involved in the LEAB study, thus, a transportability study is required[120] to determine whether the validities obtained in the 2004 LEAB study "generalize" to BOP. Fundamental to a transportability study is a job analysis in the new location that demonstrates that the work in the new location is substantially the same as the work where the original validation study was performed.  As detailed in Chapter 2, the job analysis in the LEAB validation study is not without criticism.  Moreover, the LEAB scales that are used in Pittsburgh are not the same scales as those that emerged from the LEAB validation study.  The LEAB scales that are used in Pittsburgh are shorter, less reliable scales.

---

[120] See the *Uniform Guidelines for Employee Selection*.

EB Jacobs re-computed the validities of the shortened LEAB scales and the 2004 data suggest that the shortened scales do retain validity and the mean score difference between Whites and African Americans is smaller with the shorter scales.  As explained earlier, mean test score differences between groups is a major determinant of adverse impact.  These are good outcomes.  However, the validities could be higher and the mean score differences between Whites and African Americans could be even smaller.

Some of the LEAB scales that did not validate purportedly measured some very important skills and abilities for performing effectively as a police officer.  For example, the original LEAB included measures of Integrity and Dependability but these scales did not demonstrate validity in the 2004 LEAB validation study.  At least two possible explanations are possible.  One reason might be the criteria in the original study.  If the LEAB study had included criteria based on archival records documenting disciplinary actions, citizen complaints, absenteeism, tardiness, and driving accidents, the Integrity and Dependability LEAB scales might have correlated with such criteria – criteria that they are likely to predict.  Thus, criterion deficiency might have contributed to the finding of little or no criterion-related validity for the Integrity and Dependability LEAB scales.  A second reason might be the quality of the Integrity and Dependability scales.  Perhaps these two LEAB scales were not good measures of the characteristics that they were purported to measure.

The LEAB job analysis indicates that Integrity is the most important personal characteristic for overall job performance.  The people I interviewed for this project thought it critically important as well.  Moreover, validation studies done elsewhere indicate measures of such characteristics have criterion-related validity for predicting police officer effectiveness.  Some of the LEAB scales that did not validate that relate to

important characteristics for police officers have smaller mean score differences between Whites and African Americans than some of those that are in the LEAB and for some of these characteristics, African Americans score higher than Whites.  Measures of some of these characteristics are missing from the LEAB.

The cognitive abilities measured in the original LEAB did not include Memorization, a cognitive ability that during the job analysis was rated more important than 5 of the 6 cognitive abilities that are included in the current LEAB.  Memorization was not included initially in the LEAB validation study and thus had no opportunity to demonstrate its validity for predicting officer effectiveness and be included in later versions of LEAB.

In short, the LEAB may over-emphasize some characteristics and overlook other important characteristics.  Criterion-related validity for the written exam could be higher and have less adverse impact against protected classes.

**Oral Board**

There is no evidence that the Oral Board has content validity, criterion-related validity, or construct validity.  The description of the Oral Board indicates examiners are to evaluate applicants on Reasoning, Comprehension, and Oral Expression – constructs. Thus, validation studies documenting construct and criterion-related validity are appropriate.  None was undertaken.

A content validity might be undertaken to document the relevance of the three components (subtests) of the Oral Board examination.  However, the Personal Safety Promotion subtest of the Oral Board appears to be an attempt to measure skills and abilities related to Program Support which Pittsburgh police officers rated as the least

important of all 16 possible job duties.  Indeed, it was determined to be a non-essential part of police work in Pittsburgh[121].

The Oral Board supposedly measures Reasoning, Comprehension, and Oral Expression but Reasoning and Comprehension are already measured in the selection process, specifically in the LEAB and in the Nelson-Denny Reading test.  Although oral expression is appropriately measured in an Oral Board, reasoning and comprehension are better measured with more typical cognitive ability tests.

**MPOETC Physical Fitness and Reading Tests**

This is a MPOETC required set of tests.  Although I did not evaluate their validity, the reading test measures cognitive abilities measured in the LEAB.  Both the Nelson-Denny Reading test and the Cognitive Abilities Test part of the LEAB are considered traditional cognitive abilities tests.  There is considerable overlap in what they measure.

**Background Investigation**

No study is available to document the validity of the background investigation.  It is primarily a data-gathering phase for input into the Chief's Roundtable.  More specific guidelines in what constitutes "infamous or notoriously disgraceful conduct" would improve the process.

**Chief's Roundtable**

No study is available to document the validity of the Chief's Roundtable.  It is a subjective process without guidelines about what skills and abilities to measure and how

---

[121] 3-ring binder page 418.

to evaluate the information in a consistent manner.  The procedures, particularly the "Rule of Three" is unfair for virtually all the applicants.

**Summary**

The Pittsburgh BOP entry-level police officer selection system lacks evidence of validity for predicting job performance of police officers.  Given the evidence presented in Chapter 4 that the overall system has an adverse impact on African American applicants, the system should be revised and improved.  Chapter 6 enumerates my recommended changes to the system.

## Chapter 6:  Summary of Evaluation and Recommendations

I approached the assignment of evaluating the Pittsburgh Bureau of Police (BOP) entry-level police selection system and recommending changes with the goal of making the procedures and processes better for all applicants.  I evaluated the quality of the selection system by examining what applicant characteristics should be assessed based on the requirements of the work.  I then examined the separate components of the system and finally the overall system.  The details of my review, conclusions, and justifications for my recommendations are presented in Chapters 1-5 of this report.  This chapter integrates and summarizes those details.

Overall, the Pittsburgh Bureau of Police (BOP) entry-level police officer selection system results in adverse impact against African Americans.  Their selection ratio is in the range of between .9 percent and 4.7 percent whereas the White selection ratio is in the range of between 6.0 percent and 14.2 percent, depending upon which of the final stages of the selection system the figure is calculated.  This is an adverse impact ratio in the range of about $1/5^{th}$ to $1/3^{rd}$.  That is, the African American selection ratio is less than $1/3^{rd}$ that of the While selection ratio.  Using the $4/5^{th}$ rule of thumb standard, this is considered adverse impact against a protected class.  There is no one single cause; rather it is an effect accumulated over the several components of the selection system.

The overall validity of the selection system cannot be documented nor can the validity of most of its components.  Considerable effort on the part of BOP, the City, and EB Jacobs has been made to design and implement a valid selection system but in general those efforts have been thwarted by 1) policies that have been outside their authority, 2) lack of knowledge, and 3) tradition.

111

My recommendations for improving the validity of the procedures and processes and reducing their adverse impact against protected classes are presented below.

**Update the Job Analysis**

- Identify the knowledges, skills, abilities, and other personal characteristics (KSAOs) needed to perform effectively as a police officer in the City of Pittsburgh.

  - Take into account the changing make-up of the City's citizens. That is, new immigrant communities require police officers to be aware of even more cultural diversity.

  - Consider community involvement in identifying the needed skill set of police officers is needed. That is, the philosophy of community-oriented policing should be incorporated into the job analysis.

- Develop a job analysis questionnaire that is not so arduous for participants to complete. Data quality is likely to be better.

- Use an importance rating format that produces more absolute levels of KSAO importance that will allow for better understanding of the requirements of the job.

- Identify all work outcomes that are important to predict. Be sure the set of criteria does not suffer from "criterion deficiency". For example, be sure to include counter-productive criteria (such as disciplinary actions, citizen complaints, absenteeism, tardiness, and driving accidents) that Integrity and Dependability are likely to predict.

**Improve Applicant Preparation Materials and Classes**

- Provide more information to applicants about how examiners during the Oral Board will evaluate them. Inform them specifically about the standards examiners will use to evaluate applicants.

- Provide more practice time to applicants and provide more feedback.

- Provide interviewing tips, practice, and feedback to applicants.

- Provide information and practice about the strict timing requirements of all three components of the Oral Boards.

- Provide information to applicants about the standards that will be used to evaluate their background information. Let (encourage) applicants to select

112

out early in the selection process if their backgrounds and prior experiences are such that they will receive low scores when the standards are applied to their life experiences.

**Develop a Construct-oriented Measurement Plan for Entire Selection Process**

- Develop a plan for what, where, and how to measure each required characteristic (construct/KSAO).

- Identify constructs (KSAOs) amenable to evaluation in written exam, oral board, background investigation, and Chief's Roundtable.

- Ensure that the measurement plan includes measurement of all constructs (KSAOs) that are important for effective performance as a police officer. Avoid measuring characteristics that are unimportant.

- Include KSAOs that are relevant even if they are hard to measure.

- Avoid measuring the same construct with the same measurement method multiple times in the selection process.

  o Negotiate with the Municipal Police Officers' Education & Training Commission (MPOETC) to allow Pittsburgh BOP to administer the Nelson-Denny Reading test apart from the physical abilities test. (MPOETC requires the Nelson-Denny Reading test for police officer certification. It is my understanding that Pittsburgh cannot eliminate it.) MPOETC tests are valid for 6 months, which is appropriate for physical abilities testing but not for testing reading ability. Scores on reading abilities tests have high test-retest reliability over long periods of time – years, not months. Perhaps partner with another city or a group of cities to increase the chances of persuading MPOETC to allow the reading test to be administered apart from the physical abilities test.

  o If MPOETC allows the Nelson-Denny Reading test to be administered separate from the physical abilities testing and removes the 6-month expiration date, the Nelson-Denny reading test could replace the Reading Comprehension test currently included in the LEAB. This would reduce time spent on redundant testing – testing the same construct with the same type of measurement method, i.e., written, multiple choice test – and allow for better assessment of characteristics not well measured or missing from the current selection system.

  o Instead of measuring Reasoning and Comprehension in the Oral Board, consider measuring interpersonal and practical judgment constructs. Work situation exercises, situational judgment interviews, and behavior-based interviews are good ways to measure interpersonal skills and

113

practical judgment.

- o If LEAB scales and the Oral Board were used to evaluate interpersonal effectiveness, they would not be redundant with other parts of the selection system because they are different methods of measurement.

- Increase the number of items and amount of time spent on testing for non-cognitive characteristics.

- Stream-line the selection system to eliminate some of the multiple-hurdles now included.  The multiple-hurdles acerbate the negative effect on protected classes.

- Measure only the cognitive abilities that are important to reduce negative effect on protected classes.

- o For reasoning, a measure of pure reasoning ability is a good choice. Scholarly evidence published in academic journals and experience in the work-place indicate that Whites and protected classes on average score more similarly on pure reasoning ability tests than they do on measures of general cognitive ability, and pure reasoning ability tests have a similar level of criterion-related validity as general cognitive ability tests.  Thus, criterion-related validity is not sacrificed.

## Improve the Tests

- Investigate the latest research about the predictors of characteristics of individuals that are not likely to be involved in aggressive shooting behavior. In particular learn about Kleider and her colleagues' research on working memory and its relationship to judgment and aggressive shooting.

- Investigate new technologies and strategies to measure previously hard-to-measure characteristics such as Working Memory/Memorization.

- Investigate item characteristics of items in existing non-cognitive scales (i.e., LEAB) and new non-cognitive scales to ensure protected classes score on average similarly to Whites when prior research with large data bases suggests their mean scores are similar.

- Investigate item-level validities of new items in non-cognitive scales to ensure validity of new scales for appropriate (targeted) criteria/outcomes.

- Increase the reliability and construct validity of the LEAB Work Styles Questionnaire (WSQ) and Life Experience Survey (LES) scales.

114

o   Several of the non-cognitive characteristics are very important to effective police officer performance.  These characteristics need to be measured well.

o   Applicants who are ineffective interpersonally should have be screened out before the psychological exam conducted by the licensed psychologists.

- Reconsider how "missing data" affects the LEAB WSQ and LES scale scores. Consider changing how the scales are scored.

- Identify strategies for measuring required cognitive abilities that have smaller mean score differences between Whites and protected classes and similar levels of criterion-related validity.  For example, consider using a pure reasoning ability test instead of multiple cognitive ability tests.

**Improve the Rating Processes**

- Develop rating scales for the Oral Boards that more fully capitalize on the rich information such testing methods generate.  Develop rating scales specify that specify standards and guidelines to ensure a structured, objective, and systematic evaluation that is reliable and valid.

- Develop a monitoring system to check on the quality with which the Oral Boards and Chief's Roundtable sessions are being conducted.

- Consider bringing in outside subject matter experts to evaluate applicants during the Oral Boards.  Consider "trading" subject matter experts with other police departments to reduce the cost.  Consider using some community representatives as examiners again.

- Develop construct-oriented interview form for the Background Interviews.

- Develop construct-oriented form to summarize information in Background File.

- Develop construct-oriented rating scales with definitions and standards/guidelines for evaluating information contained in the applicant files (e.g., Background File) to increase objectivity, inter-rater reliability, and validity of the rating process during the Chief's Roundtable.

o   Develop a set of guidelines to evaluate drug and alcohol use, employment history, and other background information.

o   The BOP licensed psychologists have considerable expertise in interpreting and predicting behavior and could provide invaluable help

115

in developing a set of standards/guidelines.

- Consider using the Chief's Roundtable to evaluate the candidate using all the data gathered during the selection process.  Use a construct-oriented approach.  Develop appropriate rating procedures, forms, and standards.

- Work with Civil Service to eliminate the Rule of Three.  Perhaps partner with the Mayor's Office and other police departments in other cities to change the Civil Service Statute that mandates the Rule of Three.  Inform them (or remind them) that the selection system for firefighters does not have this requirement.  Develop the rating process steps listed above to persuade Civil Service that a better system is available.

- Improve training of examiners/evaluators/raters for the Oral Board and Chief's Roundtable.

  o  Train them on the new rating processes, standards and forms.

  o  Include more practice sessions with feedback.

  o  Conduct refresher training just before the Oral Boards and Chief's Roundtable are scheduled.

  o  Include more in-depth diversity and cultural awareness training.

  o  If community members are included, create a welcoming, non-threatening atmosphere during the training.

**Conclusion**

Implementation of these recommendations will increase the job-relatedness (validity) of the selection system, increase the fairness procedures and processes for all applicants, and reduce the adverse impact of the selection system on protected classes. Minorities and African Americans in particular would have a better chance of being hired, not based on affirmative action but based on merit.

**APPENDIX A**


# Brief Description of

# Dr. Leaetta Hough's Credentials and Experiences

# LEAETTA M. HOUGH, PhD
*370 Summit Avenue • St. Paul, MN 55102*
*651.227.4888 • leaetta@msn.com*

**The Dunnette Group, Ltd.**                                    **HirePayoff™**
**President**                                                  **Chief Science Officer**

Leaetta Hough is one of the world's leaders in developing innovative candidate assessment systems. Her focus is creating tools to reliably evaluate a candidate's workplace characteristics that predict on-the-job outcomes, such as learning efficiency, job performance, engagement, retention, and advancement. Her emphasis is tracking changes in the workplace and workforce and designing new, non-traditional assessment strategies that show a solid payoff and mitigate adverse impact against protected classes. She is expert in designing measurement systems of people, work, and performance.

She founded Dunnette Group, Ltd. and was co-founder of Personnel Decisions Research Institutes (PDRI). She is past president of the Society for Industrial and Organizational Psychology (SIOP; a 6500+ member organization of industrial and organizational psychologists from around the world), and past president of FABBS (Federation of Associations in Behavioral and Brain Sciences, a coalition of 22 scientific societies with headquarters in Washington, DC).

She is a fellow of the American Psychological Society (APS), the American Psychological Association (APA), APA's Division 14 (Society of Industrial and Organizational Psychology), and APA's Division 5 (Division of Evaluation, Measurement, and Statistics). She received her Ph.D. from the University of Minnesota in 1981.

Dr. Hough has published dozens of articles in refereed journals, book chapters, and reviews. Noteworthy has been her role as co-editor of the four-volume *Handbook of Industrial & Organizational Psychology*, lead author of the personnel selection chapter for the *Annual Review of Psychology*, the biodata chapter in the *Handbook of Workplace Assessment: Selecting and Developing Talent*, and the personality chapters in the *International Handbook of Work & Organizational Psychology*, the *Handbook of Personnel Selection*, both editions of the I-O Psychology volume of the *Comprehensive Handbook of Psychology, and the APA Handbook on Testing and Assessment*.

Three of her articles were reprinted in *Employee Selection and Performance Management,* a book consisting of articles that I-O psychologists identified as the seminal publications in the last 100 years. Her work has helped shape the science and practice of I-O Psychology.

**APPENDIX B**

**First Amended Complaint – Class Action**

**James M. Foster, Mike J. Sharp, Timothy Christian, Tariq Jamal-Francis, and Darrick Payton, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,**

**v.**

**The City of Pittsburgh, Defendant**

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES M. FOSTER, MIKE J. SHARP, TIMOTHY CHRISTIAN, TARIQ JAMAL-FRANCIS, and DARRICK PAYTON, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF PITTSBURGH,<br><br>Defendant. | Case No. 2:12cv1207<br><br>District Judge David Stewart Cercone<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**<u>FIRST AMENDED COMPLAINT - CLASS ACTION</u>**

Plaintiffs James M. Foster, Mike J. Sharp, Timothy Christian, Tariq Jamal-Francis and Darrick Payton (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, hereby submit this Complaint against Defendant, the City of Pittsburgh ("Defendant" or "City"), which includes its Bureau of Police.

**INTRODUCTION**

1.     The City of Pittsburgh at all times relevant hereto has been and is responsible for the recruitment of new police officers, the setting of standards for the selection of new entry level police officers, and the administration of the processes and procedures employed in the selection of new entry level police officers to be employed in the City's Bureau of Police ("BOP").

2.      Since 2001, the City has hired about 440 entry-level police officers for its

BOP.  Of those, only 17 – less than 4% of all hires – were African-American. Since 2007,

the City has hired 260 police officers, only eight of whom – 3% – are African-American.[1]

3.      The City's hiring process for entry-level police officers operates as a pattern or

practice of systemic disparate treatment and has a disparate impact on African-American

candidates.  There is a significant and material statistical imbalance in the race of the City's

recent police recruit hires when compared to the qualified labor market for African-American

police officers.  African-American males represent 22% of Pittsburgh's labor market for sworn

protective services but only 2% of police officers hired since 2001.  African-American females

represent 10% of Pittsburgh's qualified labor market for sworn protective services but only 1.82%

of police officers hired since 2001.

4.      The City's screening and hiring process result in statistically significant

disparities against African-American applicants for the position of entry level police officer.

The City lacks any legitimate business justification for the hiring practices challenged in this

Complaint, and there are other, less discriminatory alternatives available to the City.

5.      This process includes several stages, beginning with written and oral

examinations, subsequent reading and physical-fitness tests, and background investigations,

which include a credit history check.  The next-to-final selection stage is known as the

"Chief's Roundtable," which produces conditional offers of employment, which then are

followed by medical screening, a written psychological test and an interview with a

psychologist.

---

[1] One additional African-American was invited to participate in the 2011 Policy Academy
class but was terminated from the program.  Plaintiffs also note that this case does not include
a 2007 BOP class made up entirely of former Housing Authority officers, since they were not
entry- level applicants.

6.      This class action suit challenges the City's longstanding pattern and practice of racial discrimination against African-Americans in the screening and hiring of applicants for entry-level police officer positions ("Hiring Process").  As more fully set forth below, the City's hiring practices violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended ("Title VII"), 42 U.S.C. § 1981, as applied by 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*. ("PHRA").  Plaintiffs, on behalf of themselves and all other similarly situated persons, seek, among other remedies, injunctive relief to correct the City's policies and practices that have deprived members of the plaintiff class of their right to equal employment opportunities.

## PARTIES

7.      Plaintiff James M. Foster ("Foster") is an African-American male who lives in Allegheny County, Pennsylvania.

8.      Plaintiff Mike J. Sharp ("Sharp") is an African-American male who lives in Allegheny County, Pennsylvania.

9.      Plaintiff Timothy Christian ("Christian") is an African-American male who lives in Allegheny County.

10.      Plaintiff Tariq Jamal-Francis ("Francis") is an African-American male who lives in Allegheny County.

11.      Plaintiff Darrick Payton ("Payton") is an African-American male who lives in Allegheny County.

12.      The City is a municipality in the Commonwealth of Pennsylvania that operates through a number of agencies, offices, and departments, including the Bureau of Police ("BOP").

The City operates pursuant to its Home Rule Charter as a City of the Second Class. Under the

Home Rule Charter, the City has the authority to set its own municipal hiring requirements so

long as these do not violate the State Constitution or state law.

13. The City is an employer within the meaning of Title VII and the PHRA, and a

state actor for purposes of 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause of the

Fourteenth Amendment to the U.S. Constitution.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because

this action arises under the laws of the United States. Supplemental jurisdiction exists over

Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

15. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because the City is

located in and conducts business in this judicial district and because the events giving rise to the

claims set forth herein occurred in this judicial district.

**PROCEDURAL AND ADMINISTRATIVE REQUIREMENTS**

16. Plaintiffs Foster and Sharp have exhausted their administrative remedies as

necessary to bring this lawsuit.

17. Plaintiff Sharp has exhausted the procedural and administrative requirements for

his claims as follows:

A. On or about September 28, 2011, Plaintiff Sharp filed a timely written

charge of discrimination (Charge No. 533-2012-00004) against the City with the Equal

Employment Opportunity Commission ("EEOC") alleging discrimination based on race

and/or color;

      B.      Plaintiff Sharp cross-filed the aforementioned charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC");

      C.      On or about May 30, 2012, the EEOC issued a Notice of Right to Sue on the foregoing charge.  Plaintiffs commenced this action on August 23, 2012, less than ninety days after Plaintiff Sharp received his Notice of Right to Sue.

18.      Plaintiff Foster  has exhausted the procedural and administrative requirements for his Title VII claims as follows:

      A.      On or about November 7, 2011, Plaintiff Foster filed a timely written charge of discrimination (Charge No. 533-2012-00186) against the City with the EEOC alleging discrimination based on race and/or color;

      B.      Plaintiff Foster cross-filed the aforementioned charge of discrimination with the PHRC;

      C.      On or about May 30, 2012, the EEOC issued a Notice of Right to Sue on the foregoing charge.  Plaintiffs commenced this action on August 23, 2012, less than ninety days after Plaintiff Foster received his Notice of Right to Sue.

## FACTUAL BACKGROUND

19.      Defendant City of Pittsburgh maintains an active Bureau of Police which, among other things, is responsible for protecting individuals and property in the City of Pittsburgh.

20.       The City of Pittsburgh is the responsible employer with the power to establish, implement, administer and revise the standards, processes, and procedures for the recruitment and selection of new entry level police officers for the BOP.

21.     The City has maintained, and continues to maintain, a multi-stage screening, testing and/or hiring process by which applicants for the position of entry level Police Officer are selected.

22.     For instance, the City operates a website that provides information on the recruitment and selection of new entry level police officers for the City's BOP, and through which applicants may apply for such positions.

23.     The City also provides legal assistance from its City Solicitor's office regarding the recruitment and selection of new entry level police officers.

24.     The City has retained from time to time the services of professional consulting services to be used in connection with the selection of BOP entry level police personnel, including the retention of EB Jacobs, for the period from July 1, 2011 through August 31, 2013, and, upon information and belief, for several years before that.

25.      The City also appoints a civilian Director of Public Safety who is responsible for the operation of the City of Pittsburgh's Department of Public Safety, which includes the BOP.

26.     In short, the City has legal authority and maintains complete control over the entire selection process, which results in hiring an average of about forty entry-level police officers per year.

**The City of Pittsburgh's Police Officer Recruit Hiring Process**

27.     To be hired as a police officer recruit, an applicant must first complete two Civil Service examinations, consisting of a written test and an oral test.  Assuming that the applicant passes both tests, he or she receives a ranking based on a combined score.  The applicant then proceeds to what is termed processing for an academy class ("Processing"), which includes a reading test, a physical fitness test, and background screening.  If successful at each of these

B - 6

stages, the applicant continues to the "Chief's Roundtable," which may make a conditional offer of employment as a police officer recruit. To enter the policy academy, the recruit must then successfully complete a psychological suitability evaluation, consisting of a written psychological assessment and an interview with a licensed psychologist, and a medical examination. Applicants must also become a resident of the City prior to beginning training at the Police Academy.

<u>*The Civil Service Examinations*</u>

28.     The City requires candidates to take and pass two Civil Service Examinations – one written and the other oral.

29.     The written examination is the Law Enforcement Aptitude Battery ("LEAB"), which consists of a multiple choice cognitive ability test and two non-cognitive measures: The Work Styles Questionnaire and The Life Experience Survey. According to information on the City's website, this test measures, among other things, "written comprehension." According to the website, the definition of "written comprehension" as tested by the LEAB is:

the ability to understand written language. This ability involves the understanding of individual words as well as patterns of words (sentences and phrases), so it is more than simply vocabulary. It is also the ability to read a sentence or series of sentences and understand the meaning. This involves receiving information, not giving it….

30.     Candidates must score seventy percent (70%) or higher in order to pass the written test. Those who pass are then scheduled for the oral examination.

31.     There is a statistically significant imbalance between "minorities"[2] and "whites" with respect to the failure rate for the written exam.  For the 2008-09 examination, the racial-minority fail rate was 13.8% versus 2.8% for Caucasian applicants.

32.     According to materials on the City's website, the oral examination is designed to test the verbal and cognitive abilities of applicants, as well as comprehension.  During the oral examination, candidates are presented with several hypothetical factual scenarios and are asked a series of questions related to each situation, such as particular police rules and regulations that apply or may have been violated.  Different scenarios are used on different days so the candidates are not supposed to know the specific scenario(s) applicable to them prior to the examination.

33.     After the written and oral examinations, Police Officer Recruit candidates are given a final score.  Final scores are comprised of a combination of a candidate's passing score on the written and oral examinations and veteran's preference points, where applicable ("Final Scores").

34.     The City places only those candidates who take and receive a passing score on each examination on its Eligibility List, which the City posts after the written and oral examinations have been scored.  The City maintains the Eligibility List for eighteen months.  When the decision is made to hire new police officers, the City schedules candidates for further

---

[2] Plaintiffs have received demographic documents from the City which include certain breakdowns as between "minorities" and "whites."  References herein to "minorities" are derived from these documents.  In contrast, the City's Annual Reports for 2009 to 2011 provide demographic information regarding the City's BOP personnel, broken down into five categories, American-Indian or Alaskan, Asian or Pacific Islander, African American, Hispanic, and White.

processing in order of their rank on the eligibility list.  All Police Officers hired over the 18-month period will come from the current eligibility list.

35.    Candidates are placed on the Eligibility List in descending order based upon their Final Scores, i.e., the highest scoring candidate is ranked number 1.

36.    Upon information and belief, the City's utilization of the written and oral examinations has a disparate impact on African-American candidates.

37.    The City uses the written and oral examinations for two purposes:  to screen out candidates entirely and to rank candidates on the Eligibility List.  The City creates this ranking by combining the scores on the written and oral tests.  If a candidate ranks low on the Eligibility List, he or she may never be considered for a position because selection at the Chief's Roundtable (assuming satisfactory completion of other subsequent steps discussed below) begins with the highest ranked candidates.  In addition, a low ranking may delay any consideration of that candidate.  Both the screening and the ranking have had a disparate impact on African-American candidates.

38.    As explained below, the City routinely manipulates the oral examination.

39.    For many years, the City used an oral-examination panel that generally consisted of three BOP personnel: a detective, a patrolman and a supervisor.  Several different panels interview applicants simultaneously and each panel conducts multiple examinations over a two-week period.

40.    The City contracted with the firm of EB Jacobs to develop and help implement the oral examination process.  EB Jacobs has prepared the scenarios, model answers and identified the standard associated with each of the scores.  EB Jacobs has been responsible for

training the members of the panel as to what should – and should not – be considered in grading the oral examinations.

    A.    For instance, EB Jacobs has instructed the panel members that they should not participate in an oral examination if a member knows the candidate, which promotes objectivity and avoids bias.

    B.    EB Jacobs has instructed the panel members that they should not seek to learn the identity of the candidates they question prior to the examination.

    C.    EB Jacobs has instructed the panel members that they were not to evaluate whether the candidate would be a good police officer.  Rather, the focus was on whether the candidate identified the correct issues and rules that applied to the factual scenario(s) that was the subject of the examination.

    D.    EB Jacobs has instructed the panel members that the members should not discuss the scores given to a particular candidate with each other prior to submitting the scores.  Rather, each member should independently grade each candidate so panel members do not influence (or attempt to influence or intimidate) other panel members.

    41.    Upon information and belief, the City disregards and violates the instructions and guidelines established by EB Jacobs for the proper administration of the oral examinations, including by allowing the oral examination panels and others to disregard and violate the rules and guidelines established by EB Jacobs.  In particular:

    A.    The City has allowed supervisors to obtain a copy of the list of candidates and look for candidates who were related to or friends of police officers, and to take

actions to improperly influence or pressure panel members to score the preferred candidates more favorably.

B.     The City has allowed and enabled panel members, often higher-ranking officers, to learn the identities of candidates in advance, and create lists of the favored candidates that were shown to or discussed with other panel members, thus improperly influencing them to score those candidates more favorably.

C.     The City has allowed panel members to participate in panels when those members knew the candidates, thus favoring family members, friends, or friends of relatives of other police officers, which has a disparate impact on African-Americans.

D.     The City has allowed and enabled panel members to obtain application files for certain candidates to ensure that those candidates appeared before their panel, resulting in more favorable evaluations.

E.     The City has allowed panel members to lobby and influence other panel members before whom particular candidates were to appear, resulting in more favorable scores for the preferred candidates.

F.     The City has allowed panel members to inform their preferred candidates of the factual scenarios and rules and regulations *in advance of the oral examination* such that the preferred candidates knew the answers.  In fact, there have been instances when nervous candidates accurately provided answers to scenarios that had not been provided yet (but were to be part of that examination).  Panel members were provided with the scenarios and answers in advance of the examinations so that they could prepare, but certain members either photocopied

or brought the materials home in order to educate the preferred candidates. The particular scenarios provided to a candidate varied depending on the day of the examination, so certain panel members planned in advance to make sure the candidates received the correct answers for the specific day of the examination.

42.     Upon information and belief, panel members gave African-American candidates low scores during the evaluations based on subjective views of how the candidates looked, dressed, talked, or spoke or for other reasons unrelated to the merits of the examination and standards established by EB Jacobs. These members voiced those reasons to other panel members.

43.     A recent example of the problems that African-Americans face in applying for positions with the BOP involves an African-American candidate for the 2011 class who previously had been a Pittsburgh Police Officer for approximately fifteen years. He left in the mid-2000's to pursue another career. He had a strong police record, including deployments with federal law enforcement task forces, an assignment given only to the best officers. After being away several years, he decided to return to the BOP and re-applied. He received a high score on the written test. He knew two of the three proctors for the oral examination, who told him he should not have to do the oral examination. They did not ask him any questions. When he received his Final Scores, however, he was ranked very low on the Eligibility List, demonstrating that he was given an extremely low score on the oral examination that panel members had told him he did not have to take. On the same day, however, the very same panel told a similarly-situated Caucasian candidate, also a former Pittsburgh Police Officer who appeared immediately before the aforementioned former African-American police officer, that he did not have to take the oral examination because he had previously been a Pittsburgh Police

Officer. On information and belief, the Caucasian candidate received high scores on the oral examination and thus was ranked much higher on the Eligibility List than the African-American candidate. The African-American candidate, a decorated former Pittsburgh Police Officer, seeing that he was so low on the Eligibility List as to have no chance of selection, quit the process in disgust and is pursuing another career.

44.     The above-described irregularities occurring during the oral examinations have continued to the present. In 2011, acceding to pressure from community groups to address the statistical disparity in hiring of racial minorities, the City agreed to include a civilian representative on the panels in addition to the three police members. It was hoped and believed that the inclusion of a fourth panel member, someone from the community without ties to law enforcement, would deter any overt discrimination and favoritism by the police officers in connection with the oral examinations.

45.     In December 2011, however, after only two days of using a civilian representative, City officials terminated participation of the civilian representative after one of the community representatives was found to have a prior arrest. The City had not publicized or established standards for what qualified or disqualified a civilian from serving as the civilian representative. Significantly, that same standard was not applied to the police members of the oral boards as several of them had recent, prior arrests for felony offenses. They were not, however, disqualified from participation.

46.     Rather than find an alternative civilian representative or establish standards for civilian representatives, City officials immediately halted the inclusion of a civilian representative on the remaining oral review panels.

47.     Nevertheless, even in the day and a half that civilians, many of them clergy from local religious institutions, sat on the panels, some of them observed the same favoritism and irregularities described above.

48.     On information and belief, the City fails to perform any quality control to determine whether the oral examination panels followed the instructions from EB Jacobs and otherwise were properly conducting the oral examinations.

49.     In short, the oral examination process is a vehicle to favor family members and friends of police officers and to disadvantage and otherwise discriminate against African-American candidates.  In that regard, a large majority of the police force is Caucasian, so the preference to family members and friends necessarily has a disparate adverse impact on African-Americans.

50.     The rankings generated by the first two steps of the selection process – the written and oral examinations – determine whether an applicant has a legitimate chance for employment. Since only about the top one hundred ranked applicants have a chance for a position in a recruit class, and there are typically no more than two such classes produced by an Eligibility List, applicants ranked below 200 are effectively precluded from employment even though they may have "passed" the tests.

51.     The City has less discriminatory alternatives for how the written and oral examination are conducted, including but not limited to hiring an outside company to conduct the oral examinations, preserving the confidentiality of the candidate names before the oral examinations occur, and videotaping the oral examinations to ensure the examinations are conducted properly.

*Background Processing*

52.     Once the Eligibility List is created, the City requires candidates to undergo additional tests, including the State of Pennsylvania Municipal Police Officers' Education and Training Commission's ("MPOETC") physical fitness test, a reading test, and a background investigation.

53.     If a candidate fails the reading test, the candidate is disqualified from further consideration.

54.     The reading test is an unusual and unnecessary step in the process because the written test, given at the outset, already screens candidates for reading comprehension.

55.     During the physical-fitness test, which occurs in Schenley Park and is open to the public, candidates must perform a 300-meter sprint, sit-ups, a bench press, and a timed 1.5 mile run.  If a candidate fails this test, the candidate is given one additional opportunity to pass the test.

56.     Rather than using an independent company to perform the MPOETC testing, which is an available alternative, the City utilizes proctors who are either civilians or retired police officers.  It is common for proctors to be related to individuals who are still on the police force or who are retired from the police force.

57.     Certain proctors exercise discretion in administering the fitness test that favors non-African-American candidates:

        A.      They pass certain preferred candidates when they otherwise would have failed, such as by crediting sit-ups that otherwise did not meet the applicable standard.

        B.      They run along with and encourage preferred candidates in the sprint or the 1.5 mile run but do not provide that assistance to all candidates.

C.      They do not use calibrated stop watches for the sprint and the 1.5 mile run, and, on information and belief, did not use accurate starting and stopping times.

58.      Further, because the fitness test is open to the public, supervisors and other police officers in uniform often attend the tests for preferred candidates and make it clear to the proctors that they support those candidates, thereby influencing the proctors.

59.      The City has not divulged statistical pass-fail results for the two tests, but rather combines them into one phase of the selection process.  For the 2011 class of candidates, the failure rate for the physical fitness and reading tests combined was 57% for minorities versus 32% for Caucasians.

60.      The City has other alternatives for conducting the fitness test that are readily available to it, including but not limited to treating all candidates the same when conducting the test, preventing contact by police officers with the proctors, and maintaining quality control measures to prevent partiality and favoritism.  As discussed above, the reading test is redundant and thus unnecessary.

*Background Investigation*

61.      Assuming a candidate passes the reading and fitness tests, the City conducts a background investigation that requires candidates to undergo finger printing, criminal-background check, polygraph test and a drug test.

62.      Under the established procedure for the polygraph test, which is administered by City employees, questions are based on the answers a candidate provided on his or her job application.

63.      On information and belief, some polygraph examiners ask questions of certain candidates that are not in the application.  In addition, it is believed and therefore averred that

City personnel responsible for supervising the background investigation consult with the examiner prior to administration of the polygraph for particular candidates in an effort to have the examiner probe certain issues unrelated to the application, which is a violation of procedure and unnecessary to the polygraph.

64.     The City has nondiscriminatory, available alternatives concerning administration of the polygraph, including but not limited to prohibiting access to the examiner prior to the polygraph test and videotaping the polygraph test.

65.     The background investigation also addresses a candidate's employment, education, military service, criminal record, credit, and behavioral history.

66.     The City uses police officers and other employees to perform the background investigations and exercises discretion as to how detailed to make the investigation.  On information and belief, the City is more critical of backgrounds for African-American candidates than for non-African-American candidates.

67.     For example, to pass the background investigation, a candidate may not have a misdemeanor or felony conviction.  In 2011, the City investigated Plaintiff Christian and disqualified him based on the allegation that he had violated a domestic-violence ordinance. However, he in fact had a 10-year old conviction for disorderly conduct, which is a summary offense, and thus should not have been disqualified under the ordinance.  The City disqualified him anyway and then refused to instate him to the position even after he won a civil service appeal.

68.     The City has nondiscriminatory, available alternatives concerning the background investigation, including but not limited to retaining an outside company to conduct the background investigation and performing the same background investigation for all candidates.

69.     Once again, as with the preceding steps in the recruit selection process, the background checks and polygraph tests are applied to disqualify disproportionately African-American applicants.

70.     For the 2011 Police Officer Recruit Class, the City disqualified five out of the nine minorities who reached that point in the evaluation, for a 55.6% disqualification rate.  In contrast, only seven out 64 Caucasian candidates (three had withdrawn) were disqualified, for an 11% disqualification rate.

71.     Candidates that successfully pass the physical-fitness and reading tests and all components of the background investigation, including the polygraph and drug test, are deemed "certified" for employment as Police Officer Recruits and are placed on the Certification for Appointment List ("Certified List").

*Chief's Roundtable*

72.     The City has given ultimate selection authority to a committee of top-ranked police officials, commonly known as the "Chief's Roundtable," who decide by majority vote whether to accept or reject each applicant on the Certified List.

73.     It is believed and therefore averred that approximately a dozen senior officers – the chief, all assistant chiefs and all commanders available on that day - and three to four other City employees decide by majority vote which individuals from the Certified List are to be made a conditional offer of employment for a position as Police Officer Recruit.

74.     Conditional offers of employment are extended to the candidates selected at the Chief's Roundtable.  A final offer of employment is contingent upon successful completion of a psychological-suitability evaluation and medical examination.

75. It is believed and therefore averred that members of the Chief's Roundtable are given written materials concerning the candidates on the Certified List. These materials include, *inter alia*, the candidate's Civil Service Examination scores, physical fitness testing results and background-investigation results. The applicants' race is discernible from the materials in the file.

76. It is believed and therefore averred that members of the Chief's Roundtable know and/or are told who is related to a police officer or preferred by a police officer, facilitating their ability to vote based on nepotism and cronyism, resulting in an adverse impact on African-American candidates.

77. The City applies the "Rule of Three" methodology to govern the process by which the Chief's Roundtable selects candidates.

78. Under the "Rule of Three" methodology, the first three candidates on the Certified List are reviewed and one is chosen by a vote of the Chief's Roundtable to be made a conditional offer of employment as a Police Officer Recruit. The two remaining candidates from the first group of three go into consideration with the next individual on the Certified List. One of these candidates is chosen by a vote of the Chief's Roundtable to be made a conditional offer of employment as a Police Officer Recruit. The remaining two candidates go into consideration with the next person on the list. One of these candidates is chosen by a vote of the Chief's Roundtable to be made a conditional offer of employment as a Police Officer Recruit.

79. Under the "Rule of Three," if a candidate is rejected after three rounds, the candidate is removed from consideration and will not be made a conditional offer of employment as a Police Officer Recruit.

80.     It is believed and therefore averred that the City has adopted no standards, guidelines or objective criteria to constrain the discretion of the people voting on applicants in the Chief's Roundtable.

81.     It is believed and therefore averred that the City has not required members of the Chief's Roundtable to state their reasons for selecting or rejecting a particular candidate.

82.     It is believed and therefore averred that certain members of the Chief's Roundtable routinely vote based on nepotism and cronyism rather than on the merit of a candidate, making decisions that are entirely subjective, discretionary and discriminatory, resulting in an adverse impact on African-American candidates.

83.     When a candidate has been passed over three times during a Roundtable session, the candidate is then removed from the Eligibility List and must re-apply and go through the entire selection process again, even though the candidate previously passed all aspects of the testing.

84.     For the 2011 class, the Chief's Roundtable passed over three of the four minority candidates presented on the Certified List, for a 75% non-select rate.  They were ranked 3, 11, and 42 on the Certified List.  In contrast, the Chief's Roundtable passed over only seven of the 57 Caucasian candidates, for a 12.2% non-select rate.  Only one of the 49 Police Officer Recruits selected by the Chief's Roundtable was African-American, and he was terminated from the Police Academy.

85.     Plaintiff Foster was ranked third on the Certified List and Plaintiff Sharp was ranked eleventh.  Candidate 42 was an African-American female who was a combat veteran. Forty-nine candidates were selected.  Consequently, all three African-American candidates were passed over for lower-ranked Caucasian candidates.

86.     The City had nondiscriminatory alternatives available concerning the Chief's Roundtable, including but not limited to establishing standards to guide decisionmaker discretion, requiring members of the Chief's Roundtable to articulate the reasons for not selecting a candidate, and employing other quality-control measures.

87.     There is a disproportionate impact on African-American candidates at every stage of the hiring process, including during the final selection phase, the Chief's Roundtable.

88.     As a result of these discriminatory practices, since 2001 less than 4% of police officers hired by the City are African-American.  Since 2007, the disparate treatment and impact are even starker, with only about 3% of new recruits being African-American.

**Statistics for 2009 and 2011 Recruit Classes**

89.     The 2008 Civil Service examination produced an Eligibility List from which the City selected the 2009 and 2011 recruit classes.  Prior to 2012, the Eligibility List produced by the Civil Service examinations was good for three years.  That has now been changed so the List is only good for 18 months.

90.     In 2008, 1,357 candidates applied to be a BOP officer, of whom 280 were racial minorities, or about 20.6%.

91.      For the written examination, 135 minority candidates failed to appear, so 145 racial minorities took the examination (19.7% of total applicants sitting for the written test).  Of those, seven were disqualified for lack of a college transcript, leaving 138 minorities among 712 candidates, which is 19.4%.  Thereafter, 19 of the 138 minorities failed the written test, or 13.8%.  Only 16 out of 574 Caucasian applicants failed the test, which is 2.8%.

92.      For the oral examination, 119 racial minorities remained eligible after the written examination, but 14 did not appear, leaving 105 eligible minority candidates out of 592 total

candidates, which is 17.7% of eligible candidates.  The oral exam "failure" rates were approximately the same for racial minorities and Caucasians, i.e., just under 5%.

93.    The 2009 class ultimately had 45 Police Officer Recruits.  The Eligibility List included 31 racial minorities out of 202 total applicants, or 15.3%.  The failure rate on the physical fitness and reading tests for minority applicants was 42%, compared to a 15.3% failure rate for Caucasian candidates.  At the background-investigation stage, 50% of the 10 remaining African-American candidates were disqualified, while 36 of 101, or 35.6% of Caucasian candidates were disqualified.

94.    The Certified List sent to the Chief's Roundtable had 70 candidates, of whom only five were minorities, or about 7%.

95.    Of the five minority candidates on the Certified List, two were passed over (40%).  Another minority candidate was not considered at the Chief's Roundtable.

96.    Thus, two minority candidates were selected out of 56 total recruits, or 3.6%.  They were an African-American male and an Asian male.

97.    Of the 66 Caucasian candidates, only 11 were passed over or dropped out (16%).

98.    The final 2009 class had 44 Police Officer Recruits and only two were minorities (4.5%), only 1 of whom was African-American, or less than 2.3% of the class.

99.    The 2009 class was thus 95.5% Caucasian.

100.    For 2011, the Eligibility List included 292 applicants, of whom 51 were minorities, or about 17.5%.  Of the 21 minorities showed up for the fitness and reading tests, 12 failed (57%).  The failure rate for Caucasian applicants was only 31.6%.  After the testing, therefore, nine of the 76 remaining applicants were African-American, or 11.8%.  At the background-investigation stage, the City disqualified five of the 9 minority candidates, or 56%.

B - 22

The disqualification rate for Caucasian applicants was only 11%. Consequently, only four African-American candidates were placed on the Certified List sent to the Chief's Roundtable.

101.    At the Roundtable, three out of four minority candidates, including Plaintiffs Sharp and Foster, were not selected, for a 75% non-selection rate. Of 57 Caucasian applicants on the Certified List, only seven were not selected, for a 12.2% non-selection rate. Consequently, of the 49 candidates offered conditional employment, only one was African-American, or just 2%. And that single African-American was terminated from the Police Academy, meaning that the final graduating class did not include a single African-American. The three African-Americans not selected by the Chief's Roundtable were ranked 3, 11 and 42.

102.    In the August 2012 class, there was one African-American male and one African-American female out of 41 new recruits, which is less than 5%. In the April 2013 class, there are two African-Americans out of a class of 31, which is less than 6.5%. While a slight improvement over other recent classes, the numbers are still far below what would be expected based on the demographics of the relevant community.

103.    The disparate treatment and disparate impact experienced by African-American applicants is evidenced by the statistics from the past four Recruit Classes, which mirrors the numbers for other classes since 2001, confirming that the City has engaged in continuing violations of the employment laws. The following chart shows the demographics of those classes:

| Hiring Statistics for Classes 2001 - Present | | | | |
|---|---|---|---|---|
| Date | Total recruits | Caucasian | African-American | Other Minorities |
| May '01-Oct. '01 | 32 | 31 | 1 | 0 |
| Dec. '01-May '02 | 39 | 35 | 4 | 0 |
| Jan '05-July '05 | 48 | 46 | 2 | 0 |
| Sept. '05-Apr '06 | 61 | 59 | 2 | 0 |
| Feb '07-Aug 07 | 27 | 26 | 1 | 0 |

| | | | |
|---|---|---|---|
| July '07 | 40 | 39 | 1 | 0 |
| Oct. 07 | 27 | 26 | 1 | 0 |
| Sept. '08 | 13 | 13 | 0 | 0 |
| Sept. '09 | 45 | 43 | 1 | 1 |
| June '11 | 36 | 35 | 1 | 0 |
| August '12 | 41 | 36 | 2 | 3 |
| April '13 | 31 | 29 | 2 | 0 |
| | | | | |
| **TOTALS** | **440** | **418** | **18** | **4** |
| **% of Recruits** | | **95%** | **4.09%** | **0.91%** |

| Hiring Statistics for Classes 2007 - Present | | | | |
|---|---|---|---|---|
| Date | Total recruits | Caucasian | African-American | Other Minorities |
| Feb '07-Aug 07 | 27 | 26 | 1 | 0 |
| July '07 | 40 | 39 | 1 | 0 |
| Oct. 07 | 27 | 26 | 1 | 0 |
| Sept. '08 | 13 | 13 | 0 | 0 |
| Sept. '09 | 45 | 43 | 1 | 1 |
| June '11 | 36 | 35 | 1 | 0 |
| August '12 | 41 | 36 | 2 | 3 |
| April '13 | 31 | 29 | 2 | 0 |
| | | | | |
| **TOTALS** | **260** | **247** | **9** | **4** |
| **%** | | **95%** | **3.5%** | **1.5%** |

104.    According to documents that the City filed with the EEOC, the qualified labor market for African-American males seeking law-enforcement jobs is 22%, and 10% for African-American females.  The City's above-cited hiring statistics are far below those figures.

**Plaintiff James M. Foster**

105.    Plaintiff James Foster is African-American.  He is a college graduate who is studying for a Master's degree.  He works in the behavioral-health field.

106.    Plaintiff Foster first applied for the position of Police Officer Recruit with the City in 2008.

107.    Plaintiff Foster completed the written and oral examinations and was placed on the Eligibility List.

108.     Based on his Final Score, Foster received a rank of 141 out of approximately 600 candidates.

109.     The ranking materially impacts applicants' chances for employment because hiring is made, in significant part, based the applicants rank, i.e., higher ranked candidates have a better chance of making onto a Certified List whereas very low ranking candidates have no chance of being considered for and offered a position.

110.     Plaintiff Foster proceeded to the next phase, where he successfully completed the physical fitness and reading testing, background check, polygraph, and drug test.

111.      It is believed and therefore averred that Plaintiff Foster was placed on the Certified List for the 2009 Police Officer Recruit class.

112.     Although he was placed on the Certified List, Foster was not selected for a position in the 2009 Police Officer Recruit class.

113.      Plaintiff Foster was informed by an employee in the Civil Service Office that the last candidate receiving a conditional offer of employment was ranked approximately three places above him on the Certified List.

114.     The City selected only one African-American for the 2009 Police Officer Recruit Class.

115.     Because the City elected to utilize the 2008 Eligibility List for three years, Foster knew that candidates who were not selected for the 2009 class could again be considered for the next class, which was announced in 2011, and that he would be at or near the top of the list.

116.     In February of 2011, the City notified Foster that another Police Officer Recruit class was to be created and invited Foster to re-apply.

117.     Foster re-submitted his application and again successfully completed the various phases of the Hiring Process, including the physical-fitness and reading tests, background check, polygraph, and drug test.

118.     On or about May 27, 2011, Plaintiff Foster was placed on the Certified List.

119.     Foster was ranked third on the Certified List.

120.     Foster's application materials were provided to the Chief's Roundtable for consideration.

121.     By letter dated June 2, 2011, Plaintiff Foster was informed that in accordance with "Section 14 of the General Civil Service Act," he was "no longer eligible for appointment as a Police Officer Recruit because three or more persons below [him] on the certified list were selected."

122.     The June 2, 2011 letter from the City to Plaintiff Foster stated that he was not entitled to a reason for his non-hire and that he had no right of appeal.

123.     In June of 2011, the City selected 36 individuals from the Certified List for its Police Officer Recruit class.

124.     Of those 36 individuals, only one recruit was African-American.  The City proceeded to expel the one African-American recruit from the Training Academy, with the result that the 2011 class did not include a single African-American officer.

125.     Accordingly, the City selected at least 32 Caucasian applicants ranked lower than Plaintiff Foster on the Certified List for a position in the 2011 Police Officer Recruit class.

126.     In 2011, the City announced that it was creating a new Eligibility List for upcoming Police Recruit classes.

127.    Plaintiff Foster again applied for employment with the City as a Police Officer Recruit in the winter of 2011.

128.    The City required Foster to take another written test and submit to an oral examination, which he did.

129.    After being ranked 141 when he took the test in 2008, in 2011 the City ranked Foster 353, a ranking that effectively precludes him from obtaining a Police Recruit position.

130.    Indeed, the City has now hired two classes of recruits from the 2011 Eligibility List – one in 2012 and one in April 2013 -- and Foster's ranking was too low for him to be considered for placement on the Certification List for either class.

131.    Upon information and belief, the City will discontinue using the current Eligibility List and will conduct written and oral examinations this summer for a new Eligibility List.

132.    In response to Mr. Foster's EEOC Charge of Discrimination, filed in late 2011, the City asserted that Mr. Foster's "background check showed that he had a bad driving record which included at least nine moving violations and three warrants for failing to respond to citations and also that he'd been discharged from one private employment for violating protocol and from another private employer for failing to appear for training." Those assertions are pretextual and false and thus do not justify Mr. Foster's rejection.

133.    Upon information and belief, other candidates who were selected over Mr. Foster for the 2011 class had similar and worse diving records and other transgressions but were nonetheless hired. All of these applicants were Caucasian.

134.    There was no objective, merit-based reason why the Chief's Roundtable failed to select Plaintiff Foster.

**Plaintiff Mike J. Sharp**

135.    Plaintiff Sharp is African American.  He graduated from the Police Training Academy at Indiana University of Pennsylvania in 2007.

136.    Since that time, Mr. Sharp has been employed as a police officer in several suburban Pittsburgh police departments, and is currently employed part time by two different police departments.

137.    Mr. Sharp applied for the position of Police Officer Recruit with the City in 2009.

138.    Mr. Sharp completed the written and oral examinations and was placed on the Eligibility List.

139.    Mr. Sharp successfully completed the physical fitness and reading testing in 2009.

140.    Mr. Sharp was ranked too low on the Eligibility List (the mid 100's) and thus the City did not consider him for a position in the 2009 Police Officer Recruit class.

141.    Mr. Sharp knew, however, that his mid-100 ranking was high enough on the Eligibility List ensure that he would be considered for employment in the next Recruit Class.

142.    In February of 2011, the City notified Mr. Sharp that another Police Officer Recruit class was to be created and invited him to re-apply.  This class was being created from the 2008 Eligibility List.

143.    Plaintiff Sharp re-submitted his application and once more successfully completed the physical fitness and reading tests.

144.    Mr. Sharp proceeded to the Processing stage, where he was subjected to a polygraph test and drug testing.  An extensive background check was also conducted.

145.     On or about May 27, 2011, Plaintiff Sharp was placed on the Certified List.  Thus, the City did not find anything disqualifying in his background and he did not test positive for drug use.

146.     Plaintiff Sharp was ranked eleventh on the Certified List.

147.     By letter dated June 2, 2011, Plaintiff Sharp was informed that in accordance with "Section 14 of the General Civil Service Act," he was "no longer eligible for appointment as a Police Officer Recruit because three or more persons below [him] on the certified list were selected."

148.     The June 2, 2011, letter from the City advised Plaintiff Sharp that he was not entitled to know the reasons for the denial and that he had no right of appeal.

149.     In June of 2011, the City selected 36 individuals from the Certified List for its police recruit class.  Of those 36 individuals, only one recruit was African-American, and upon information and belief he had been ranked seventh.

150.     Accordingly, at the Chief's Roundtable, at least 25 Caucasian applicants ranked lower than Plaintiff Sharp on the Certification List were selected for a position in the 2011 Police Officer Recruit class.

151.     There was no objective, merit-based reason why the Chief's Roundtable failed to select Plaintiff Sharp.

152.     In response to Plaintiff Sharp's EEOC Charge of Discrimination, the City asserted that Mr. Sharp was not hired "because he admitted that between 1996 and 2004 he smoked marijuana between 800 and 1000 times and assisted in arranging drug deals."  Those assertions are pretextual and false.  If in fact they had been true, he never would have passed the background checks and been certified for consideration by the Chief's Roundtable.

153.    Moreover, Mr. Sharp has been a police officer since 2007 and is drug-tested regularly as part of his position.  He has never failed a drug test.

154.    It is believed and therefor averred that some of the six Caucasian applicants selected over Plaintiffs Foster and Sharp had histories of drug use during their youth, and one even was found to have demonstrated a high degree of deception during his polygraph exam when asked about prior drug use.

155.    Mr. Sharp was too upset by the City's unexplained refusal to hire him that he did not apply for the next civil service testing process in 2011, though he still wants to be a Pittsburgh Police Officer.

### Plaintiff Timothy Christian

156.    Plaintiff Timothy Christian is African-American.  He received an Associate's Degree from the Career Training Academy specifically to get the credits he needed to become a police officer, and graduated in December 2004 from the Allegheny County Police Academy.

157.    Plaintiff Christian has worked at a number of security and borough police department jobs.  Since April 2008, he has worked as a police officer for Tarentum and then Frazier Township, as well as Verona Borough.

158.    Plaintiff Christian applied for a police officer position with the Pittsburgh Bureau of Police in October 2008.  In connection with this application, he successfully completed the oral and written examinations with a total score of 264.13.  The District processed him to take the reading test, and then informed him he had failed.

159.    In March 2011, the City advised Mr. Christian that because of his position on the 2009 Eligibility List, he would again be processed for a new round of hiring.  He successfully

completed the reading and physical fitness tests, but the City disqualified him at the background investigation stage on account of an alleged violation of a domestic-violence ordinance.

160.     Plaintiff Christian successfully challenged the disqualification in a civil service appeal.  On information and belief, this was because his actual offense was not a basis for disqualification but was rather a 10-year old conviction for a summary offense, disorderly conduct.  Although he won his appeal, the City refused to instate him in the 2011 class, and merely offered to consider him for subsequent classes.

161.     On information and belief, the City has not disqualified Caucasian applicants for entry level police officer positions who have committed offenses similar to or even more serious than Plaintiff Christian's offense.

162.     For the 2011 police officer recruit class, the City disqualified five out of the nine minorities who reached that point in the evaluation, for a 55.6% disqualification rate.  In contrast, only seven out of 64 Caucasian candidates (three had withdrawn) were disqualified, for an 11% disqualification rate.

163.     In August 2011, Mr. Christian once again successfully completed the written and oral tests, receiving a score of 276 and a ranking of 381 on the eligibility list, which is retained for use in the appointment of police officers for eighteen months.  Mr. Christian has been waiting since that time to be contacted by the City to proceed with the application process, but has not been contacted.

164.     Plaintiff Christian has filed a charge of discrimination with the Equal Employment Opportunity Commission, charging systemic discrimination in the City's failure to hire him.

**Plaintiff Tariq Jamal-Francis**

165.     Plaintiff Tariq Jamal-Francis is African-American.  He is a 2004 graduate of the
University of Pittsburgh and a substitute teacher in the Pittsburgh Public Schools, where he is
head basketball coach at Westinghouse High School.

166.     After applying for the position of Police Officer Recruit with the City in March
of 2012, Plaintiff Jamal-Francis successfully completed the written and oral examinations and
was ranked 29 on the Eligibility List.

167.     Mr. Jamal-Francis proceeded to the next phase of the hiring process, where he
successfully completed the physical fitness and reading testing, background check, polygraph,
and drug test.

168.     Mr. Jamal-Francis was placed on the Certified List for the 2012 Police Officer
Recruit class, and received a conditional offer of employment as a police officer recruit.  The
offer advised him that it was conditioned on demonstrating full compliance with the City's
residence requirement, and passing the pre-employment medical exam and the psychological
evaluation.

169.     On or about July 13, 2012, Plaintiff Jamal-Francis took the written psychological
evaluation and was interviewed by a psychologist.  A City employee later advised him that that
he did not pass but would not give him a reason.  A second psychologist then interviewed him
and stated that he would pass him, but that the final decision would result from a panel of three
psychologists, the first and second psychologists who interviewed him and a third who had not.
Plaintiff was notified by phone shortly thereafter that he had not passed, but the City gave him no
reason.

170.     Jamal-Francis has no history of mental health problems.

171.    In August 2012, the City hired 41 police recruits, only two of whom were African-American.  Mr. Jamal-Francis has filed a charge of discrimination with the Equal Employment Opportunity Commission, charging systemic discrimination in the City's failure to hire him.

### Plaintiff Darrick L. Payton

172.    Plaintiff Darrick L. Payton is African-American.  He received an Associate's Degree from the Art Institute of Pittsburgh.  He has worked at several jobs including as a news writer and producer for KDKA radio.

173.    Plaintiff Payton first applied for a police position with the City in 2007.  His rank was well below 200 on the Eligibility List after the written and oral testing stage.  He successfully completed the other stages of testing and was offered a conditional letter of employment, but the City failed to hire him, although he was otherwise qualified, because the City did not pass him on the psychological evaluation.

174.    He again applied for a position in 2011 and after taking the written and oral examinations, was informed on February 7, 2012 that his rank on the Eligibility List was 545, more than 345 ranks below his 2007 ranking.

175.    The City has not yet called Plaintiff Payton for processing.

176.     Plaintiff Payton has filed a charge of discrimination with the Equal Employment Opportunity Commission, charging systemic discrimination in the City's failure to hire him.

### Racial Discrimination in the City of Pittsburgh's Police Hiring Process

177.    The City has engaged in and continues to engage in employment policies and practices that discriminate against African-American applicants for Police Officer Recruit positions on the basis of their race and/or color.

178.    The City has engaged in and continues to engage in employment policies and practices that have a significant disparate impact on African-American applicants for Police Officer Recruit positions.

179.    It is believed and therefore averred that the City of Pittsburgh's population is approximately 26% African-American based on the 2010 census.

180.    It is believed and therefore averred that of the approximately 440 Police Officer Recruits hired by the City between 2001 and 2013, only 17 were African-American -- less than 4%.

181.    Since 2007, the City has hired 260 entry-level police officers, only 8 of whom – 3% – are African-American.

182.    It is believed and therefore averred that the percentage of minority applicants who began the City's Police Officer Recruit application process in 2008 was 19.7%.  These were the Police Officer Recruit applicants that formed the pool of applicants for the 2009 and 2011 Police Officer Recruit classes.

183.    It is believed and therefore averred that the combined percentage of African-Americans hired as Police Officer Recruits in 2009 and 2011 was 3.3%.

184.    When compared to the relevant labor market, African-Americans are significantly under-represented in the job category of "Protective Services: Sworn," *i.e.* police officers.

185.    It is believed and therefore averred that the qualified labor pool in Pittsburgh for Sworn Protective Services is 22% for African-American males and 10% for African-American females.

186. It is believed and therefore averred that a significant number of African-Americans are discouraged from even applying for the position of Police Officer because, *inter alia*, so few African-Americans are actually hired.

187. Beyond the extreme statistical imbalance generated by the City's overall hiring process, several specific practices employed by the City result in discrimination on the basis of race and/or color, including but not limited to:

A. A higher failure rate on the written examination by minority applicants than by Caucasian applicants, approximately 13.8% versus 2.8%, respectively, for the 2008 testing, which produced the Eligibility Lists for the 2009 and 2011 Recruit Classes;

B. The circulation of names of candidates who have relatives on the police force to the individuals administering the oral examination, which has disparate impact on African-American applicants;

C. Distribution of the oral examination scenarios to certain Caucasian candidates prior to testing;

D. Subjectivity in the scoring of the oral examination which has been more heavily weighted than the written examination and presently is equally weighted;

E. The provision of assistance and encouragement by proctors of the physical-fitness test to some Police Officer Recruit applicants during the testing;

F. The inclusion of a redundant and unnecessary reading test that, combined with the physical fitness test, has a disparate impact in disqualifying African-American candidates.

G. The use of background and polygraph examinations to screen out minority applicants at a higher rate than Caucasian applicants, approximately 56% versus 11%, respectively, for the 2011 Police Officer Recruit class;

H.   The unfettered discretion given to the Chief's Roundtable in the final stage of the selection process that results in the rejection of a disproportionate number of African-American applicants compared to Caucasian applicants, approximately 75% versus 12.2%, respectively, for the 2011 Police Officer Recruit class; and

I.   The use of psychological testing and screening in a manner that has a disparate impact in disqualifying African-American candidates.

188.    The elements of the City's hiring process are not capable of separation for analysis and have a cumulative discriminatory effect such that the entire hiring process should be analyzed as one employment practice.

189.    Alternatively, if the elements are capable of separation, numerous elements have a significant disparate impact on African-Americans as explained above.  The City does not have any legitimate business reasons for the discriminatory elements of its hiring process.

## Class Allegations

190.    Plaintiffs bring this action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of all African-Americans who (1) have applied for, are applying for, or will in the future apply for the position of police officer with the City of Pittsburgh; (2) submitted or will submit their application by a date that made or will make them eligible to take any written and oral police officer examinations offered by the City in 2008 or thereafter; (3) were not or in the future are not given a final offer of employment as a police officer recruit with the City, **or** did not or will not receive a final offer to join the first available Police Academy class after they receive a ranking based on their scores on the written and oral examinations.

191.     Plaintiffs seek to certify the claims in each of the following Counts:

- Count I -- Title VII (Disparate Impact)

- Count II -- Title VII (Systemic Disparate Treatment)

- Count IV -- 42 U.S.C. §§ 1981 and 1983

- Count V -- the Fourteenth Amendment and 42 U.S.C. § 1983

- Count VI -- Pennsylvania Human Relations Act (Disparate Impact)

- Count VII -- Pennsylvania Human Relations Act (Systemic Disparate Treatment)

192.     Plaintiffs are members of the proposed class they seek to represent.

193.     The members of the proposed class are sufficiently numerous – in or around 300, with future additional members -- that joinder of all members is impracticable. ·

194.     There are questions of law and fact common to all class members as to whether the City's Hiring Process violates Title VII, the Pennsylvania Human Relations Act, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment, and such common questions will predominate over any questions that affect or might affect only individual members of the class in the disposition of this action.  Such common questions of law and fact include but are not limited to the following:

A.     Whether the City has failed or refused to hire African-American applicants for the position of Police Officer Recruit on the same basis as Caucasian applicants;

B.     Whether the City's Hiring Process has a disparate impact on African-Americans;

C.     Whether the City's Hiring Process is justified as a valid basis for assessing police recruits;

D.      Whether there are alternative Hiring Processes which are equally as valid for assessing police recruits, but which have no or less of a disparate impact on African-Americans;

E.      Whether the City has adversely treated African-American applicants for the position of Police Officer Recruit during its Hiring Process;

F.      Whether the stark statistical imbalance of hiring Caucasian applicants over African-American applicants for Police Offer Recruits shows systemic disparate treatment of African-American applicants for Police Officer Recruit positions;

G.      Whether the City has employed subjective factors, including nepotism, and favoritism towards current officers' friends and family during its Hiring Process in a manner which discriminates against African-American applicants;

H.      Whether the City has failed to employ valid standards during the Chairman's Roundtable, resulting in discrimination against African-American candidates;

I.       Whether there is a significant disparity in the failure rate on the written and oral examinations between African-American candidates and Caucasian candidates;

J.       Whether the City circulated names of preferred candidates prior to or during the oral examinations in a manner which discriminated against African-Americans;

K.      Whether members of the oral examination panels considered subjective factors in scoring applicants in a manner which discriminated against African-Americans;

L.      Whether there is a significant disparity in the failure rate on the reading examination between African-American candidates and Caucasian candidates;

M.      Whether the City's use of background checks has an adverse impact on African-American applicants or involves disparate treatment;

N.  Whether the Chief's Roundtable lacked objective criteria in selecting candidates in a manner which discriminated against African-Americans;

O.  Whether psychological screening has a disparate impact on African-American applicants or involves disparate treatment;

P.  Whether injunctive relief is suitable to abate the conduct at issue in this Complaint;

Q.  Whether the City violated Title VII by the acts alleged herein;

R.  Whether the City violated the PHRA by the acts alleged herein;

S.  Whether the City violated 42 U.S.C. §§ 1981 and 1983 by the acts alleged herein; and

T.  Whether the City violated the Fourteenth Amendment and 42 U.S.C. § 1983 by the acts alleged herein.

195.  Plaintiffs' claims, and the legal theories underlying those claims, are typical of the claims of the class as all are subject to the same hiring process, and all class members were subject to disparate treatment and disparate impact as a result of their race and/or color, giving rise to the employment claims herein.

196.  Plaintiffs' claims, and the legal theories underlying those claims, are typical of the claims of the class.  All of the Plaintiffs either failed or were ranked on the basis of their combined scores on the written examination and the oral examination.

197.  Plaintiffs and their counsel will fairly and adequately represent the class members.  In particular:  (a) counsel will vigorously and adequately represent the interests of the class and have significant experience in civil rights and class action law suits; and (b) the class representatives have no conflict of interest in maintaining a class action.

198.     Counsel are advancing the costs and expenses associated with this case contingent on the outcome.

199.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because the City has acted, or has refused to act, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declarative relief with respect to the class.

200.     Class-wide monetary relief for all Class Members is properly certified under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

## CLAIMS

### COUNT I – Title VII (Disparate Impact) Plaintiffs on Behalf of Themselves and All Others Similarly Situated v. Defendant City of Pittsburgh

201.     Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth below.

202.     As shown above, there has been a significant statistical disparity based on race resulting in a substantial adverse impact on African-Americans in the City's hiring of entry level police officer candidates, when compared to the relevant labor market, in violation of Title VII.

203.     The elements of the City's hiring process are not capable of separation for analysis and therefore the entire hiring process should be analyzed as one employment practice.

204.     Pleading in the alternative, if the hiring process is not considered to be one employment practice incapable of separation for statistical analysis, then the individual elements identified above each cause a significant statistical imbalance and substantial adverse impact

between the hiring of Caucasian applicants, on the one hand, and the hiring of African-Americans, on the other hand.

205.     The City's hiring process has adversely affected Plaintiffs and the class they seek to represent.

206.     The City has no justification for failing to use a hiring process or processes that have a less severe adverse impact on African-Americans.

207.     The City's hiring practices and procedures deprive African-Americans of employment opportunities with the Bureau of Police because of their race and/or color in violation of Title VII.  The City has implemented these practices and procedures, in ways that include, but are not limited to, the following:

A.     By failing or refusing to hire African-American applicants for the position of Police Officer Recruit on the same basis as Caucasian applicants;

B.     By using employment practices that have an adverse impact on African-American applicants; and

C.     By failing or refusing to take appropriate action to correct the present effects of its discriminatory policies and practices.

208.     The City's discriminatory hiring practices and procedures are not job-related for the position of Police Officer Recruit, not consistent with business necessity, and there are available equally valid and less discriminatory alternatives to its discriminatory practices.

209.     The City's discriminatory practices described above have denied African-American applicants opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

210. As a direct and proximate cause of The City's unlawful conduct, Plaintiffs and the proposed class members have suffered and continue to suffer irreparable harm. This harm will continue indefinitely into the future absent the requested relief.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request judgment against the City as set forth in the Requested Relief below.

**COUNT II – Title VII (Systemic Disparate Treatment) Plaintiffs on Behalf of Themselves and All Others Similarly Situated v. Defendant City of Pittsburgh**

211. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

212. As shown above, there has been a significant statistical disparity based on race to the detriment of African-American candidates in the City's hiring of entry-level police officers, when compared to the qualified relevant labor market.

213. There is no reasonable explanation for this continuing statistical disparity other than intentional racial discrimination in violation of Title VII.

214. It is believed and therefore averred that the BOP representatives employed and/or engaged by the City to participate in the hiring of Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the reading and MPOETC fitness tests, the polygraph test, the background investigation, the Chief's Roundtable, and the psychological reviews intentionally discriminated against Plaintiffs specifically and African-Americans generally as a group because of their race and/or color.

215. It is believed and therefore averred that discrimination is the City's standard operating procedure with respect to police officer training.

216.     As more fully set forth above, Plaintiffs were qualified for appointment to the position of Police Officer Recruit.  However, Plaintiffs were denied employment by the City for pretextual reasons.

217.     It is believed and therefore averred that other class members were qualified for appointment to the position of Police Officer Recruit; however, the City denied employment to them because of their race and/or color.

218.     At all times relevant hereto, individuals employed and/or engaged by the City to participate in the hiring process for the City's Police Officer Recruits were acting as agents for the City.

219.     The City's employment policies, practices, and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of Title VII.

220.     It is believed and therefore averred that the City acted willfully, intentionally and with callous disregard and reckless indifference to Plaintiffs' and class members' rights under Title VII.

221.     As a direct and proximate cause of the City's unlawful conduct, Plaintiffs and class members have suffered damages including, without limitation, lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request judgment against the City as set forth in the Requested Relief below.

**COUNT III – Title VII (Disparate Treatment) Plaintiffs vs. Defendant City of Pittsburgh**

222.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth at length herein.

223.    It is believed and therefore averred that the City representatives employed and/or engaged by BOP to participate in the hiring of Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the reading and MPOETC fitness tests, the polygraph test, the background investigation, the Chief's Roundtable, and the psychological assessment intentionally discriminated against Plaintiffs because of their race and/or color.

224.    It is believed and therefore averred that the City representatives on the Chief's Roundtable knew Plaintiffs were African-American based on the application materials provided to the members of the Chief's Roundtable.

225.    As more fully set forth above, Plaintiffs were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by the City.

226.    In each instance, the City selected many Caucasian applicants ranked lower than Plaintiffs on the Certified List for positions in the 2011 police recruit class.

227.    It is believed and therefore averred that the City selected many Caucasian applicants ranked lower than class members on the Certified List for positions in prior years.

228.    At all times relevant hereto, individuals employed and/or engaged by the City to participate in the hiring process for the City's Police Officer Recruits were acting as agents for the City.

229.    The City does not have a legitimate, nondiscriminatory reason for its failure to hire Plaintiffs as Police Officer Recruits and the reasons given by the City are pretext for

discrimination.  Plaintiffs allege they were not selected and/or hired as Police Officer Recruits because of their race and/or color.

230.    The City's employment practices and procedures violate Title VII of the Civil Rights Act of 1964, as Plaintiffs were disparately treated on the basis of their race and/or color.

231.    The City's employment policies, practices, and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of Title VII.

232.    It is believed and therefore averred that the City acted willfully, intentionally and with callous disregard and reckless indifference to Plaintiffs' rights under Title VII.

233.    As a direct and proximate cause of the City's unlawful conduct, Plaintiffs have suffered lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs respectfully request judgment against the City and request an award of the Requested Relief, below.

### COUNT IV – 42 U.S.C. §§ 1981 and 1983
### Plaintiffs on Behalf of Themselves and
### All Others Similarly Situated v. Defendant City of Pittsburgh

234.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth at length herein.

235.    At all times relevant hereto, the City was acting under the color of state law.

236.    Through the practices described above, the City has engaged in a continuing pattern and practice of intentional race discrimination.

237.    The City's hiring process has deprived Plaintiffs and the class of their right to enter into employment contracts guaranteed by 42 U.S.C. § 1981 in that said practices

unlawfully and intentionally discriminate against Plaintiffs on the basis of their race and/or color in seeking and obtaining employment contracts with the City.

238. The City acting under color of state law instituted, authorized, tolerated, ratified, permitted and acquiesced in policies, practices and customs that intentionally discriminated against applicants for the position of Police Officer Recruit because of their race and/or color.

239. The City's acts were performed in knowing violation of Plaintiffs' legal and constitutional rights, and have directly and proximately caused Plaintiffs to suffer damages, including, but not limited to, lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs respectfully request judgment against the City and seek the relief set forth in the Requested Relief, below.

## COUNT V – The Fourteenth Amendment and 42 U.S.C. § 1983 Plaintiffs on Behalf of Themselves and All Others Similarly Situated v. Defendant City of Pittsburgh

240. Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth at length herein.

241. At all times relevant hereto, the City was acting under the color of state law.

242. As more fully set forth above, Plaintiffs were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by the City.

243. It is believed and therefore averred that the individuals employed and/or engaged by the City to participate in the hiring process for Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the reading and MPOETC fitness tests, the polygraph test, the background investigation the Chief's Roundtable, and the

psychological reviews, intentionally discriminated against Plaintiffs because of their race and/or color.

244.    At all times relevant hereto, individuals employed and/or engaged by the City to participate in the City's hiring process for the City's Police Officer Recruits were acting as agents for the City.

245.    As a direct and proximate cause of the City's unlawful conduct, Plaintiffs and the class have suffered damages including, but not limited to, lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs respectfully request judgment against the City and seek the relief set forth in the Requested Relief, below.

### COUNT VI – Pennsylvania Human Relations Act (Disparate Impact) Plaintiffs on Behalf of Themselves and All Others Similarly Situated v. Defendant City of Pittsburgh

246.    Plaintiffs incorporate the allegations in each of the preceding paragraphs as if set forth herein.

247.    As shown above, there has been a significant statistical disparity based on  race resulting in a substantial adverse impact on African-Americans in the City's hiring of entry level police officer candidates when compared to the relevant labor market, in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq*.   The elements of the City's hiring process are not capable of separation for analysis and therefore the entire hiring process should be analyzed as one employment practice.

248.    Pleading in the alternative, if the hiring process is not considered to be one employment practice incapable of separation for statistical analysis, then the individual elements identified above each cause a significant statistical imbalance and substantial adverse impact

between the hiring of Caucasian applicants, on the one hand, and the hiring of African-Americans, on the other hand.

249.    The City's hiring process has adversely affected Plaintiffs and the class they seek to represent.

250.    The City has no justification for failing to use a hiring process or processes that have a less severe adverse impact on African-Americans.

251.    The City's hiring practices and procedures deprive African-Americans of employment opportunities with the Bureau of Police because of their race and/or color in violation of in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.*

252.    The City has implemented these practices and procedures in ways that include, but are not limited to, the following.

253.    The City's discriminatory hiring practices and procedures are not job-related for the position of Police Officer Recruit, not consistent with business necessity, and there are available equally valid and less discriminatory alternatives to its discriminatory practices.

254.    The City's discriminatory practices described above have denied African-American applicants opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

255.    As a direct and proximate cause of The City's unlawful conduct, Plaintiffs and the proposed class members have suffered and continue to suffer irreparable harm.  This harm will continue indefinitely into the future absent the requested relief.

256. The City's actions deprive African-Americans of their right to equal employment opportunities without discrimination based on race and/or color in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.*

257. As a direct and proximate cause of The City's unlawful conduct, Plaintiffs and the proposed class members have suffered and continue to suffer irreparable harm. This harm will continue absent the requested relief.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request judgment against the City and request the Requested Relief set forth below.

### COUNT VII – Pennsylvania Human Relations Act (Systemic Disparate Treatment) Plaintiffs on Behalf of Themselves and All Others Similarly Situated v. Defendant City of Pittsburgh

258. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein

259. It is believed and therefore averred that the City representatives employed and/or engaged by the City to participate in the hiring of Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the reading and MPOETC fitness tests, the polygraph test, the background investigation, the Chief's Roundtable, and the psychological reviews, intentionally discriminated against Plaintiffs specifically and African-Americans generally as a group because of their race and/or color.

260. It is believed and therefore averred that accepted statistical methodologies show gross statistical disparities that cannot be explained as a product of chance.

261. It is believed and therefore averred that discrimination is The City's standard operating procedure.

262.     As more fully set forth above, Plaintiffs were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by The City for pretextual reasons.

263.     It is believed and therefore averred that other class members were qualified for appointment to the position of Police Officer Recruit; however, The City denied employment to them because of their race and/or color.

264.     At all times relevant hereto, individuals employed and/or engaged by The City to participate in the hiring process for the City's Police Officer Recruits were acting as agents for The City.

265.     The City's employment policies, practices, and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.*

266.     It is believed and therefore averred that The City acted willfully, intentionally and with callous disregard and reckless indifference to Plaintiffs' and class members' rights under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.*

267.     As a direct and proximate cause of The City's unlawful conduct, Plaintiffs and class members have suffered damages including, without limitation, lost wages in the form of lost back pay and front pay, emotional distress, humiliation, inconvenience, and mental anguish. WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request judgment against the City as set forth in the Requested Relief below.

**COUNT VIII – Pennsylvania Human Relations Act Plaintiffs v. City of Pittsburgh**

268.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth herein.

269.    As more fully set forth above, Plaintiffs were qualified for appointment to the position of Police Officer Recruit; however, Plaintiffs were denied employment by Defendant City of Pittsburgh.

270.    At all times relevant hereto, individuals employed and/or engaged by the City to participate in the hiring process for the City's Police Officer Recruits were acting as agents for the City.

271.    It is believed and therefore averred that the individuals employed and/or engaged by the City to participate in the hiring process for Police Officer Recruits including, without limitation, certain individuals participating in the oral examination, the reading and MPOETC fitness tests, the polygraph test, the background investigation, the Chief's Roundtable, and the psychological reviews, discriminated against Plaintiffs because of their race and/or color.

272.    It is believed and therefore averred that the individuals on the Chief's Roundtable knew Plaintiffs were African-American from the materials contained in the files provided to the Chief's Roundtable.

273.    In each instance, the City selected many Caucasian applicants ranked lower than Plaintiffs on the Certification for Appointment List, for positions in the 2011 police recruit class.

274.    The City does not have a legitimate, nondiscriminatory reason for its failure to hire Plaintiffs as Police Officer Recruits and the reasons given by the City are pretext for discrimination.  Plaintiffs allege they were not selected and/or hired as Police Officer Recruits because of their race and/or color.

275.   The City's employment policies and practices were violative of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*., to the extent Plaintiffs were denied employment on the basis of their race and/or color.

276.   The City discriminated against Plaintiffs in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*. in failing and/or refusing to hire Plaintiffs because of their race and/or color.

277.   The City's employment practices, policies and procedures deprived Plaintiffs of their right to equal employment opportunities without discrimination based on race and/or color in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.

278.   It is believed and therefore averred that there have been numerous other instances of discrimination by the City in the screening and selection of Police Officer Recruits based on race and/or color.

279.   As a direct and proximate cause of the City's unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, inconvenience, and mental anguish.

WHEREFORE, Plaintiffs respectfully request judgment in their favor and request the relief set forth below in the Requested Relief.

## REQUESTED RELIEF

280.   Plaintiffs, individually and on behalf of the class, request the following relief:

A.   An order certifying this lawsuit as a class action, designating Plaintiffs as representatives of the Class, and designation of Plaintiffs' counsel of record as Class Counsel;

B.   A permanent injunction restraining the City from maintaining and enforcing policies, practices, customs, or usages that discriminate on the basis of race or color with respect to the testing, screening, and hiring of Police Officer Recruits in the City;

C.      An order enjoining the City from the use of its hiring process, as a whole, because it results in systemic disparate treatment and has a disparate impact upon African-Americans, is not job related for the position in question and consistent with business necessity, and does not otherwise meet the requirements of Title VII, 42 U.S.C. §2000e, *et seq*. and of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq*.;

D.      An order requiring the City to take appropriate action to correct the present effects of its discriminatory policies and practices;

E.      An order requiring the City to take other non-discriminatory measures to overcome the effects of its discriminatory policies and practices;

F.      Instatement of each Plaintiff to the position of Police Officer Recruit with back pay, front pay, and compensatory damages including, without limitation, for future loss and for emotional distress, pain and suffering, inconvenience, mental anguish and loss of enjoyment of life;

G.      An award to class members in the form of back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the City's discriminatory practices;

H.      A declaratory judgment that the practices complained of in this Complaint are unlawful;

I.      Attorneys' fees, expert fees, costs, and expenses pursuant to Title VII, 42 U.S.C. § 1988, and other applicable laws;

J.      Prejudgment and post-judgment interest where recoverable, and

K.      Such other and further relief as this Court shall deem just and appropriate.

## Jury Trial Request

Plaintiffs demand a trial by jury.

Respectfully submitted,

Dated: April 15, 2013

s/Edward J. Feinstein
_____

Edward J. Feinstein

Witold J. Walczak
A I.D. 29718

PA I.D. 62976
efeinstein@stemberfeinstein.com

vwalczak@aclupa.org
Ellen M. Doyle

Sara J. Rose
PA I.D. 21854

PA I.D. 204936
edoyle@stemberfeinstein.com

srose@aclupa.org
Pamina Ewing

American Civil Liberties Union of PA
PA I.D. 59244

313 Atwood Street
pewing@stemberfeinstein.com

Pittsburgh, PA 15213
STEMBER FEINSTEIN DOYLE PAYNE &

(412) 681-7864
KRAVEC, LLC

429 Forbes Avenue

Allegheny Building, 17th Floor

Pittsburgh, PA 15219

Tel: (412) 281-8400

*Attorneys for Plaintiffs*

**Appendix C**

# Interview Materials:

- **Project Description & Contacts**
- **Interviewee Demographic Information Sheet**
- **Interview Protocol**

# Review of City of Pittsburgh Bureau of Police (BOP) Entry-Level Police Officer Selection Process

The City of Pittsburgh is involved in possible litigation regarding its entry-level police officer selection process.  The City (Defendant) and Plaintiffs retained a Joint Expert, Dr. Leaetta Hough, to review and make recommendations regarding the City's hiring processes for entry-level police officers.

## Key People and Contact Information:

| | | | |
|---|---|---|---|
| **Doyle**, Ellen | Esquire<br>Feinstein Doyle Payne & Kravec, LLC<br>429 Forbes Ave. Allegheny Bldg.<br>Pittsburgh, PA 15219 | EDoyle@fdpklaw.com | 412-281-8400 |
| **Hough**, Leaetta | President<br>Dunnette Group, Ltd.<br>370 Summit Avenue<br>St. Paul, MN 55102 | leaetta@msn.com | 651-227-4888<br>612-805-8230 (cell) |
| **Kobee**, Wendy | Assistant City Solicitor<br>City of Pittsburgh Dept. of Law<br>414 Grant Street, Suite 313<br>Pittsburgh, PA 15219 | wendy.kobee@pittsburghpa.gov | 412-255-2018 |
| **Mackler**, Lorraine | Assistant City Solicitor<br>City of Pittsburgh Dept. of Law<br>414 Grant Street, Suite 313<br>Pittsburgh, PA 15219 | lorraine.mackler@pittsburghpa.gov | 412-255-2017 |
| **Walczak**, Witold | Legal Director<br>ACLU  of Pennsylvania<br>313 Atwood Street<br>Pittsburgh, PA 15213 | VWalczak@aclupa.org | 412-681-7864 |

## Current Hiring Process:

1. **Written examination (LEAB)**
   - Consists of:
     - Cognitive ability test
       - Written comprehension
       - Multiple choice
     - Non-cognitive tests
       - Work Styles Questionnaire
       - Life Experience Survey
   - Passing score = 70%. If pass, invited to oral exam

2. **Oral Examination/Test** – pass/fail
   - Consists of:
     - ○ Situational Judgment items
       - ▪ Hypothetical scenarios, e.g., rules and regulations that may apply or may have been violated (cognitive/knowledge-based)
     - ○ Measures verbal, cognitive, and comprehension (according to website)

3. **Combined Written and Oral Score**
   - Passing score = 70%

4. **Veteran's Preference points added – if eligible. 10 points added to score**

5. **Police Officer Recruit Eligibility List** created
   - Applicants rank ordered according to score; highest score ranked highest (best)
   - List is valid for 18 months
   - Applicants notified and mailed "Candidate Processing Packet" to complete and return

6. **Nelson-Denny Reading Test** – pass/fail
   - Vocabulary
   - Comprehension
   - Reading Rate

7. **Fitness Test** – pass/fail
   - State of Pennsylvania Municipal Police Officers Education and Training Commission standards; adopted from Cooper Institute for Aerobics Research Standards for Law Enforcement Fitness Assessment
   - Physical Activity Readiness Questionnaire (if answer yes to any of 7 questions, advise against participating in the Physical Fitness Test)
   - 300 meter run (seconds)
   - 1 RM Bench Press (ratio)
   - 1 Minute of Sit-ups
   - 1.5 mile run (minutes, seconds)
   - Pass/fail each event at 30 percentile for applicant's age and gender

8. **Background Investigation Phase** – conducted by OMI; pass/fail
   - Polygraph
   - Drug screening (urine and hair analysis)
   - Comprehensive background investigation, including credit history
   - City's Civil Service Commission reviews and applies Section 10 of the General Civil Service Act to determine if any candidates should be disqualified
     - ○ Disqualified candidates can request a public hearing

9. **Certified List created**
   - Consists of those who passed the Background Investigation Phase
   - Applicants rank ordered

**10. Chief's Roundtable**
- Chief of Police and others review all documentation for each candidate
- Evaluation based on Section 14 of the General Civil Service Act
- Uses Rule-of-Three to select
  - Starting at top, a group of 3 candidates is reviewed
  - A minimum of 1 of the 3 must be selected
  - Those not selected receive a "strike"
  - The next group of 3, including those not selected, are reviewed
  - Again, a minimum of 1 of the 3 must be selected
  - Those not selected receive a "strike"
  - The next group of 3, including those not selected, are reviewed
  - Once an applicant has received 3 strikes, the person is removed from the list and no longer processed from the current Eligibility List
- Disqualified candidates cannot request an appeal

**11. Conditional Offer of Employment** extended

**12. Psychological Assessment** – pass/fail
- MMPI-2 Assessment (written)
- One-on-one interview with a PA Licensed Psychologist
- If fail, can appeal to 3-person panel of licensed psychologists

**13. Medical Examination** – pass/fail
- City's Civil Service Physician
- Cardio-vascular stress test

**14. Final Offer of Employment if pass psychological assessment and medical exam**

**15. Resident of City of Pittsburgh** – Civil Service Rule V

**16. Training – Police Training Academy** – pass/fail

**17. Probation** – police officer

## Review of City of Pittsburgh Bureau of Police (BOP)

## Entry-Level Police Officer Selection Process

# Interviewee Demographic Information

1. **Today's Date:**

2. **Your Name:**

3. **Phone Number:**

4. **Email Address:**

5. **Age** (in years)**:**

6. **Gender:**
   - ____ (1) Female
   - ____ (2) Male

7. **Ethnicity:**
   - ____ (1) Hispanic
   - ____ (2) African American
   - ____ (3) Asian
   - ____ (4) Caucasian
   - ____ (5) Native American
   - ____ (6) Pacific Islander
   - ____ (7) Other:

# Interview Protocol

## Review of City of Pittsburgh BOP Entry-Level Police Officer Selection Process

Introduce myself; exchange pleasantries.

Explain project; provide project description document including names and contact info of key players.

Briefly describe myself and my role in project; provide business card and one-page bio.

Explain purpose of interview; explain how information will be used.

Ask him/her to complete the "demographic" information sheet. Explain its purpose.

**Interview Questions:**

What is (was) your role in the hiring process for entry-level police officers?

Probes (ask these questions as they are relevant to the person and his/her role):

- What specifically was your part/role in the process?

- How does your part/role fit into the overall hiring process? (Refer to project description document that includes description of hiring process.)

- What aspects of the process work effectively and why?

- What aspects of the process seem problematic and why?

- What changes or enhancements might improve the process and why?

- What parts of the process should remain as is and why?

- What parts seem susceptible to candidate complaints?

- What might be done to overcome those complaints?

- Why do candidates drop out of the hiring process?

- Why do candidates drop out of the police academy?

- What can be done to address/rectify drop-out issues?

- What standards are used to evaluate candidates?

  - Oral interview/exam

  - Background Investigation Phase (polygraph, drug screening, comprehensive background investigation)

  - Chief's Roundtable

  - Psychological Exam (written and interview)

  - Police Academy

- What training was provided for evaluators and others involved in the hiring process?

C - 9

- What quality controls are in place for each step of the hiring process?

- What appeal processes are in place at each step of the hiring process?

- What aspects of the process seem fair to all participants and why?

- What are the biggest challenges for minorities to get hired?

- What are the biggest challenges for women to get hired?

- What are the biggest challenges for white men to get hired?

- From your perspective, what are the most important characteristics of an effective police officer?

- From your perspective, what are the most important characteristics of an effective community-oriented police officer?

- Are those characteristics measured in the hiring process? Where in the process?

- What important characteristics for police officer effectiveness seem to be missed in the hiring process?

- What are the most common citizen complaints against BOP and its police officers?

- What are the key challenges for BOP over the next five years?

- Is there anything else that you would like me to be aware of?

- Can I call or email you if I have follow-up questions?

Thank the person.

Ask him/her to call or email me with additional thoughts or questions.

Explain next steps and close the interview.